**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Charles C. CONAWAY, John T. McDonald, Jr., Defendants.**

Case No.: 2:05–CV–40263.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 20, 2010.

Alan M. Lieberman, Richard B. Skaff, Robert I. Dodge, U.S. Securities and Exchange Commission, Washington, DC, for Plaintiff.

Hille R. Sheppard, Scott R. Lassar, Sidley, Austin, Chicago, IL, Todd R. Mendel, Barris, Sott, Detroit, MI, John F. Sylvia, McKenzie E. Webster, Jessica C. Sergi, Mintz, Levin, Boston, MA, Steven C. Susser, Young & Susser, Southfield, MI, for Defendants.

*MEMORANDUM OPINION ON DEFENDANT'S MOTION UNDER RULES 50(b) AND 59 FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, FOR A NEW TRIAL.*

STEVEN D. PEPE, United States Magistrate Judge.

*"The whole financial system is based on trust and belief that what people say is their word. So, without that, the system decays."*—Witness Eric Beder, equity analyst, (December 17, 2007, *at* TrDep00299.)

*"If they ask a question, yes. And you determine that you're not going to disclose the information to them, no, that's not disclosing. That's not lying."*—Defendant Charles C. Conaway, former Kmart CEO, (February 13, 2008, at TrDep00344.)

*"Corporate fraud is not usually begun by here's a bad guy in a company who does bad things .... Usually ... companies ... ultimately have problems with their financials.... [T]hen they hit a bump in the road, and within the company there is this mind-set of 'well this is a bump in the road and we'll just paper it over.' When it proves not to be a bump in the road but a chasm ... it gets wider and wider and wider.... The corporate fraud cases— sometimes they're less greed than arrogance .... a lot of these people believe that it's absolutely impossible for them to fail."*

-Kurt Eichenwald, Author of THE INFORMANT, A TRUE STORY (Broadway Books 2000) [1]

*CEO Charles Conaway characterized the August 2001 $850 million overbuy as a "bump in the road." (September 25, 2001, Voice Mail Blast to Kmart Employees Plf. Exh. 318, at p. 89:18.) Later he also characterized Project eLMO as a bump in the road, but in truth it was the false cover story he used in the effort to paper over the liquidity crisis caused by the $850 million overbuy. (November 27, 2001, Conference Call 1 Plf. Exh. 57. at p. 25.)*

Following a three week trial, a jury of 10 determined that defendant Charles C. Conaway, former CEO of Kmart Corporation, violated Section 10(b) of the Securi-

---

1. National Public Radio, Weekend Edition Sunday, September 20, 2009, "The Serious Story Behind The Informant," Liane Hanson Interview with Kurt Eichenwald. http://www. npr.org/templates/player/mediaPlayer.html?action=1&t=3&islist=true&id=10&d=09–20–2009, last visited September 20, 2009.

ties Exchange Act of 1934 ("Exchange Act") and Rule 10b–5, and in addition he aided and abetted Kmart in its violation of Section 10(b) of the Exchange Act and Rule 10b–5, and in Kmart's violation of Section 13(b) of the Exchange Act and Rules 12b–20 and 13a–13. Defendant has filed a motion under Federal Rules of Civil Procedure 50(b) for judgment as a matter of law or, in the alternative, under Rule 59 for a new trial. Other than the finding of fact on one alleged misstatement for which it is determined there is insufficient evidence, DEFENDANT'S MOTION IS DENIED and the jury's verdict is upheld.

While arising in the same 2001 time frame as the securities fraud cases involving Enron and WorldCom, this case involving America's then third largest discount retailer presents less overt wrongdoings and no stock profiteering. To understand the nature and validity of the Securities Exchange Commission's claims, a detailed presentation of the facts is required as set forth in Section I. Following the factual summary, this decision will address Mr. Conaway's legal claims in Section II followed in Section III with an analysis of his claims asserting insufficient evidence to uphold the jury's findings.

PAGE

I. BACKGROUND FACTS ...................................................... 778
 A. Kmart's Liquidity Problem .......................................... 778
 B. The Cover–Up Story: Project Elmo .................................. 787
 C. Communications with the Board ..................................... 789
 D. Kmart's Quarterly SEC Filing on Form 10–Q(3) ..................... 797
 E. The Conference Call ................................................ 798

II. DEFENDANT CONAWAY'S LEGAL CHALLENGES: ................................ 802
 A. Claim Three—Aiding and Abetting Kmart's Violation of Section 13(a) of the Exchange Act ................................................ 802
 1. Challenge to the Violation of Section 13(a) of the Exchange Act .......... 802
 2. Challenge to the Instruction on Item 303 of Regulation S–K .............. 807
 3. Jury Instructions ................................................ 808
 a. Background Law ............................................. 808
 b. Regulation S–K, Item 303 ..................................... 809
 (1.) Did the Jury Instruction Confuse 303(b) with 303(a) and not require a Change? ......................................... 809
 (2.) Must all Item 303 Disclosures Affect Future Operations? ....... 814
 (3.) Was the Instruction on Materiality Confusing? ................. 820
 B. Claim Two—Aiding and Abetting Kmart's Violation of Section 10(b) of the Exchange Act ................................................ 821
 1. Jury Findings on Claim Two ........................................ 821
 2. Challenge to Use of the MD & A as a Whole as the Statement Underlying Section 10(b) and Rule 10b–5 Liability .................... 822
 3. Challenge to the "implied representation theory of liability." ............. 825
 4. Challenge to Use of Regulation S–K Item 303 as a Basis of Section 10(b) and Rule 10b–5 Liability ...................................... 834
 C. Claim One—Defendant Conaway's Violation of Section 10(b) of the Exchange Act ...................................................... 850

III. DEFENDANT CONAWAY'S CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE ........ 851
 A. Sufficiency of the Evidence Legal Standard ........................... 851
 B. Credibility Issues Regarding Defendant Conaway ...................... 851
 1. Mr. Conaway's Involvement in Misleading Financial Representations to the Board .................................................... 852
 2. Mr. Conaway's Misleading Statements and Actions at Kmart ............. 853
 a. The Growing Debt, Vendor "Noise" and Talking Points ............. 853
 b. The November 13 Levin Letter ................................. 854
 c. Conaway Statement to the New York Times ...................... 854

d. Conaway's November 14 Voice Mail to his Employees.: ............... 855
e. Conaway's November 27 Meeting with Employees ................. 855
f. Conaway's November 27 Conference Call .......................... 856
g. Conaway's Lies to his Board ..................................... 857
3. Mr. Conaway's Misrepresentations Under Oath ....................... 858
C. Challenge to Claim One--Primary Liability for a Violation of Section 10(b) and Rule 10b–5 ....................................................... 865
D. Evidence in the Record Supporting the Jury's Finding that Charles Conaway Caused the Form 10–Q Violations ............................ 869
1. Evidence that Charles Conaway Caused the Three Omissions: ........... 869
2. Evidence that Charles Conaway Caused a Misstatement in the MD & A...................................................................... 876
a. Was there a Materially Misleading Statement? .................... 876
b. Did Conaway Cause the Misstatement? ........................... 881
E. Were the Conference Call Statements of Mr. Conaway violations of Section 10(b) and Rule 10b–5 ........................................ 882
F. Evidence in the Record Supporting the Jury's Conclusion that Conaway Acted with Scienter ................................................. 886
G. Conaway Aided and Abetted Kmart's Fraud and Disclosure Violations ........ 888

IV. CONCLUSION ...................................................... 889

## I. BACKGROUND FACTS.

### A. Kmart's Liquidity Problem.

Kmart experienced a liquidity crisis in the third quarter of 2001 of historic proportions caused in large part by an early $850 million inventory purchase above plan (the "overbuy" (Gilbert, 5/13/09, at Tr00359–60; Moreland 6/27/07, at TrDep00016.)) [2] In the years leading up to the 2001 problem, Kmart had lost much of its market share to rivals Wal–Mart and Target. (Conaway 5/27/09, at p. Tr02021; Beder 12/17/07, at TrDep00301.) Defendant Conaway was hired by Kmart from CVS Corporation as a young, imaginative executive who could reverse the troubles facing Kmart. Further exacerbating Kmart's liquidity crisis in the third quarter of 2001 were the drop in sales after the September 11th terrorist attack and the launch of an unsuccessful Blue Light Always program with its lower pricing on commonly purchased products that fal-

tered due to a cutback in advertising.[3] (Conaway 5/28/09, at Tr02415–Tr02418.)

The overbuy began in the end of July or early August when Kmart's President and Chief Operating Officer Mark Schwartz directed a series of inventory purchases that exceeded the company's operating plan. (Gilbert 5/13/09, at Tr00359; Moreland 6/27/07, at TrDep00016; Plf. Exh. 8). In the first week of August, Scott Gilbert, the Assistant Controller for Accounts Payable, was informed of the overbuy by Assistant Treasurer Mark Moreland. (Gilbert 5/13/09, at Tr00359.) While first believed to be $400 million, the overbuy was later determined to be $850 million. (*Id.* at Tr00360; Moreland 6/27/07, at TrDep00056; Plf. Exh. 7.)

The Schwartz overbuy was not authorized by Defendant Conaway and was characterized by him as being "reckless." (Conaway 5/28/09, at Tr02407; Plf. Exh. 188, p. 3). Mr. Conaway's notes of August

---

**2.** Kmart was on a January 31 fiscal year, so the third quarter included August, September and October.

**3.** Blue Light Always was an everyday low pricing marketing strategy that was put place in the third quarter of 2001 for items consumers bought regularly, similar to what Wal–Mart did in their stores.

30, indicate that Kmart's CFO Jeff Boyer was "blindsided" by the inventory buy that was "totally unacceptable" to CEO Conaway who demanded to know "what *happened* !" (Plf. Exh. 188, p. 3, emphasis in original.) The overbuy had the effect of moving up Kmart's peak borrowing date and "clearly magnified" the annual liquidity crunch that came in early November when holiday merchandise was acquired and holiday sales had yet to materialize. (Boyer 7/19/07, at TrDep00381; Conaway 2/13/08, at TrDep00330–31.) Executive Vice–President of Merchandise, Cecil Kearse, who worked at Kmart from to 1979 to 2002, was so concerned about the negative trends that he spoke to Conaway to reign in President Schwartz's continued buying activities, which strained relations between Kearse and Schwartz. (Kearse 5/20/09, at Tr01051–52 and Tr01100–17.)

In an August 17, 2001, letter to the Board of Directors, Mr. Conaway told the Board that the second quarter ended with $283 million more inventory than the prior year due in large part to efforts to improve in-stock position for his new BlueLight Always sales initiative (Plf. Exh. 110.) In the July 9 Board package, there was a liquidity cushion forecast for the peak borrowing date of November 9 at $207 million (Pft. Exh. 4, p. 2.) [4] Noting decreases in capital expenditures and revised accounts payable terms negotiated in the second quarter, Mr. Conaway's August 17, 2001, letter to the Board estimated Kmart's liquidity cushion in early November's peak borrowing period would increase "from $200 to nearly $600 million." (Plf. Exh. 110.)

Taking the overbuy into account at a time when he thought it was only $ 400 million, Assistant Treasurer Mark Moreland, generated a series of cash forecasts for the Finance Committee of the Board projecting that Kmart's cash needs in October and November would exceed its available borrowing capacity by $135 million and he acknowledged that with such forecasts "the company would be illiquid." (Moreland 6/27/07, at TrDep00016, TrDep00037–38, & TrDep00040–41; Plf. Exh. 4, p. 2 & 4). This August 15 draft showing a $342 million deterioration in the liquidity cushion from plus $207 million to minus $135 million did not make it to the Finance Committee of the Board. (Moreland 6/27/07, at TrDep00040.) An interim liquidity forecast draft showed instead of a negative $135 million, a positive $217 liquidity cushion as of November 8, or $10 million better than the July 17, 2001, Board package forecast (Pft. Exh. 5, p. 3.) The version that actually went to the Finance Committee of the Board, dated August 17, showed a $544 million liquidity cushion on November 9 (Plf's Exh. 6, pp. 2 & 4, Moreland 6/27/07, at TrDep00049–50.) These data apparently supported the projected $600 million liquidity cushion in Mr. Conaway's August 17th letter to the Board.

Similar optimistic liquidity cushion forecasts were made by John McDonald and Charles Conaway in a September 10 power point presentation to bankers, including J P Morgan Chase which coordinated Kmart's $1.6 million credit revolver. It showed "peak borrowings" for 2001 at $878 + $35 = $913 million against that $1.6 million revolver leaving a significant positive cushion whereas internal documents showed significant deficits even with a $600 million dollar "Reduction in Receipts" (i.e. receipt of new inventory). (Compare Pft. Exh. 14, p. 44 to Exh. 12).

---

**4.** A liquidity cushion was the amount of credit still available to Kmart on its lines of credit including its $1.6 billion bank revolver and its $175 million in letters of credit. (Plf. Exh. 63.)

In forecast scenarios Mr. Moreland prepared for Kmart's top officers on Kmart's Executive Leadership Team (the "ELT")[5] around this time, if sales were flat to the prior year ("Zero Comp Scenario") and nothing was done to deal with the liquidity crunch, Kmart exceeded its borrowing capacity by $122.7 million on October 3, and by $455 million on November 7 and would be "illiquid" (Plf. Exh. 9; Moreland 6/27/07, at TrDep00058.) Even if sales were up 8%, liquidity turned negative on October 10 (Plf. Exh. 7, at p. 1 a & 3.) If sales were down 3% from the prior year the November 7 deficit would reach $641.8 million. (Plf. Exh. 10.) With a $600 million reduction in future receipts of inventory, zero comp sales showed a liquidity deficit of $597 million on October 24. (Plf. Exh. 12) Negative 3% comparable sales forecast a deficit exceeding one billion dollars on that date. (Plf. Exh. 16.) The actual sales for Kmart in the third quarter were down 2.2% overall, down 1.5% for comparable stores, from the prior year.[6] These late August and September internal scenarios showed a looming deficit of hundreds of millions of dollars, while circulated internally to the Executive Leadership Team ("ELT") including Defendant Conaway, were not shared with the Board. (Moreland 6/27/07, at TrDep00034–35.)

On September 14, 2001, Jeffrey Stark, Kmart's Merchandise Controller, sent a memo to Jeffrey Boyer, then Kmart's CFO, regarding the inventory forecast risk. (Plf. Exh. 260.) In it he stated that even with the forecasted 2.1% sales increase for the remainder of the quarter that still put Kmart with $980 million inventory above plan at the end of September and by $725 million inventory above plan at the end of October. He continued that if sales dropped 1.8% compared to the prior year, then the September number would climb to $1.1 billion above plan, and October would balloon from $725 million to $1.36 billion above plan. With flat sales the inventory overage to plan would be $1.1 billion for September and $1.3 billion for October. At that point the trend was not good, and the effects of the overbuy were not going to go away without work. (Kearse 5/20/09, at Tr01095.) With or without the forecasted 2.1% sales increase Kmart had an inventory problem. (*Id.* at Tr01096.)

The September Board package included an August Inventory Summary showing total inventory $825 million over "commitment" or plan. (Plf. Exh. 65 at p. 29.) In his September 20, 2009, letter to the Board following the September telephonic Board

**5.** The ELT consisted of:Charles Conaway, CEO, Mark Schwartz President and Chief Operator Officer, Tony D'Onofrio, Head of Supply, Jeffrey Boyer, CFO (Treasurer Mark McDonald often attended ELT meetings and upon replacing Jeffrey Boyer as CFO became an official member), David Montoya, Head of Operations, Cecil Kearse, Lead Merchant, Dave Rots, Chief Administrative Officer and Randy Allen, Executive Vice President, Strategic Planning and Chief Information Officer. (Archambeau 5–13–09, pgs. 43–4, Kearse page:lines 191:23–192:9, Moreland 4/23/09, page:lines 10:1–7) While Cecil Kearse indicated his belief that General Counsel Janet Kelly was on the ELT, this appears not to be the case in light of evidence not available to the jury (Mr. Conaway expressed his regret at the

hearing on remedies of not having had Chief Legal Counsel as part of the ELT during the third and fourth quarters of 2001. Conaway 9–16–09, at Tr03143–44).

**6.** The Kmart Board materials show: August sales up 0.2% from the prior year with unit movement down 1.8%; September sales were flat comparable to the prior year with unit movement down 4.1% in September due to the September 11th incident and reduction in advertising; November sales were down 2.6% notwithstanding a good Thanksgiving week up 3.4%; and the entire third quarter was down 2.2% overall and down 1.5% for comparable stores from the prior year. (Plf. Exhs. 65, p. 22, 114, p. 4,183, p. 1, 121 at CC0098731 & CC0098734–35.)

meeting Mr. Conaway identified "canceling of receipts" and new accounts payable terms as means of managing liquidity, yet, he also noted Kmart's need for "an additional $500–800 million more inventory in the immediate term." (Plf. Exh. 113, p 2.) In his October 12, letter to the Board, Mr. Conaway noted ending September with $1.1 billion more merchandise than the prior year, up from the $283 million increase at the end of July noted in his August 17, 2001, letter to the Board. (Plf. Exh. 71, p. 2.)

Conaway admitted that the overbuy had a negative impact on Kmart's working capital and liquidity, making management of the liquidity crisis a big issue for Kmart (Conaway 2/13/08, at TrDep00317–18; Conaway 5/28/09, at Tr02414–15). Obviously the actual sales decline for the third quarter made things worse.

After the overbuy, the issue of Kmart's liquidity was discussed at a majority of the weekly ELT meetings. (Boyer 7/19/07, at TrDep00378; Gilbert May 13, 2007, at Tr01072; Conaway 2/13/08, at TrDep00319.) Treasurer John McDonald, not yet part of the ELT, attended many of these meetings and led the discussion on the handling of financing. (Boyer 7/19/07, at TrDep00378.) Kmart could have taken a number of steps to avoid becoming illiquid during that time frame-reducing future inventory purchases, delaying scheduled capital expenditures, accelerating vendor allowances, and making efforts to negotiate sale-leaseback transactions. (Conaway 5/27/09, at Tr02078–81; 80–84; Boyer 7/19/07 at TrDep00378-79). In his October 12 letter to the Board, Mr. Conaway estimated Kmart could immediately get $500 million in the September to November 2001 time frame if it needed to by such asset-based lending but that would require financial disclosures to the Board, banks and stock analyst who followed Kmart. (Conaway 2/13/08, at TrDep00320–22.) Additionally, while the secured borrowing process could have been begun, it likely would have taken too long to prevent Kmart from becoming illiquid. (Moreland 6/27/07, at TrDep00101 & TrDep00137; Tucker 5/22/09, at Tr01674–76.) Mr. Conaway chose not to pursue that course of action. (Boyer 7/19/07, at TrDep00385.) Some thought these methods were not chosen because none of them would provide sufficient cash to meet the liquidity needs of Kmart. (Moreland 6/27/07, at TrDep00022.) By late August or early September it became apparent that efforts to increase collection of vendor allowances, cutting capital expenditures and reducing receipts of inventory, sale leaseback of stores were not going to be sufficient to deal with the $800 plus million overbuy cash problem. (Moreland 6/27/07, at TrDep00020–22.)

Thus, in addition to cutting future inventory receipts to deal with the liquidity problem, Mr. Conaway chose slow paying vendors beyond their negotiated payment terms. This involved unilaterally initiating two programs—later identified as the AP System changes and Project SID (sometimes called the "Moreland process")—to delay payments to its vendors. (Archambeau 5/13/09, at Tr00270; Conaway 2/13/08, at TrDep00322–24; Conaway 5/27/09, at Tr02084 & Tr02094.) He ordered McDonald to slow pay Kmart's vendors, specifically prioritizing vendor payments. (McDonald 5/28/09, at Tr02639–40 & Tr02660.)

Kmart chose not to pursue further negotiations on new terms with the vendors because the cash needs were significant and imminent leaving Kmart no time for such talks. (Moreland 6/27/07, at TrDep00023.) Efforts to negotiate longer payment terms, called the "working capital initiative," had been tried in the prior quarter with limited success and Kmart, in

the short run, may have reached the limits of what was possible on better negotiated terms. (*Id.* at TrDep00099; Boyer 7/19/07, at TrDep00382–83; Archambeau, 5/13/09 at Tr00470–71.) Also, if the liquidity crisis were known to the public there could possibly be a "classic run on the bank where everyone panics, and then— then you're out of money." (Levin 9/11/07, at TrDep00175.)

According to Head Merchant Cecil Kearse, in an effort to come into accord with a widespread industry practice, Kmart changed the start date for payment terms from when the order was placed to the date when the goods were received (hereinafter referred to as "extended dating"). (Kearse 5/20/0, at Tr01259.) In addition, Gilbert was called to a meeting with Treasurer John McDonald and Moreland, and asked if there was anything accounts payable could do "to stretch payments" to vendors to help deal with the liquidity issue, which was at the time considered a short term problem likely to be resolved by the end of September. (Gilbert 5/13/09, at Tr00360–61.) On August 7 he held another meeting with Jeff Stark, the Merchandise Controller or head of the merchants or buyers at Kmart, and worked out what vendors they could add days in the payment system to delay vendor payments beyond their agreed payment terms. (*Id.* at Tr00364– 71.) An August 14 email from Stark to Gilbert confirmed adding "+4/5 days" to weekly paid vendors. (Plf. Exh. 159.) The written Vendor Authorization Forms Kmart had used to set payment terms were not modified to permit this change, nor were the vendors informed of these changes. (Archambeau 5/13/09, at Tr00475; Gilbert 5/13/09, at Tr00371 & Tr00378). This undisclosed, unilateral initiative to stretch vendors, known as the "AP System changes," was accomplished by modifying the software in Kmart's accounts payable system to add a fixed 4–5

days to the scheduled payment date for each invoice. (Gilbert 5/13/09, at Tr00359 & Tr00363; Archambeau 5/13/09, at Tr00472–73; Moreland 4/23/09, at TrDep00145.) On September 5, Stark told Gilbert that John McDonald wanted another 5 days delay for daily pay vendors on top of the earlier August delays. (Gilbert 5/13/09, at Tr00381–82; Plf. Exh. 135.) Gilbert noted Kmart paid approximately $70–75 million to hardline vendors each day, so delaying payments five days saved approximately $300 million. (Gilbert 5/13/09, at Tr00373–75.) Moreland also estimated the amounts held back by the AP System changes were in the range of $300 million. (Plf. Exh. 20, at p. 3; Moreland 4/23/09 at TrDep00145–46.) After these two rounds of AP System changes, Gilbert in a September meeting with McDonald and Moreland in McDonald's office, was informed even with the AP System changes involving most of Kmart's hardline vendors "liquidity was getting more difficult" and he was asked whether AP could do anything more. (Gilbert, 5/13/09, at Tr00374.) Gilbert said that they could not go further with the Alpha coding changes used in the AP System changes because there were limits. (*Id.* at Tr00374–5 & Tr00383–84.)

Conaway admits to authorizing the AP System changes stating that Kmart was paying its vendors too fast and they needed to slow it down to levels similar to the ones utilized by Kmart's competitors Target and Wal–Mart. (Conaway 5/27/09, at Tr02034; Conaway 2/10/05, at TrDep00314.) By adding days Kmart was essentially extending the "loans" they were getting from vendors. (Boyer 7/19/07, at TrDep00382; Moreland 6/27/07, at TrDep00011.) Conaway felt that stretching vendors, or as he put it "managing payables," was essential for Kmart's turn around. (Conaway 5/27/09, at Tr02083– 84.) Mr. Conaway testified that these AP

System changes were started in late July or early August, were unrelated to the overbuy and were intended to be permanent. (Conaway 5/27/09 at Tr02084–85.) McDonald described his involvement on the working capital initiative starting in October 2000 to get added payment days, and noted additional days were permanently added in August 2001 before they knew about the overbuy, although his testimony is not clear whether this referred to extended dating or the AP System changes. (McDonald 5/28/09, at Tr02652–53.) Gilbert was clear that his meetings with McDonald and Moreland in early August to start the AP System changes was in response to the overbuy which was considered a "short term problem," although the AP System changes stayed in place into January 2002. (Gilbert 5/13/09, at Tr00360–61, Tr00371 & Tr00378).

The AP System changes, however, were insufficient to get Kmart through its major liquidity problem. Thus, with Conaway's blessing, an additional method of delaying vendor payments was developed. (Conaway 5/28/09, at Tr02429.) The second method was dubbed "Project SID" (for "slow it down"). (Moreland 6/27/07, at TrDep00024.) Conaway referred to it as "prioritize invoices" or "slow pay vendors" claiming that while at Kmart he did not know it by the term "SID." (Conaway 3/27/09, at Tr02094, Tr02097, Tr02132 1/23/2003, at TrDep00310.) Yet Moreland testified that the week following Labor Day weekend 2001, he used and distributed a prepared document stamped "confidential" entitled "Project SID Process Overview" during a conversation he had with Defendant Conaway and Treasurer McDonald.[7] (Plf. Ex. 11; Moreland 6/27/07, at TrDep00023–24; McDonald 4/23/09, at Tr02426–28; Conaway 5/27/09,

at Tr02426–29.) The conversation detailed Project SID's workings, where instead of delaying payments on all invoices across the board like the AP System changes, an accounts payables working group of Mr. Kearse, Mr. Jellinek and Mr. McDonald, in conjunction with Mr. Moreland, would select a number of the invoices due to each vendor—*e.g.* 25–30% of that vendor's invoices—for an additional 30 days delay in payment. (McDonald 5/28/09, at Tr02641–43; Moreland 6/27/07, at TrDep00028–30; Moreland 4/23/09, at TrDep00150–51; Gilbert 5/13/09, at Tr00387–38.) The selection of invoices was designed to mislead vendors into thinking individual payments had simply been "hung up in processing" rather than intentionally withheld. (Moreland 6/27/07, at TrDep00026.) Invoices were to be selected based on dollar amount, because the larger the invoices the more cash that was delayed being paid, with a majority of the vendors and majority of dollars being affected at some point. (*Id.* at TrDep00029–30.)

Conaway was very supportive of Project SID because the mechanism of stretching vendors would not be obvious to the vendors. (*Id.* at TrDep00025–26.) At the meeting Conaway approved Project SID and asked that it be put into place as quickly as possible. (*Id.* at TrDep00028.) McDonald and Conaway made it clear to Moreland that only a "very limited" number of people were aware of this new effort. (*Id.* at TrDep00026.) Their concern, as expressed to Moreland, "was that if vendors understood that there was a liquidity crisis occurring, that they may not ship goods; and it could cause … a very bad public relations issue with the company." (*Id.* at TrDep00026–27.)

---

**7.** Prior to the commencement of trial, co-defendant McDonald entered in a settlement

agreement with the SEC.

Other witnesses confirmed that Project SID was intended to be kept a secret from the majority of Kmart's employees, as it was only talked about behind closed doors. (Lindsey 5/18/09, at Tr00638–29; see also Moreland 6/27/07, at TrDep00026 "very limited"; Gilbert 5/13/09 at Tr00392 "top secret"; Archambeau, 5/13/09, at Tr00487.) Concerned about whether this undertaking was proper, Mr. Moreland commented at the September meeting "at least what we were doing was not—was not illegal." Both McDonald and Conaway chuckled at his assertion replying that such a scheme is done in every LBO ("leveraged buy-out"). (Moreland 6/27/07, at TrDep00027.) Before leaving the meeting Mr. McDonald took Conaway's copy of the "Project SID Process Overview" noting he "did not need to have it." (*Ibid.*).

The Project SID payment delays began on September 19, 2001 and continued through the fourth quarter, with a two week interruption of the program in mid-December. (Plf. Exh. 170; Archambeau 5/13/09 at Tr00493 & Gilbert 5/13/09 Tr00442; Moreland 6/27/07 at Tr00463.) Project SID was not a small undertaking, it was a time-consuming effort that required daily monitoring with multiple large-scale computer runs. (Moreland 6/27/07, at TrDep00030; Archambeau 5/13/09, at Tr00480–87.) Gilbert, who was Assistant Controller for Accounts Payable in charge of account payable, described a typical day as getting into the office at 6:30 a.m. to get work done before the vendors' calls began, prepare for the 9 a.m. meeting with Moreland and McDonald, handle calls all day after that meeting until early evening again trying to get his normal job functions done until 8 p.m.. (Gilbert 5/13/2009, at Tr00357 & Tr00413.) This pace was all of November, half of October and part of December and Mr. Gilbert attributes this as having contributed to his divorce. (*Id.* at Tr00414.) While a majority of vendors were affected by Project SID, certain vendors were excluded such as trucking companies who were deemed to be too "sensitive" for Kmart's operations. (Moreland 6/27/07, at TrDep00029–30.) Mr. Archambeau, who was in charge of each days computer check runs after getting from Moreland the list of invoices to be delayed, worked overtime, ten to twelve hour days minimum, weekends and holidays, not allowing anyone else in his department to perform the task because with the fewer people knowing about Project SID the easier it was to keep it under wraps. (Archambeau, 5/13/09, at Tr00486–88.) Mr. Archambeau—who worked for Kmart since 1980, and at headquarters since 1982—felt that project SID was unethical, not done in the past and he was concerned for his staff. (*Id.* at Tr00487–88.) "This was totally out of the ordinary from anything we ever done in the past." (*Id.* at Tr00500.) "It was not something we had particularly done in the past and to me holding vendor payment without their knowledge, it didn't seem to me fair, I guess is how I would have to explain it." (*Id.* at Tr00499.)

Scott Gilbert, who headed accounts payable, also noted that project SID "was something that has never been done before. And we—it was just top secret." (Gilbert 5/13/2007, at Tr00392.) Mr. Gilbert had 300 people under him, about 50–60 handling vendor calls about delayed payments. (*Id.* at Tr00417.) Of these he only informed three or four "direct reports" about Project SID and the AP System changes.

Daily invoices could range from 20,000 to 100,000, for Kmart's 5,000 plus vendors and at times under Project SID 80–90% of that day's invoices could be held back (Archambeau, 5/13/09, at Tr00490–91; Gilbert 5/13/09, at Tr00429.) These payment delays were not small amounts, one $3.3 million payment to an important DVD sup-

plier and $1.6 million to Pepsi, $2.9 million to Gillette were selected for delayed payment (Plf. Exh. 170; Archambeau, 5/13/09, at Tr00494). Plaintiff's Exhibit 170 is a two inch, two sided print, copy of the thousands of vendors involved. Mr. Gilbert used a November 9 printout of a November 7, 2001, computer run showing $553,871,834 of $2,381,092,541 due, or 23.3%, being held back under Project SID on hardline invoices as of November 7, which was in addition to the $300 million being held back with the AP System changes and additional Project SID softline invoices being held back. (Plf. Exh. 41, Gilbert 5/13/09, at Tr00394–98.) Moreland's Project SID Master Tracking Document showed $700 million in both hardline and softline invoices being held back on November 7, in addition to the $300 million under the AP System changes. (Plf. Exh. 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163–64.) As of November 7, the weighted days delay on all invoices was thus stretched to 43.5 days, compared to the usual 30 days payment cycle. (Plf. Exh. 41.) Gilbert noted a similar $564 million on hardlines being held back from $2.5 billion invoices due on November 12 (22.4% of the total invoices), which again did not include the softline and AP System changes delayed payments. (Plf. Exh. 288; Gilbert 5/13/09, at Tr00404.) Moreland's Project SID tracking for November 12 showed $673 million being held back under SID for softline and hardlines, again separate from the $300 million under the AP System changes. (Plf. Exh. 289A and Plf. Exh. 20.) Gilbert's and Moreland's figures for November 27, 2001, were $283 million and $263 million under Project SID (Plf. Exh. 54 & 289A.)

Kmart had an online vendor portal or "window" called Workbench, where its vendor could log on and follow their invoice's payment history. (Gilbert 5/13/08, at Tr00376–77; Moreland 6/27/07, at TrDep00087.) Gilbert, concerned about vendor complaints likely to be directed to his department, noted that through Workbench vendors could see the difference between the payment dates and the agreed on due dates. (Gilbert 5/13/08, at Tr00377.) Moreland noted with Workbench vendors would have seen the large amount of payables getting "hung up in processing." (Moreland 6/27/07, at TrDep00087.) In September Kmart's President Mark Schwartz shut down Workbench, and it remained down through January 2002. (Plf. Exh. 68; Gilbert 5/13/08, at Tr00378.) It was shut down due to the volume of calls from unhappy vendors. (Conaway 2/13/08, at TrDep00332.) After the shut down, instead of vendors having access to their accounting information, they were greeted with a generic message stating the system was down for maintenance. (Plf. Exh. 68; Kearse 5/20/09, at Tr01158–59.)

In the first week of November Gilbert was called to Mr. McDonald's office to attend a meeting with Messrs Conaway, Moreland, Boyer and Kearse to discuss the slow pay of vendors. (Gilbert 5/13/09 at Tr00445–46.) Mr. McDonald introduced Gilbert to Mr. Conaway as being in charge of accounts payable and Mr. Conaway noted it was nice meeting him and referred to him as "a franchise." (*Id.*) One suggestion made at that meeting on delaying payments was simply to hold up mailing the checks but as Gilbert pointed out, in Mr. Conaway's presence, the vendors would notice the dates of the checks and postmark two weeks later and they would immediately know exactly what Kmart was doing. (*Id.* at Tr00447.)

Although Kmart had a reputation for stretching vendors a few days (Stallkamp 5/18/09, at Tr00838 & Tr00848) and had, at times, delayed payments to vendors (Moreland 6/27/07, at TrDep00032), the liquidity crunch in the third quarter of 2001

was more severe than normal and it had never been done on such a scale before. (Kearse 5/20/09, at Tr01275.) Even Mr. Conaway acknowledged that he did not recall having to prioritize invoices to manage a liquidity crunch of the previous year or in his eight years at CVS Pharmacy. (Conaway 2/13/08, at TrDep00330–31.)

Mr. Archambeau's office was next to Mr. Gilbert's and he observed the situation with the vendors, their nearly "non-stop" calls and screaming which he described as "hectic," "stressful" and "pretty ugly." (Archambeau, 5/13/09, at Tr00498–99.) Mr. Gilbert had a white board in his office the entire length of one wall, approximately 12′–15′ × 4′–5′, covered with writing to record hot button issues such as when vendors were threatening to stop shipment. (*Id.* at Tr00498.) With vendors not being paid, friction between the vendors and Kmart reached a crescendo during the third quarter with vendors calling what was estimated to be every 70–90 seconds demanding their money. (Gilbert 5/13/09, at Tr00411.)

Karen Lindsey, Treasurer McDonald's administrative assistant, testified that beginning in September 2001 and continuing into December, she started receiving phone calls from vendors complaining about late payments, though she had never received them before this time. (Lindsey 5/18/09 at Tr00645–46.) The calls to McDonald grew in number to the point that he did not return most of them. (*Id.* at Tr00646–47.)

On October 27, 2001, Kmart's then-CFO, Jeffrey Boyer, sent an e-mail to Conaway expressing his concern over the Company's financial situation. (Plf. Exh. 76; Boyer 7/19/07, at TrDep00391–94.). In it he noted that Kmart was scheduled to receive $900 million in inventory in the first week of November, and that it would not help the Project SID situation. He stated that Kmart would not be able simultaneously to handle the new inventory and pay down the "nearly $800 million in past-due invoices" to manage the "noise level" coming from vendors. Sales shortfalls were compounding the cash crunch by "several hundred million" per month, which was based on actual sales reports, not forecasts. Boyer ended the e-mail by saying that he was "very worried."

At its peak, Project SID resulted in vendor payment delays of over $790 million on October 31, 2001, according to a contemporaneous spreadsheet maintained by Assistant Treasurer Moreland who managed the program on a day-to-day basis. (Plf. Exh. 289A; Moreland 4/23/09, at TrDep00164.) Moreland testified that the AP System changes involved about another $300 million delayed vendor payments for the two separate 5 day extensions of hardline invoices. (*Id.* at TrDep00145–46; Plf s Exh. 20.) Regarding these figures, Mr. Moreland was confident they were directionally accurate meaning plus or minus 10%. (*Id.* at TrDep00167.) Between the AP System changes and Project SID, Moreland's Master Tracking Document and the October 4 Cash Flow Management chart show Kmart held back $600 million in early October and over $1 billion in vendor payments from October 24 through November 7, 2001, Kmart's peak borrowing date. (Plf. Exhs. 20, p. 3, & 289A). According to Moreland, SID was the "most significant short-term liquidity action the company undertook." (Moreland 6/27/07, at TrDep00082.)

Both of these programs strained relationships with vendors which raised concerns with Kmart's ELT that vendors may not pay year end allowances. (Kearse 5/20/09, at Tr01074–75.) This concern was compounded by Kmart not hitting its sales targets. (*Id.* at . Tr01075 & Tr01230.) These allowance payments from vendors, which were based on meeting certain sales

targets, were important to Kmart's liquidity, and were a "huge part" of final profitability. (*Id.* at Tr01074.)

## B. The Cover–Up Story: Project eLMO.

With the growing pressure from vendors on the Kmart merchants (buyers) and accounts payable personnel working under Gilbert there was a desire to get out a consistent message that would allow Kmart to get to late November without creating additional questions or panic in the marketplace and without revealing cash flow problems or the intentional slow pay. (Kearse 5/20/09 at Tr01140–41.). Conaway, during a November 2 meeting with the ELT, had his secretary call McDonald to his office to discuss the development of Talking Points which would create a consistent story Kmart could communicate to its vendors to explain away the payment delay. (Plf. Exh. 35 & McDonald 5/28/09, at Tr02645–46.) McDonald testified that he was called up to the office, took notes and "then I took that list, went downstairs to my office, told Mark Moreland, told him he had to meet with Cecil Kearse and they were to lay out what my discussion was with the four gentlemen upstairs" and thus from those notes the "AP System Issues Talking Points" (hereinafter "Talking Points") were created. (McDonald 5/28/09 pp. 269:11–16 & 280:17–20.) Kearse testified that the concept of Talking Points was discussed with Mr. Conaway in early November, and while the draft of Talking Points was not circulated to the ELT, its basic concept was presented to and understood by "the leadership of our company." (Kearse 5/20/09 at Tr01140–Tr01143.) Talking Points blamed the delay in vendor payments solely on a computer system called Project eLMO. Project eLMO was an inventory control and accounts payable system which in 2001 converted Kmart's two separate inventory systems—"hardline" products (such as

electronics) and "softline" products (such as apparel)—into a single unified system. Because the changes in eLMO involved adding softlines to the hardlines already on the system, eLMO could not have affected payments on the larger volume hardline products. (Gilbert 5/13/09, at Tr00424–26.) The Talking Points asserted that Project eLMO encountered computer software errors in the accounts payable "complex terming logic" which in turn created a backlog of approximately 750,000 unpaid invoices which had to be manually processed. (Plf. Exh. 35.) These 750,000 invoices allegedly affected were an arbitrary number made up by McDonald who did some calculations on the back of an envelope, a number which was significant, but not too large. (Moreland 6/27/07, at TrDep00087.) Mr. Gilbert noted that eLMO had no effect on payments of either softline or hardline vendors. (Gilbert 5/13/09, at Tr00505–56.) Mr. Archambeau, whose department was largely responsible for the eLMO conversion, acknowledged it was possible eLMO could cause a softline invoice not to get paid, but he added that they implemented a control system of requiring vendors send a hard copy and an electronic copy of invoices to avoid this problem. (Archambeau 5/13/09, at Tr00502 & Tr00505–06.) He and Moreland, who did the initial draft from the working group of McDonald, Kearse, and Jellinek, noted each of the Talking Points regarding eLMO causing delays in payments were false, a fabricated "storyline" or script to tell the vendors. (*Id.* at Tr0050610; Moreland 6/27/07, at TrDep00085–87.) The delays caused by the AP System changes and from Project SID were separate from the eLMO conversion which Archambeau believed "was very successful." (Archambeau 5/13/09, at Tr00522.) Like Mr. Gilbert, Mr. Archambeau also testified the conversion did not affect hard line vendors and thus could not

cause any delays in invoice payments on hardline invoices which were the majority of purchases. (Archambeau 5/13/09, at Tr00505.) While it was possible a softline invoice might slip through their controls during the eLMO conversion, if that occurred it was "very isolated." (*Id.* at Tr00505.) The Talking Points refers to an extraneous purchase order of $109 million being generated by eLMO, but if that was not caught before delivery of the goods, it would not have affected vendor payments. (*Id.* at Tr00507; Gilbert 5/13/09, at Tr00428 & Plf. Exh. 35.) There was no documentary or other evidence of any vendor actually not being paid on time due to Project eLMO.

ELT member Cecil Kearse, who was involved in the creation of Talking Points, was reluctant to acknowledge that many statements contained in the Talking Points were not true. (Kearse 5/20/09 pp. 93–7.) According to Kearse, the story was developed in order to "build a bridge from point A to point B [later identified as "November 2nd [until] late November"] without creating additional questions in the market place" and that "it was determined that not speaking to cash flow or slow pay would be the best course." (Kearse 5/20/09, at Tr01138 & Tr01140.) Kearse testified that the eLMO story was "a small part, if not insignificant to the truth" and he acknowledged that cash flow was the real reason vendors were not being paid, not *eLMO*. (*Id.* at Tr01206–07.) Ultimately Mr. Kearse admitted that eLMO was "definitely not the reason why [vendors] weren't getting paid." (*Id.*)

While Mr. Conaway denies calling McDonald to an ELT meeting to take notes regarding Talking Points, he admits a meeting with Boyer and Schwartz and Kearse, which McDonald joined, where Kearse wanted to talk about communication with vendors. (Conaway 5/28/2009 at Tr02626–27.) He acknowledge that his Outlook Calendar for November 2 shows an entry "Vendor Talking Points w/ John, Cecil, Mark, Jeff." (*Id.* at Tr02627 & Plf. Exh. 190 at November 2, 2001.) While Talking Points clearly uses eLMO as the only reason for the vendors being paid late, Mr. Conaway denied the ELT making a decision that eLMO would be the only reason given to vendors for slow pay and he said anyone saying otherwise was lying. (Conaway 1/27/03, at TrDep0030809.)

Mr. Conaway testified that his belief that eLMO caused vendor delays came from Lorna Nagler, who was then Kmart's Senior Vice President of Apparel and Jewelry, who told him that her part of BlueLight Always was in jeopardy because of eLMO and the "inability to process invoices" for vendors and of the need to get "system integration issues corrected." (Conaway 2/13/08, at TrDep00334–35, 5/27/09 at Tr02162–63.) Ms. Nagler testified to the contrary. (Nagler 4/18/08, at TrDep00349–51.)

The payment delays caused angry vendors and factors (those who "fronted" money to vendors and were assigned accounts payables for collection) to demand payment, some threatened to stop shipments. (Archambeau 5/13/09, at Tr00497.) Some major vendors, including Black & Decker, 3M, AC Delco, and General Electric, did stop shipment of their products. (Plf. Exhs. 237, 238 & 257.) Some vendors indicated that they would resume shipping if their calls were returned, but communication to vendors was silent. (Kearse 5/20/09, at Tr01136.).

The CEO of Sunbeam, Jerry Levin, after failing to reach Kearse called Conaway directly to demand payment for $25 million worth of unpaid invoices. (Levin 9/11/07, TrDep00173.) With no reply phone call from Conaway, Levin wrote a letter to him demanding payment which letter indicated he had been told the problem was due to

"Kmart's accounts payable system conversion." (Plf. Exh. 107.) Without using the term "Project eLMO" Conaway's response letter referred to "the breakdown we have had on our hard lines and soft lines integration" to explain the reason for the delay of payment. (Plf. Exh. 108.) Conaway testified that he did not write the letter, that most likely his secretary wrote it and used his signature stamp. Yet during a 2003 deposition he testified that he had dictated the letter "from the field" which was typed by his secretary, his signature stamped and sent to Levin. (Conaway 1/22/03, at TrDep00309–10.)

Maurice Sabony, a representative of Milberg Factors, was told on at least six occasions in October and November of 2001 that the late payments were due to the Project eLMO glitch. (Sabony 2/28/08, at TrDep00200–12, specifically at page:lines 63:6–64:10, 65:23–66:18, 69:4–73:25, 76:9–79:21, 79:22–81:2, 87:15–89:8.) He received the Project eLMO excuse from three different people at Kmart, including Gilbert and McDonald, even after he expressed doubt that this was the real reason for the delays. On November 29, 2001, he received a fax from a client that included a letter from Kmart explaining that the late payments were due to problems with the eLMO system. (*Id.* at TrDep00217–19 & Plf. Exh. 196.)

## C. Communications with the Board.

As noted above, in mid- to late-August 2001 Kmart's senior management received a series of liquidity forecasts Assistant Treasurer Moreland prepared showing that the company was facing cash needs that could exceed its borrowing capacity by up to $1 billion. (Plf. Exhs. 4, 5, 6 & 7). McDonald presented these forecasts to Conaway and the other members of the ELT. The cash needs caused by the overbuy was never communicated to the Board of Directors. (Moreland 6/27/07, at TrDep00055–56.)

On August 17, 2001, Conaway sent a letter to Kmart's Board, even though there was no Board meeting scheduled for that month, as a response to the Board's request at the previous meeting for "more frequent financial reports." (Plf. Exh. 110.) Board member Thomas Stallkamp testified that the statement in the letter regarding Kmart ending the second quarter with $283 million more inventory than the previous year was not unexpected, because increasing inventory was part of the business plan. (Stallkamp 5/18/09, at Tr00728.) Yet, at that time, the Board had not been informed about the overbuy. (*Id.* at Tr00729.) Stallkamp, who had served as President and Treasurer of Chrysler Corporation, also testified that his understanding of the phrase "revised accounts payable terms" was that Kmart had approached vendors to negotiate longer payment terms, not that it was done unilaterally or without vendor consent. (*Id.* at Tr00708 & Tr00730.)

Because of the importance of the changes Conaway was implementing, they had scheduled a two day gathering of the Board in September. Mr. Conaway had been warned by Kmart's former CEO to keep the board packages manageable in size and to end the meetings by noon. (Conaway 5/27/09, at Tr02104–05.) Conaway and others noted that two board members slept through meetings. (*Id.* at Tr02104.) Board member Stallkamp did not recall Board members sleeping during the meetings though he acknowledged it could have happened. (Stallkamp 5/18/09, at Tr00855.) The events of 9/11 forced the September Board meeting to be handled by telephone and cut the time down to its usual 3 hour time frame (Conaway 5/27/09, at Tr02106.) As a result, on the inventory problem and its solution, it was thus necessary to give the Board "a shortened version of the strategy piece." (*Id.* at Tr02106.) Mr. Conaway noted that he of-

ten did not have time to edit the Board package before it went out, and thus would make notes on his copy or a separate sheet of paper to make sure he covered additional points at the Board meetings. (*Id.* at Tr02110 & 02121–22.)

Mr. Conaway contests that the Board was not informed about the actions taken to manage payables. He testified that at the telephonic September Board meeting the liquidity cushion forecast on the peak borrowing day was only $96 million, which compared to an August forecast to the Board of $544 million (Def. Exh. 119, p. 17, Conaway, 5/27/09 at Tr02113–14.) The first priority on the "Short Term Liquidity Actions" page, which was prepared by CFO Boyer, was cutting receipts of inventory by $600 million by October 3. (Def. Exh. 65, at p. 20; Conaway, 5/27/09, at Tr02114.) He discussed the other three listed Short Term Liquidity actions in the Board Package—shifting capital expenditures into the fourth quarter, getting a new 364 day revolver, and various sale-leasebacks that were planned. While not listed on the Board's Package page 20 on Short–Term Liquidity Actions, as were the other four items noted above, Mr. Conaway testified:

> The second most important thing we were doing was managing our payables, stretching our vendors.

> So, I wanted to make sure the board was aware of that, given the criticality of it. This particular that I talked about, that we had already extended dating. So, we had already took it dating, starting back in August. So, that had already occurred. We had taken them in two different series, one in the beginning of August, one toward the mid or late August. So, this was letting them know we had already pushed our suppliers in addition, and that's how we were going to run the business on top of what previous management had done.

> In total when we looked at it, we wanted to get about five days. The reality during this forecast was it was about three days. And we talked about how long it took to cycle through. So, we had already taken that action.

> And then we had to manage the payables, and what we figured at this time was another additional, on top of that, anywhere from an additional kind of three to four to five days. We weren't really sure, but we thought it would be probably be at its peak at least another five days.

> And that is indicated by the second point, that we are going to try to extend supplier terms wherever we can, but we've got to add on those additional three to five days no matter what, and we will continue to stretch vendors if we can't get, you know, terms.

> And it's also not just terms. Again, we are managing days. It could be changing policies, as we spoke of earlier. But one way or the other, we had to add additional three to five days over what we had already adding, that we were going to do irrespective of the credit crunch. But because of this liquidity crunch, we had to add more days.

> Q. And underneath that, what is your writing indicate you are telling the board?

> A. Well, again the two biggest items, A, I wanted them to fully understand that we were managing payables, that we were stretching vendors and we were going to have to stretch them more. That was going to have to happen. The second key component which is the number one thing I said we were doing was this reduction in inventory receipts. . . .

*Id.* at Tr02116–17.

These assertions seem to discuss the efforts taken in the prior quarter to extend vendor terms through negotia-

tions, and to extend dating of the payment period to begin running not from the date of the purchase order but from the date of receipt of the goods. Yet the "additional three to five days no matter what" seems possibly to refer to one of the two 5–day AP System additions to the hardline vendors that Moreland discussed as being unilaterally imposed. This testimony suggests that Mr. Conaway told the Board that in addition to extending payment terms through negotiations, when that failed Kmart would, if needed, unilaterally extend the payment terms ("it's also not just terms. Again, we are managing days. It could be changing policies.") Nothing in Mr. Conaway's testimony suggests he disclosed the 30 plus day delays of the Moreland plan for Project SID. Also, the handwritten notes Mr. Conaway made on his copy of the September Board package to remind him to discuss certain things only seem to support "extended dating" and "supplier terms" as well as "chasing receipts," i.e. cutting the receipt of new merchandise. (Def. Exh. 119, at p. 20.) These three initiatives—negotiating better supplier terms, extending dating for payment to date of receipt, and cutting future inventory purchases—likely could have been discussed without any Board opposition, which the more aggressive means of unilaterally stretching vendors would have drawn from Board member Stallkamp who would have opposed such a move had it been raised. (Stallkamp 5/18/09, at Tr00741 & 00781.) There are no Conaway handwritten notes on page 20 of Conaway's September Board package (Defendant's Exhibit 119) indicating unilaterally adding days without the vendor's consent.

Mr. Conaway also testified that he drew to the Board's attention to the overbuy noting that the August Inventory Summary on page 29 of the Board Package showed a negative $825 million inventory variance to "commitment" or plan. (Conaway, 5/27/09 at Tr02122–23, Def. Exh. 119 & Plf. Exh. 65, at p. 29.) He testified that when Board Member Stallkamp said the Board was not informed about the overbuy until the November Board meeting, he was mistaken. (Id. at Tr02123) Mr. Conaway wrote a September 20 letter to the Board because of his frustration with their lack of attentiveness and caring. (Id. at Tr02124–26.) In that letter he noted:

> I fully appreciate the sent of urgency on managing our liquidity. I am fully confident our recent extension of Kmart's revolver (club deal), canceling of receipts, new accounts payable terms and reduced capital expenditures, we will insure liquidity. You have my assurance of monitoring this situation as my # 1 priority over the next 6–10 weeks.

Plf. Exh. 113.

While this September letter adds "new accounts payable terms" to the actions to deal with liquidity, similar to Conaway's handwritten note "supplier term" on his page 20 of the September Board package, this term seems to deal with bargained for terms and not the unilateral AP System changes or Project SID. That was how Board member Stallkamp interpreted "new accounts payable terms" in that letter. (Stallkamp 5/18/09, at Tr00754.)

Later in the September 20 letter after noting an "immediate term" need for "an additional $500–800 million more inventory" he noted as one of the focuses for the Board:

> b. Manage all components of working capital given inventory needs, accounts payable, supplier terms, accounts receivable, and reducing capital expenditures to minimum levels.

He testified that liquidity being his "number one priority" was an exaggeration because he thought the problem was

"self-inflicted" and would be over in the next 6–10 weeks. (Conaway, 5/27/09 at Tr02127.) [8]

When asked what "manage . . . account payables" in paragraph b. means, Mr. Conaway responded:

A. That means that we are going to continue to manage to a certain number as we run this business, until we get a good capital structure, separate and above from supplier terms, which is negotiated.

Q. So, how do you manage to a certain number in addition to negotiating supplier terms?

A. It's exactly what I explained. It's what we were doing. It is what I explained to them in the September Board meeting. You say I need to get to ten additional days, right. You manage to that number. And supplier terms are separate than that. If supplier terms can help you do that, that's great. That's why they are separate.

Q. How do you get to that number in addition to negotiating?

A. You've got to stretch numbers, slow pay them, you know, pay them slower.

*Id.* at Tr02132.

While here "manage . . . accounts payables" is separated from managing supplier terms, the September 20 letter is less than clear that this refers to unilaterally adding days to vendor payment. The "ten additional days" he referred to at trial as being separate from "supplier terms" may refer to the 5 days + 5 days that were unilaterally added to hardline vendors under the AP System changes. While this statement may have been meant to suggest that Mr. Conaway told the Board about this unilateral move at the September Board meeting, that is a disputed fact

with Board member Stallkamp denying being told that at the September Board meeting or in the September 20 letter. (Stallkamp 5/18/09 at Tr00740–41 & Tr00754055.)

In an October 12, 2001, letter Conaway informed the Board that Kmart's September sales were flat and its September inventory was up $1.1 billion from the prior year with "much of the inventory increase . . . due to our efforts to improve in-stock and support BlueLight Always" (Plf. Exh. 71.) Unlike the September 20 letter's statement of a need for "an additional $500–800 million more inventory in the immediate term", this letter notes the need to "reduce inventory by the end of the third quarter." (Compare Plf. Exh. 112, p. 2, Plf. Exh. 68, p. 2.) The October letter makes no reference to the Schwartz August overbuy. The letter also states:

We have made significant progress on several of our working capital initiatives. Our efforts to work with our vendor partners on terms changes have been successful. Our A/P leverage ratio has improved dramatically from 33% in July to 42% in September.

Board member Stallkamp testified that he understood this to mean that Kmart had been negotiating with vendors for longer terms, and there was no indication that the increased AP ratio was due to Kmart unilaterally delaying payments to vendors. (Stallkamp 5/18/09, at Tr00771 & Tr00773–74.)

If CFO Boyer learned at the September Board meeting from what Mr. Conaway claims he told the Board that his page on "Short–Term Liquidity Actions" should have included stretching vendors or "managing payables," Mr. Boyer again failed to put that in the October 23 Board package

---

**8.** At his deposition, when asked if liquidity was the Executive Leadership Team's number one priority, responded, "Again I can't say it's a number one priority, but it was one of the key things we were focused on." (Conaway 2/13/08, at TrDep00319.)

which notes only shifting capital expenditures, sale-leaseback, and refinancing the credit revolver under Short Term Liquidity Actions. (Plf. Exh. 114, p. 30) Again, Mr. Stallkamp testified that neither that page of the Board package nor anything told the Board at their October meeting revealed that Kmart was unilaterally delaying payments. (Stallkamp 5/18/09, at Tr00779–80.)

At the October 23 telephonic Board meeting, in discussing his notes on his copy of the October Board package giving updates "on the previous September board package," Mr. Conaway testified that the "33" referred to the 3 days they were adding to the 30 day payable terms that he claims he had told the Board about at the September meeting. (Conaway 5/27/09, at Tr02143–44, Plf. Exh. 27, pg. 2) The "38" included the 5 additional days added since that September Board meeting which he "wanted to make sure" they were aware of in addition to what "I told them, you know, 30 days earlier." (Conaway 5/27/09, at Tr02144.) The "41" referred to the need to add another 3 days. "So I wanted them to absolutely know we had gone further than I had told them we were probably going to have to go in managing payables, and we still had farther to go as of this point."

As with the September and October Board Packages, the November 20 Board presentation omitted any direct reference to the intentional vendor delay tactics or the August overbuy but it did note a 1.5% drop in comparable sales (2.2% down overall) for the Third Quarter and inventory being $600 million off plan (Pl. Exhs. 121 Bates # CC 0096834–35, CC–0096841 & CC–0096862.)

On November 8, 2001, CFO Boyer had a one-on-one meeting with Conaway lasting 90 minutes to two hours because he felt there were significant matters that needed to be discussed. (Boyer 7/19/07, at TrDep00395.) Boyer wanted to highlight three issues—"financial performance of the company, the liquidity situation and the allowance issue." (Boyer 7/19/07, at TrDep00409.) Unlike his usual one-on-one meetings with the CEO, Mr. Boyer had prepared a 27 page Power Point presentation for this meeting to make sure he covered all of the important points. (Boyer 7/19/07, at TrDep00395.) He thought it was important to talk about how serious the situation was and, as part of their worst-case scenario, discuss the possibility of bankruptcy. (Id. at TrDep00400.) While disputed by Mr. Conaway, Mr. Boyer said he went through each slide of the PowerPoint presentation page by page with Mr Conaway to whom he gave a printed copy. (Id. at TrDep00395.)

The PowerPoint slide on Risk Profile for the fourth quarter noted that competitive pressures, the recession and reduced promotions could lead to flat comparable sales instead of the targeted increase of 4.2% over the prior year. (Plf. Exh. 97, at JNB 000020) His slides warn that inventory receipt forecasts were "[w]ay too high" in the forth quarter as happened in the third quarter, with a bottom line being a "[n]eed to 'plan for the worst and hope for the best'" and "[n]ot 'plan for the best and hope the worst doesn't happen.'" (Id. at JNB 000022.) His next slide on "Implications/Next Steps" warns that Kmart would not meet its financing covenants to the banks, its cash flow was "close to $500 million negative," leading to "Credibility" issues with the "Board, Rating Agencies, Banks and [Wall] Street." (Id. at JNB 000023.) This led to a recommended need to develop financial contingency plans including a fundamental restructuring, a possible need to plan for bankruptcy, and the need to "[d]iscuss issues with the Board at the November Board Meeting." When asked to explain why he had concern about credibility with the Board, Mr. Boy-

er noted that there were certain things related to financing the Board was not aware of. (Boyer 7/19/07, at TrDep00398.) The Board had an understanding that Kmart's capital/financial structure was appropriate, and if they were going to recommend an alternate financing plan, there would be a need get into funding sources and "have a conversation with the board that would clarify all elements of our cash management system, including Project SID." (*Id.* at TrDep00399.) Based on his attendance at Board meetings, he did not believe "that the board had a sense that Kmart was unilaterally not paying its vendors on time as part of its cash management program in the third quarter?" (*Id.* at TrDep00399–400.) Assistant Treasurer Moreland had also testified that he did not believe the Board and Board Finance Committee were informed of Project SID. (Moreland 6/27/07, at TrDep00055 & TrDep00088–89.) While his slide that noted the $500 million negative cash flow and "credibility" issues with the "Board, Rating Agencies, Banks [and the] Street" ended with "[d]iscuss issues with the Board at the November Board Meeting," Boyer admitted that he did not explicitly tell Mr Conaway that they had to tell the Board about stretching vendors. (*Id.* at TrDep00415.) When asked if he ever "told Mr. Conaway that the public needed to be told about stretching vendors?" he responded "The typical time that you would do that is in the preparation of a 10Q, and we had not started the preparation of the 10Q yet." (*Ibid.*)

Boyer at the meeting also felt that it would be prudent to have a third analysis performed by an independent outside auditor on how Kmart had handled its vendor allowances, because he felt the PriceWaterhouseCooper ("PWC") review had its auditors reviewing their own work. (*Id.* at TrDep00409–10.) While Mr. Boyer did not outright question the integrity of PWC's lead Kmart auditor, Joe Murphy,

he did have questions about Mr. Murphy's closeness to Kmart. When asked directly by Mr. Conaway if he had an issue with Mr. Murphy's integrity, Mr. Boyer said "no" but he thought it was difficult to audit your own work, and suggested an independent PWC quality review be done. While acknowledging that Mr. Conaway showed more interest in this part of the meeting than the discussion over the financials, Mr. Conaway did approve Mr. Boyer contacting Jay Henderson, a PWC partner in Chicago with whom Boyer once worked, with regard to Boyer's suggestion for the quality review. (*Id.* at TrDep00411.)

Conaway testified that when he and Boyer met, Boyer never got past the Jim Adamson talking points which would have been the first 8 pages of the 27 page presentation. (Conaway, 5/28/09, at Tr02510–13.) Boyer then raised the allowances issue again after several prior efforts including a PWC review that Boyer had earlier indicated satisfied him. Mr. Conaway testified that Boyer's seemingly erratic, flip-flopping on the sufficiency of the PWC review on how Kmart handled vendor allowances, his questioning the independence of Kmart's lead PWC auditor, Joe Murphy, with no basis except that he vacationed with the former Kmart CFO, and the suggestion of a "strategic bankruptcy," all of which made him realize he had to let Boyer go.(Conaway, 5/27/09, at Tr02184–85.) Conaway checked with Jim Adamson, head of the Board's Audit Committee, who approved the firing and also with Thomas Stallkamp, head of the Board's Finance Committee. (*Id.* at Tr02188–91.)

Mr. Boyer was told the next day by Kmart's general counsel and others that he was fired. He had been with Kmart only since May 2001. (Boyer 7/19/07, at TrDep00377.) Mr. Stallkamp testified that on a November 9, 2001, telephonic Board

meeting, Mr. Conaway advised the Board that Boyer was not a team player and was not working well with other members of management, and that he had made what Mr. Conaway characterized as "ludicrous" statements about the possibility of a "strategic bankruptcy." (Stallkamp 5/18/09, at Tr00790.) Stallkamp was concerned about the timing of the firing and that it may generate negative publicity, but eventually the Board supported the decision because, as CEO, Conaway was the one with the ultimate authority to fire Boyer. (*Id.* at Tr00791–92.) Mr. Stallkamp also noted that if Mr. Boyer had "legitimate concerns about an actual need for a bankruptcy filing as opposed to a suggestion to make a strategic bankruptcy filing" that would have "set off a lot more bells." and not been a legitimate basis to fire Mr. Boyer. (*Id.* at Tr00792–93.)

Mr. Conaway said he met with Mr. Stallkamp for breakfast in early November at which time they discussed stretching vendors and he told him they would be caught up in two weeks with vendor late payments. (Conaway 5/27/09, at Tr02145–46, see also Conaway 5/28/09, at Tr02654–55.) He said they discussed the "overbuy" and project eLMO. (Conaway 5/27/09, at Tr02146.) Later in November at the regular in-person Board meeting, Mr. Stallkamp brought up a vendor complaining about 30–60 days late payment, and Mr. Conaway told him they were "going to be caught up in the next week or so with all the suppliers that we were, you know, prioritizing invoices on or stretching." (Conaway 5/27/09, at Tr02145.) He denied telling Mr. Stallkamp at that time or the Board that they were not stretching vendors or that the only reason vendors were not being paid was because of Project eLMO. (*Id.* at Tr02147–48.) He also noted that they talked about the number of days they were behind with venders "every time" at of the weekly ELT meetings and he scheduled separate meetings 3 or 4 times with just Mr. McDonald and Mr. Moreland (*Id.* at Tr02152–54.) Mr. Conaway later noted that he never knew what vendors were being told about Project eLMO and he never saw the Talking Points. (*Id.* at Tr02161–62.)

In contrast to Mr. Conaway's testimony, Board member Stallkamp said repeatedly that throughout this period, Conaway never informed Kmart's Board of the unilateral payment delays beyond terms on vendor invoices even though Kmart's Board was acutely interested in the Company's liquidity in the third and fourth quarters of 2001. (Stallkamp 5/18/09 at Tr00730–31 [August], Tr00740–41 [September],Tr00773–74 [October 12, 2001, letter, Plf. Exh. 180], Tr00779 [October Board package an meeting], Tr00798 [November Board meeting], Tr00803 [November breakfast meeting], Tr00807 [December breakfast meeting].) When told in Conaway's August 17 letter to the Board that the inventory was increased for the Blue-Light Always program and " "[r]elatedly, we have decreased capital expenditures and revised accounts payable terms to ensure appropriate liquidity," Mr. Stallkamp understood by this that "they would be approaching selected buyers to negotiate longer payment terms than the normal terms they had." " (*Id.* at TR00730, Plf. Exh. 110) Again in relation to Conaway's reference to "new accounts payable terms" dealing with liquidity in his September 20 letter to the Board, Mr. Stallkamp also understood that as "negotiating with the major vendors lengthening the payment terms." (*Id.* at TR00754, Plf. Exh. 113, p. 1) Similarly, in the Conaway October 12 letter to the Board discussing "working capital initiatives", Mr. Stallkamp interpreted "[o]ur efforts to work with our vendor partners on terms changes have been successful" again referred to negotiated changes. (*Id.* at TR00769, Plf. Exh. 180, p. 2)

Mr. Stallkamp, who chaired the Board's Finance Committee, expressed his concern about the September Board package showing the liquidity cushion on the peak borrowing date had fallen from the $544 million projection in the August Board package to $96 in September because the Board had set a $100 million minimum liquidity cushion (*Id.* at TR00739–40. The transcript erroneously refers to 996, but the document shows it is $96 million) He also noted that the Board was not told of any negative liquidity scenarios that Kmart had run (*Id.* at Tr00737.) Stallkamp testified that was never made aware of, and never would have endorsed, the programs to systematically delay vendor payments because "[i]t's against everything I've been doing in business. You need to communicate with people if you are changing contract terms." (*Id.* at Tr00740–41.) He also would have expected to be told if any of the $96 million liquidity cushion was based on funds past due to vendors because it was understood the liquidity cushion "was after all of the payables were accounted for." (*Id.* at Tr00745.)

When he received the October 12 letter from Conaway referring to ending September with $1.1 billion more inventory than the prior year, he thought it was related to BlueLight Always and he was not told it was acquired without the approval of Mr Conaway. (*Id.* at Tr00766–67; Plf. Exh. 189.) Similarly at the October Board Meeting it was not disclosed that this $1.1 billion in inventory over plan had been acquired without Conaway's approval. (*Id.* at Tr00778.) The Board package on Short Term Liquidity Actions again did not disclose the unilateral delay in vendor payments as a source of liquidity nor where they told that at the meeting. (*Id.* at 152, Plf. Exh. 114, p. 31) Again he said he would not have approved of such an action and would have been upset. (*Id.* at Tr00781.)

The November Board Package showed that the $1.1 billion inventory over plan had been cut to $600 billion over plan by the end of October (*Id.* at 168, Plf. Exh. 121, at p. CC 0096841) The day before the November Board meeting, Conaway informed the Board Finance Committee of the overbuy by President Mark Schwartz that was not approved by Mr. Conaway" (Stallkamp 5/18/09, at Tr00797.) This revelation upset the Board members so they asked for a private meeting with Conaway after the Board dinner that evening. Stallkamp's understanding for the reasons the Board was not told about the overbuy sooner was Conaway's telling them that he had not been aware of it in August, September or October. (*Id.* at Tr00798.)

At a one-on-one breakfast meeting before the November Board meeting, Stallkamp had asked Conaway directly about rumors that Kmart's vendors were not being paid on time. The New York Times on October 25 and November 8, 2001, had articles noting several manufacturers were complaining about being paid late, some "by a week or more." (Def. Exh. 21–A and 22–A.) Instead of disclosing any intentional late payments of vendors, Conaway repeated the cover-up story to Stallkamp that the delays were caused by a glitch with the eLMO system, but that it was unintentional and would be fixed. (Stallkamp 5/18/09, at Tr00802–03.) Mr. Stallkamp said he was reassured by this information as an explanation for he rumors concerning Kmart and he had no reason to doubt Mr. Conaway. (*Id.* at Tr00804.) Mr. Conaway repeated the eLMO explanation to the entire Board at the November Board dinner and a third time to Stallkamp at a breakfast meeting in December— that it was a temporary problem that had been fixed. (*Id.* at Tr00805–07.)

In a December 20 letter to the Board, Conaway noted that inventory levels im-

proved in November to only $128 million above the prior year, compared to $300 million in October and stated:

Our initiatives to reduce inventory also were important to maintain our liquidity cushion. As we have now passed our peak borrowing date and we have renegotiated our short-term credit facility, we are comfortable with our working capital position going into the fiscal year 2002.

Plf. Exh. 183, p. 2.

Mr. Stallkamp took the "working capital position" to be a reference to Kmart's liquidity, and being unaware of the AP System changes that had not been ended and unaware of SID, that had recently be restarted, he was comfortable with Kmart's liquidity position going into 2002 based on what he had been given by Kmart's management. (Stallkamp 5/18/09, at Tr00812–13.)

### D. Kmart's Quarterly Filing on Form 10–Q(3).

On November 27, 2001, Kmart filed its quarterly Form 10–Q(3) with the SEC. (Plf. Exh. 209; Def. Exh. 5). As required by SEC regulations, the Management's Discussion and Analysis ("MD & A") section of the filing needed to include a discussion of Kmart's liquidity, including any material change such as a material liquidity event or deficiency that occurred during the quarter. Reg. S–K, Item 303(a), (b) (17 C.F.R. §§ 229.303(a), (b); Carmichael 5/21/09, at Tr01409–13.) Kmart's 10–Q(3) MD & A section, however, omitted any reference to Kmart's liquidity problems, the delay of $1 billion in payments to its vendors, or that the payment delays had continued into Kmart's fourth quarter. While Project SID was ended for a couple of weeks in early December, and there were hopes that Kmart would get caught up with vendors, there was other evidence that from September to the end of Decem-

ber that Kmart's vendors were not paid in full, not even coming within 200 million dollars of paying the vendors in full. (Gilbert 5/13/09 at TR00464.) Maurice Sabony of Milberg Factors testified to his vendors being owed from $4.3 million to $10.5 million in November and December of 2001. (Sabony 2/28/08, at TrDep00193 and Plf. Exh. 200.) While there was a dispute over whether the AP System changes, estimated at $300 million, was intended to be temporary or permanent, it was not ended in 2001. (Gilbert 5/13/09, at Tr00378; Archambeau 5/13/09, at Tr00512.) Other than Mr. Conaway's testimony, there was no evidence that AP System changes were ever disclosed to or approved by the Board of Directors.

In the MD & A the company must also disclose its response to any material liquidity deficiency. (Carmichael 5/21/09, at Tr01403.) Conaway received his MBA from the University of Michigan, and became CFO of both CVS Pharmacy and later its parent, Melville Corporation. (Conaway 5/27/09, Tr02009.) Melville changed its name to CVS Corporation where Conaway was promoted to served as CFO, COO and President. (*Id.* Tr02009–10.) At CVS as CFO he was responsible for and signed each 10Q and 10K. (Conaway 5/28/09, at Tr02402–03.) He was aware that liquidity needed to be discussed in the MD & A. (*Id.*) While Mr. Conaway had signed Kmart's second quarter Form 10–Q(2), he denied ever seeing, reviewing or discussing the third quarter document. (Stipulation # 6, Schedule A to Jury Instructions, Conaway 5/27/09, at Tr02232.)

CFO McDonald and Controller Richard Noechel signed the 10–Q(3). (Plf. Exh. 209.) By November 2001, McDonald and Conaway had worked together when Conaway was President of CVS and McDonald helped Conaway restructure Melville Corporation. (Conaway 5/28/09, at Tr02381–

82.). He was hired at Kmart by Conaway's CFO (Conaway 5/28/09, at Tr02404.) In Conaway's Voice Mail to Kmart's employees in November 2001 announcing his new CFO he noted their eight years together at CVS and he touted McDonald as his "right-hand person" when he was President of CVS and also his "right-hand person in helping restructure Melville Corporation." (Plf. Exh. 318, November 12, 2001, at. p. 6.) Upon firing Boyer on November 9, 2001, Conaway replaced him immediately with Mr. McDonald. (Plf. Exh. 116; Conaway 5/28/09, at Tr02514.)

The jury found two statements in the 10–Q(3) to be materially misleading: The first being the opening sentence of the "LIQUIDITY AND FINANCIAL CONDITION" section of the 10–Q(3) which read, "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities." (Plf. Exh. 209, p. 13; Verdict Form, Dkt. 129, at p. 1–2 & 9–10.) The second sentence found materially misleading was "Inventory increased ... due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position." (*Id.* at 2 & 10.) In addition, the jury found that the MD & A was misleading because it did not include three material omissions concerning events in the third quarter of 2001:

1. Kmart had a known material liquidity event;
2. Kmart had a material liquidity deficiency that involved the delay of vendor payments to remedy that deficiency;
3. The delay in vendor payments was a material change in an internal source of liquidity.

(*Id.* at 3–6 & 10–12.)

The jury also found that each of omissions was required to be disclosed by Item 303 of Regulation S–K and that the failure to include each fact rendered the Management Discussion & Analysis section of the Form 10–Q materially misleading. (*Id.*)

### E. The Conference Call.

In conjunction with the electronic filing of the Form 10–Q on November 27, 2001, CEO Conaway and CFO McDonald held a conference call with stock analysts, factors and other interested individuals. Prior to the call McDonald called Moreland to see if Kmart would be completely caught up on SID by the time of the call and Moreland said it would not. (Moreland 6/27/07, at TrDep00091.)

Because of the importance of the call, a call book was prepared and distributed to Mr. Conaway enabling him to inform the listeners on the call as to Kmart's financial health. Mr. Conaway identified Defendant's Exhibit 115, a 48 page document, as the third quarter 2001 Conference Call Book. (Conaway 5/27/09, at Tr02211.) Mr. Conaway could not verify it was the complete call book but it was admitted with no objection. (*Id.* at Tr02212.) Mr. Conaway testified that the Form 10–Q was not part of that call book, that he did not review the 10–Q nor its MD & A prior to the conference call, and he had never before had a question at such conference calls on a MD & A. (*Id.* at Tr02212–13.) Mr. Conaway also noted he would have received the conference call script, and he identified Defendant's Exhibit 138, a November 27, 2001, 8:23 a.m. version, as the script for the November 27 conference call which exhibit showed the call was to begin at 9:00 a.m.. (*Id.* at Tr02213; Def. Exh. 138.) Defendant's Exhibit 138 was admitted. On Cross examination, Mr. Conaway was given another copy of what purported to be the "3rd Quarter Conference Call Book." (Plf. Exh. 242.) Mr. Conaway denied that this was the actual Conference Call Book because it had the transcript of the actual conference call at the beginning

of the exhibit and thus at least that portion of the exhibit had to have been added after the call was completed and transcribed. (Conaway 5/28, 08 at Tr02519–20; Plf. Exh. 242.) Plaintiff's Exhibit 242 does have a copy of the Form 10–Q(3) included. (Plf. Exh. 242, at SE 00122357–76.) Plaintiff's Exhibit 242 also contains a copy of the prior day's 2:45 p.m. draft of the conference call script with multiple handwritten omissions, changes and notations. (*Id.* at SEC 0012295–120051.) While Mr. Conaway suggested that conference call script of November 27, 2001, 8:23 a.m. (Def. Exh. 138) was the one he actually used, a comparison of the actual transcript of the conference call in Plaintiff's Exhibit 242 to Defendant's Exhibit 138 and also to the later portions of Plaintiff's Exhibit 242, show without doubt that Mr. Conaway did not use Defendant's Exhibit 138 during the conference call of November 27, but rather used the conference call script in Plaintiff's Exhibit 242.[9]

During the conference call, Conaway and McDonald indicated on several occasions that the vendor complaints on late pay stemmed from Project eLMO "systems integration problems" as noted in boldface below:

McDonald:

As we discussed last quarter, we are aggressively pursuing competitive payment cycles. This is not a blanket policy to extend terms. We are working with each vendor, partnering with them to create the right and the best relations for both parties.

For background, on, March30, Chuck spoke to the vendor community about our strategy and how we were going to become better partners. For our part ... [we] would clean up ours processes and flow and not charge any vendor compliance fees, as our strategy is to give more business to fewer vendors so we can be more meaningful to each other.

And after that was concluded, we were gong to come back to them and talk about competitive terms. We want to develop a partnership with our key vendors who can offer the depth and breadth for our customers. As a result, we have focused on developing stronger relationships with these vendors who can best serve Kmart's customers And we've cut approximately 25% of our entire vendor base from a year ago.

Plf. Exh. 57. at p. 17–18.

As Chuck mentioned earlier, we're continuing to integrate our hard lines and soft line businesses as one. Part of that integration[,] that we internally call eLMO[,] was and is implementation of the new accounts payables system. **This system implementation did have some issues along the way.** And as of today, the majority of the issues related to our accounts payable system had been-have been resolved. We're nearly caught up concerning our processing. And we doubt that we will have any other integration issues going forward.

*Id.* at 18.

Conaway:

Now that John has reviewed he progress we made on working capital, I want

9. The reason this seems certain is that the handwritten changes and omissions in the 2:45 p.m. draft of November 26 script in Plaintiff's Exhibit 242 tracks the transcript of the actual conference call for both the Conaway and McDonald portions (Plf. Exh. 57), whereas Defendant's Exhibit 138 does not. These changes never got made in Defendant's Exhibit 138—the November 27, 2001, 8:23 a.m. version. Thus, it is the SEC's "3rd Quarter Conference Call Book" (Plf. Exh. 242), and not Defendant's Exhibit 138, that contains what appears to be the final script actually used in the conference call, and that Conference Call Book also contains the Form 10–Q(3).

to review some facts so everyone is entirely clear [and] we can eliminate any misinformation that's clearly been circling in the marketplace.

First, Kmart is woefully [uncompetitive] on [terms], compared to competitive benchmarking. That's a fact.... Now, while we have a commitment to our supplier partners to continue to improve execution to fulfill our commitment, I can assure you, we expect nothing less than to be fully competitive on terms and costs from any vendor who deals with Kmart.

Second, we're executing a major integration of hard lines and soft lines systems and distribution centers. I think you get an idea of the magnitude of this effort and the incredible opportunity it has. **We've clearly [caused] some systems issues, as John mentioned. During our accounts payables conversion, certain invoices involved with the integration were dropped and has clearly caused some confusion.** This was magnified by eliminating a quarter— that's right a quarter [,] 25 percent of our entire vendor base. This has been corrected and it's working as planned. * * *

Fourth, as of today, we have over $600 million in borrowing capacity on our existing credit facility and over $400 million in cash. And at any point of time, during any point during the entire year, we've had a minimum of $300 million in cash on hand.

*Id.* at 19–20.

**Also, given the magnitude of [process], system and people changes, we will have other bumps in the road, illustrated by the Elmo conversion.** That's a reality.

*Id.* at 25.

Questions:

Eric Beder:

And in terms of the vendors and the payables, what has been the, I guess— what has been the biggest problem with the vendors. I—should—have they had problems understanding what's going on here or are they just, you know, just want to get paid, I guess, quicker ?

*Id.* at 28.

Conaway:

Well, I think we had—there was some clearly, Eric, some, you know, communication issues. And so, that was one piece. We didn't communicate as quickly as we should. And then, I think there is a—you know, there was a lot of noise from small group of suppliers.

McDonald: Yeah, (inaudible) those who were part of the 25 percent (inaudible)

Conaway:

Yeah, I mean, you got to remember, we cut a quarter of our suppliers. So those people aren't very happy with us. So other than that, that's it. I mean, we're, like we said, right now, **systems fully integrated [a]nd its working fine** ....

McDonald:

(inaudible) we're fully caught up at this point, as I said. And, you know, we're on our way. **I don't see any further integration issues** as relates to the—to the vendors.

Conaway:

And were going to continue to work on getting competitive on payables [terms].

Beder:

Right. Thank you.

*Id.* at 28–29.

Two individuals on the conference call, Eric Beder, a securities analyst with Ladenberg Thalmann, and Maurice Sabony, with Milberg Factors, were extremely interested in learning as much as they could about the state of Kmart's liquidity given the negative rumors and bad press. (Be-

der 12/17/07, at TrDep00276; Sabony 2/28/08, at TrDep00212–13.) Sabony in calling various persons at Kmart, including Treasurer McDonald, about past due accounts had repeatedly been given the eLMO systems problems story line as the only reason for the late payments. (*Id.* at TrDep00200–09.) Mr. Beder left the conference call with the impression that the references to "systems integration problems" related to Project eLMO, the same story he had heard during the prior weeks, and that the problem had been fixed. (Beder 12/17/07, at TrDep00276–78, TrDep00281–82 & TrDep00284.)

Beder's understanding of Conaway and McDonald's answer to his question was that there were only two groups of vendors complaining: those who had been cut, and those who were affected by eLMO. The implication was that no other vendors were complaining. (*Id.* at TrDep00287–88.) Based on what he heard during the conference call, Beder felt that Kmart's liquidity situation was in pretty good shape, which, in part, led to his decision to maintain a "buy" rating for Kmart stock. (*Id.* at TrDep00289 & TrDep00294.) To him, what management says can be more important than the financial documents. (*Id.* at TrDep00269–70.) If he had known Kmart was intentionally delaying payments to vendors he would have included that information in his report, because it was material, in that it went to the heart of the effectiveness of the company's turnaround. (*Id.* at TrDep00294–95.)

In their Complaint the SEC challenged two statements of Mr. Conaway's at the November 27 conference call were misleading:

1. We've clearly caused some systems issues, as John mentioned. During our accounts payable conversion, certain invoices were dropped and has clearly caused some confusion.

and

2. In response to Eric Beder's question about the biggest problem with vendors and payables—

... And then, I just think there is a— you know, there was a lot of noise from a small group of suppliers.

Dkt. 1, at p. 10–11.

The jury found both of these statements were false or misleading, material misrepresentations, and made with the intent to defraud or with reckless disregard for the truth. (Verdict Form, Dkt. # 129, at p. 7–8.)

From November 27 and continuing into December and January, vendors were still calling about past-due payments. (Lindsey 5/18/09 Tr00670–73.) Mr. Sabony noted that Kmart never got caught up with its late payments to his clients from November 27 through December 12. (Sabony 2/28/08, at TrDep00216.) Two days after the conference call, on November 29, 2001, Moreland emailed Archambeau Project SID was suspended and "We're officially done." (Def. Exh. 69.) (Archambeau 5/13/09, at Tr00518.) This applied only to Project SID, not the AP System changes, and even Project SID was started up again the week before Christmas. (Archambeau 5/13/09, at Tr00512; Gilbert 5/13/09 at Tr00442–43.) Mr. Gilbert testified that the Kmart was never within 200 million dollars of being caught up with vendors in 2001. (Gilbert 5/13/09 at Tr00464.) Kearse also testified that, to his knowledge, Kmart never caught up with its vendors, and he never said as much to Mr. Conaway. (Kearse 5/20/09, at Tr01226–27 & Tr01269–70.)

## II. DEFENDANT CONAWAY'S LEGAL CHALLENGES:

### A. Claim Three—Aiding and Abetting Kmart's Violation of Section 13(a) of the Exchange Act.[10]

#### 1. *Challenge to the Violation of Section 13(a) of the Exchange Act*

Claim Three alleges that Defendant Conaway under Section 20(e) of the Exchange Act aided and abetted Kmart in violation of Section 13(a) of the Exchange Act and Rules 12b–20 and 13a–13 promulgated thereunder.[11] Section 13(a) of the Exchange Act required every issuer of a security registered pursuant to section 12 of the Act to file with the Securities Exchange Commission such annual and quarterly reports as the Commission may prescribe. Rule 13a–13 requires such corporations to file a quarterly report Form 10–Q and Rules 12b–20 requires the Form 10–Q to contain such additional material as necessary to make it not misleading. The instructions under this claim and the verdict findings follow.

**Instruction No. 30: Claim Three: Aiding and Abetting–Section 13(a)**

The SEC contends in Claim Three that Mr. Conaway violated Section 20(e) of the Exchange Act by aiding and abetting Kmart's alleged violation of Section 13(a) and Rules 12b–20 and 13a–13. Section 13(a) and Rule 13a–13 require companies that issue securities to file a quarterly report on Form 10–Q in accordance with such rules and regulations as the Commission may prescribe. Rule 12b–20 provides that in addition to the information expressly required to be included in a statement or report, the issuer shall add such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading. The term "material" has the same meaning as set forth in Instruction 22 at page 30 above.

In order to prevail on Claim Three, the SEC must prove by a preponderance of the evidence:

*First:* That Kmart Corporation committed one or more violations of Section 13(a) of the Exchange Act and Rules 12b–20 and 13a–13.

*Second:* That Mr. Conaway had a general awareness that his role was part of an overall activity that was improper.

---

**10.** The jury was charged in the order of the claims set out in the SEC's complaint. Yet, in retrospect, because Claims Three, Two and One respectively became more and more serious, and because various findings of Claims One and Two build on Claim Three, and Claim One builds on Claim Two, it would have been preferable to have charged the jury on Claim Three, then Claim Two, and finally Claim One. This would have allowed the explanations of Regulation SK's Item 303 to be introduced in conjunction with Claim Three where its applicability is agreed upon by all parties. This is one of multiple situations in this case where the benefit of hindsight raises the painful and humbling question of why did not I or someone think of this or other things at trial. While not a remedy to the order in which the jury was charged, it seems that consideration of Defendant's Rule 50(b) and 59 motions better proceed with an analysis of Claim Three before Claims Two and One. Claim One involves the considerable questions of whether the evidence is sufficient to allow a jury to find that Charles Conaway caused the 10b–5 violation and whether he acted with scienter, which issues are separate from the other central question in this case of whether a 10b–5 violation can, in part, be based on a violation of Regulation S–K's Item 303. Dealing with that difficult issue is clearer in an analysis of whether Kmart violated 10b–5 under Claim Two instead of confusing it with the other troubling issues under Claim One of whether Defendant Conaway caused any 10b–5 violation or acted with scienter.

**11.** 15 U.S.C. § 78m(a),17 C.F.R. § 240.12b–20 and § 240.13a–13.

*Third:* That Mr. Conaway knowingly assisted Kmart in its violation.

*Fourth:* That Mr. Conaway substantially assisted Kmart in its violation. The Second, Third, and Fourth elements under Count Three have the same meaning as for Count Two.

The Second, Third, and Fourth elements incorporated here from Count Two were:

### Instruction No. 27: Second Element: General Awareness

The second element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Mr. Conaway had a general awareness that his role was part of an overall activity that was improper. In order to establish this element, the SEC must show that Mr. Conaway knew or was reckless in not knowing that Kmart's Form 10–Q for the third quarter of 2001 contained material misstatements or omitted material facts necessary to make the statements that were made not misleading. "Knowledge" and "recklessness" in this context have the same meaning as for Claim One.

### Instruction No. 28: Third Element: Knowing Assistance

The third element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Mr. Conaway provided knowing assistance to Kmart in the alleged violation. With respect to this third element, the word "knowing" modifies the word "assisted," not "violation."

### Instruction No. 29: Fourth Element: Substantial Assistance

The fourth element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Mr. Conaway provided substantial assistance to Kmart in the alleged violation.

In order to establish this element, the SEC must show that Mr. Conaway's encouragement or assistance was a sub-stantial factor in contributing to the violation.

Claim Three continues:

### Instruction No. 31: First Element: A Violation of Section 13(a) and Rules 12b–20 And 13a–13 by Kmart

The first element that the SEC must prove by a preponderance of the evidence in support of Claim Three is that Kmart violated Section 13(a) and Rules 12b–20 and Rule 13a–13 promulgated thereunder.

The SEC contends that Kmart violated Section 13(a) and Rules 12b–20 and Rule 13a–13 by making false or misleading statements or omissions in its Form 10–Q for the third quarter of 2001. For a list of the false and misleading statements and omissions at issue with respect to the Form 10–Q, see Instruction 21 at pages 26–27 above.

In order to prove a violation of Section 13(a), the SEC does not need to show that Kmart acted knowingly or recklessly.

Instruction Number 21 states:

The alleged misrepresentations and omissions asserted by the SEC as to Kmart's Form 10–Q for the third quarter of 2001 are as follows:

*Statements:*

1. The Form 10–Q stated, "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities."

2. The Form 10–Q stated, "Inventory increased . . . due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position."

*Omissions:*

1. The Form 10–Q did not identify a known material liquidity event that occurred in the third quarter of 2001.

2. The Form 10–Q did not disclose that Kmart had a material liquidity deficien-

cy during the third quarter of 2001 or the course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency. 3. The Form 10–Q did not identify the delay in vendor payments as a material change in an internal source of liquidity during the third quarter of 2001.

The jury Verdict From indicates:

### CLAIM THREE

**Aiding and Abetting Section 13(a) of the Securities Exchange Act of 1934 and Rule 12b–20 and 13a–13 Promulgated Thereunder**

**For each Question below, please refer to the corresponding jury instructions for Claim Three.**

After you have answered questions 1 through 4 below, you will be asked to answer the following question:

Did Charles Conaway aid and abet one or more violations by Kmart Corporation of Section 13(a) of the Securities Exchange Act of 1934 and Rules 12b–20 and 13a–13 promulgated thereunder as to the Kmart Form 10–Q for the quarterly period ending October 31, 2001?

Do you find by a preponderance of the evidence:

1. That Kmart violated Section 13(a) and Rules 12b–20 and 13a–13 in its Form 10–Q for the third quarter of 2001 with respect to one or more of the statements or alleged omissions in Question 1 under Claim Two? (Please base your answer to this question on your answers to Question 1 under Claim Two, except do not consider any of the questions: "That Kmart acted with intent to defraud or with reckless disregard for the truth?" As set forth in Instruction No. 31 at page 40, you do not need to find that Kmart acted knowingly or recklessly in order for Kmart to have violated Section 13(a) and Rules 12b–20 and 13a–13.)

Answer: Yes ___/___ No _____

2. That Charles Conaway had a general awareness that his role was part of an overall activity that was improper?

Answer: Yes ___/___ No _____

3. That Charles Conaway knowingly assisted Kmart in its violation of Section 13(a) and Rules 12b–20 and 13a–13?

Answer: Yes ___/___ No _____

4. That Charles Conaway substantially assisted Kmart in its violation of Section 13(a) and Rules 12b–20 and 13a–13?

Answer: Yes ___/___ No _____

Did Charles Conaway aid and abet one or more violations by Kmart Corporation of Section 13(a) of the Securities Exchange Act of 1934 and Rules 12b–20 and 13a–13 promulgated thereunder as to the Kmart Form 10–Q for the quarterly period ending October 31, 2001?

Answer: Yes ___/___ No _____

Verdict Form, Dkt.# 129, at p. 15–16.

The relevant findings of the jury as to the misstatements and omissions in the MD & A of the 10–Q(3) that are applicable to Kmart's alleged § 13(a) reporting violation under Claim Three were earlier made by the jury in the response to Question 1 under Claim Two concerning Kmart's 10b–5 violation. These findings were as follows (with the **boldface type** added to clarify which alleged misstatements or omissions each series of questions involved):

Do you find by a preponderance of the evidence:

\* \* \*

a. With respect to the statement in the Management Discussion & Analysis section of Kmart's Form 10–Q that **"Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities,"** do you find:

i. That the statement was false or misleading?

Answer: Yes __√__ No ____

ii. That the statement was material?

Answer: Yes __√__ No ____

\* \* \*

b. With respect to the statement in the Management Discussion & Analysis section of Kmart's Form 10–Q that "**Inventory increased ... due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position**," do you find:

i. That the statement was false or misleading?

Answer: Yes __√__ No ____

ii. That the statement was material?

Answer: Yes __√__ No ____

\* \* \*

c. With respect to the **alleged omission** from the Management Discussion & Analysis section of Kmart's Form 10–Q **that it did not identify a known material liquidity event** that occurred in the third quarter of 2001, do you find:

i. That Kmart had a known **material liquidity event** that occurred in the third quarter of 2001?

Answer: Yes __√__ No ____

ii. That Kmart was required to disclose this fact under Item 303 of Regulation S–K?

Answer: Yes __√__ No ____

iii. That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes __√__ No ____

iv. That the omitted fact was material?

Answer: Yes __√__ No ____

\* \* \*

d. With respect to the **alleged omission** from the Management Discussion

& Analysis section of Kmart's Form 10–Q **that it did not disclose that Kmart had a material liquidity deficiency** during the third quarter of 2001 or the course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency, do you find:

i. That Kmart had a **material liquidity deficiency** during the third quarter of 2001 and, if so, **remedied** that deficiency **by a** course of action involving the **delay of vendor payments?**

Answer: Yes __√__ No ____

ii. That Kmart was required to disclose these facts under Item 303 of Regulation S–K?

Answer: Yes __√__ No ____

iii. That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes __√__ No ____

iv. That the omitted facts were material?

Answer: Yes __√__ No ____

\* \* \*

e. With respect to the **alleged omission** from the Management Discussion & Analysis section of Kmart's Form 10–Q **that it did not identify the delay in vendor payments as a material change in an internal source of liquidity** during the third quarter of 2001,

i. That the **delay in vendor payments** was a material change in an internal source of liquidity during the third quarter of 2001?

Answer: Yes __√__ No ____

ii. That Kmart was required to disclose this fact under Item 303 of Regulation S–K?

Answer: Yes __✓__ No ____

iii. That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes __✓__ No ____

iv. That the omitted fact was material?

Answer: Yes __✓__ No ____

*Id.* at p. 9–13.

Again, Defendant's challenges to the sufficiency of the evidence to support the jury's finding that the two statements in Question 1. a. and Question 1. b. were false or misleading are discussed in Section III below. As will be discussed further in that section, the SEC's legal contention is that the MD & A statement on liquidity that included these two sentences was materially misleading because of what it failed to say. If the jury found the two above statements materially misleading because of what else was not said (and if that finding had sufficient factual support which will be discussed below), then that would constitute a violation of Rule 12b–20 which states:

**Additional information.**

In addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.

17 C.F.R. § 240.12b–20.

The jury also found that there were three specific omissions of material fact [12] that were necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading? [13] In the absence of additional findings that these three items were otherwise required to be disclosed by regulation, these omissions also would support a finding of a violation of Rule 12b–20. But the jury also specifically found that each of these three omitted facts were required to be disclosed under Item 303 of Regulation S–K. [14] The disclosure requirements for quarterly reports required under section 13(a) of the Exchange Act of 1934 and by Rule 13a–13 are set out in Item 303 of Regulation S–K. [15] While De-

**12.** The jury was specifically instructed that for omissions under Rule 12b–20 (17 C.F.R. § 240.12b–20), the omitted fact had to be material as defined in Instruction Number 22 which was drawn from *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

**13.** VERDICT FORM Claim 2, Questions 1.c.i., iii. and iv. (a material liquidity event), Questions 1.d.i., iii. and iv. (a material liquidity deficiency remedied by delay of vendor payments), and Questions 1.d.i., iii. and iv.(these delays in vendor payments were a material change in an internal source of liquidity).

**14.** VERDICT FORM Claim 2, Question 1 c. i.(a material liquidity event), Question 1 d. i. (a material liquidity deficiency remedied by delay of vendor payments), and Question 1 d.

i.(these delays in vendor payments were a material change in an internal source of liquidity).

**15.** The proposed instruction on Claim Three the SEC's initially requested ("Plaintiff's Proposed Instruction No. 34"), like the final one, makes no reference that a Section 13(a) or Rule 13a–13 violation required a showing of a violation of Item 303 of Regulation S–K. Defense counsel proposed alternative instructions including one ("Conaway's Proposed Instruction No. 27") that stated the SEC's section 13(b) and Rules 12b–20 and 13a–13 claim was because the MD & A did not comply with the requirements of Item 303(b) and Regulation S–K. It then quoted all of 303(b) with no mention of the portions of Item 303(a) that needed disclosure if there were material changes from prior

fendant challenges the instructions on Item 303, which is discussed below, if the jury was adequately instructed on the reporting requirements under 303(b) for interim SEC filings, these jury findings would be legally sufficient to support the jury's finding a violation of Regulation 13a–13 on the 2001 filing for the third quarter.

Thus, either an omission under Rule 12b–20 or a failure to disclose information required under Rule 13a–13 and Regulation S–K Item 303 would form a sufficient basis for the jury's finding that Kmart committed one or more violations of Section 13(a) of the Exchange Act in its Form 10–Q for the third quarter of 2001.

### 2. *Challenge to the Instruction on Item 303 of Regulation S–K.*

Portions of Item 303 of Regulation S–K were read to the jury in conjunction with Claim One and Two, and the jury instruction binder given to the jury which included the instructions also included the entire Regulation S–K and the 1989 Release interpreting it with the portions that were read highlighted for the jury. In that earlier given Instruction Number 21, immediately after the above noted list of the two alleged false and misleading statements and the three alleged omissions at issue with respect to the Form 10–Q, were the following instructions, and the only instructions read to the jury on Item 303 of Regulation S–K:

> With respect to the alleged omissions, you must first find that the omitted facts were required to be disclosed under Item 303 of Regulation S–K and that those omissions were material as defined in Instruction No. 22 on page 30. For the alleged misleading statements and

omissions in the Management Discussion & Analysis, you must determine whether the statements and omissions were misleading and whether they were material to the period covered by Kmart's third quarter Form 10–Q, the three months ending October 31, 2001. Second, you must find that the failure to include those omitted facts rendered the Management Discussion & Analysis section of Kmart's Form 10–Q for the third quarter of 2001 materially misleading.

What I am about to read to you are selected portions of Item 303 that the SEC contends required the allegedly omitted facts to be disclosed. You will also be provided with a full copy of Item 303 and the relevant SEC guidance.

Item 303. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

(a) *Full Fiscal Years.* Discuss registrant's financial condition, changes in financial condition and results of operations. The discussion shall provide information as specified in paragraphs (a)(1), (2), and (3) ....

(1) *Liquidity.* Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency. Also identify and separately describe internal and external sources of liquidity, and briefly describe any material unused sources of liquid assets ....

---

quarterly reports. While defense counsel made numerous formal objections on the record to multiple instructions that were given and objections to several specified proposed defense instruction that were not giv-

en, it is not clear that Defendant Conaway objected to above Instruction Numbers 30 or 31, nor to the above quoted portions of the Verdict Form related to Claim Three.

Instructions to Paragraph 303(a).... 2. The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

3. The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations....

5. The term "liquidity" as used in this Item refers to the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash....

(b) *Interim Periods....* The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item ....

Instructions to Paragraph (b) of Item 303....

3. The discussion and analysis required by this paragraph (b) is required to focus only on material changes....

Defense counsel challenge whether Regulation S–K's Item 303 has any place in the 10b–5 instructions on Claims One and Two. This argument will be discussed in detail in the analysis of Claims One and Two where the issues was initially considered in the jury instructions conferences.

In addition to this objection, Defendant—without questioning that Regulation S–K's Item 303 is relevant to Claim Three—challenges the adequacy of these instruction on Regulation S–K Item 303, and the sufficiency of the evidence to support various factual findings noted above.

Because the Verdict Form on Claim Three incorporated the jury's answers to question one under Claim Two, which involved findings of violations of Regulation S–K's Item 303, if that instruction is wholly inadequate and misleading it may have prejudiced the jury's finding under Claim Three. Before considering the instruction on Regulation S–K and Item 303, a review of the standards for setting aside a jury verdict because of improper instructions is in order.

### 3. Jury Instructions.

#### a. *Background Law.*

"This circuit has set a high standard for reversal of a conviction on the grounds of improper [jury] instructions." *Roberts v. Galen of Virginia, Inc.,* 325 F.3d 776, 787 (6th Cir.2003), *quoting United States v. Sheffey,* 57 F.3d 1419, 1429 (6th Cir.1995), *cert. denied,* 516 U.S. 1065, 116 S.Ct. 749, 133 L.Ed.2d 697 (1996) (even though "jury instructions were erroneous," there was no prejudice to defendant). As the Sixth Circuit made clear in *Roberts,* the instructions must be "viewed as a whole" and any confusion or error must be "prejudicial." "Our inquiry into jury instructions is limited to whether, taken as a whole, the instructions adequately inform the jury of the relevant considerations and provide the jury with a sound basis in the law with which to reach a conclusion." *United States v. Wells,* 211 F.3d 988, 1002 (6th Cir.2000).

"This court may reverse a judgment on the basis of improper jury instructions only if the instructions, when viewed as a whole, were confusing, misleading and

prejudicial." *Roberts*, 325 F.3d at 787. That is whether, taken as a whole, they given an inadequate understanding of the law. *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir.1998). *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 828 (6th Cir.2000) (same; although jury instruction was erroneous; the error was harmless when the instructions were "viewed as a whole"); *O–So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 502 (6th Cir.1992) (affirmed in relevant part: "When instructions are challenged on appeal our duty is not to read the instructions word for word in search of an erroneous word or phrase.... [W]e find that the inclusion of the erroneous 'must' was harmless."); *Blackwell v. Sun Electric Corp.*, 696 F.2d 1176, 1181–83 (6th Cir.1983) (court found instructions adequate as a whole even though "the district court was less than precise when it tried to use language the jurors could understand"; "it is not reversible error if the court refuses to use the exact language counsel requests"); *Lees v. Thermo Electron Corp.*, 2008 U.S. Dist. LEXIS 103330 at *3, 2008 WL 5212224 at *1 (S.D.Ohio Dec. 12, 2008) (rejecting contentions that jury was confused by instructions; the trial court "enjoys considerable latitude in selecting appropriate language" for the jury instructions); *see also Thompson v. Underwood*, 407 F.2d 994, 997 (6th Cir.1969) ("A court's instructions should be patterned to fit the case being tried.").

It is well established in the Sixth Circuit that: "courts generally presume the jury will follow the instructions correctly as given." *Barnes*, 201 F.3d at 822, 827 (6th Cir.2000). *Accord, e.g., Hill v. Mitchell*, 400 F.3d 308, 325 (6th Cir.2005) (same), *citing and quoting, Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir.2000). *See generally, Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (citing the "rule that juries are presumed to follow their instructions.")

### b. *Regulation S–K, Item 303.*

Defendant first asserts the jury instructions on Regulation S–K Item 303 were erroneous because the jury was not instructed on what defense counsel attributes to being my ruling that the Kmart's filing of the 10–Q(3) could be interpreted as an implied representation that it was in compliance with Item 303. This discussion was part of the jury instruction arguments on whether Item 303 could form a basis for a Section 10(b) and Rule 10b–5 claim and it also is best discussed below in considering the defense challenges to the instructions on the 10b–5 Claims One and Two.

### (1.) *Did the Jury Instruction Confuse 303(b) with 303(a) and not require a Change?*

■ Defendant next argues that because the instructions on Item 303 began with Item 303(a) which only applies to the 10–K annual report and not the quarterly reports, and further because the Verdict Form tracks the language of Item 303(a) [e.g. material liquidity "event", material liquidity "deficiency", and "internal ... source[ ] of liquidity"], that the jury was not adequately instructed that only Item 303(b) applied to quarterly filing, and further that the jury was not sufficiently apprised of the fact that liquidity items noted in Item 303(a) need only be discussed in quarterly reports if there was a "material change" in that quarter from what had earlier been reported.

The Complaint in paragraph 28–34 notes that: complete and accurate MD & A disclosures were required in Kmart's Form 10–Q(3); disclosure of changes in financial conditions were required including the causes for the material changes in accounts payable and inventory from the end of the prior fiscal year and the third quarter of 2000; and where material deficiencies are identified then the report must

include the course of action the company had taken or proposed to take to remedy the deficiency as well as identify and separately describe internal and external sources of liquidity. (Dkt.# 1) The complaint then states that the MD & A in the 10–Q(3) should have disclosed the August 2001 overbuy as the cause for the $400 million or 6% inventory increase and the $718 million or 28% increase in accounts payable from the third quarter of 2000 which increase was a material deficiency. The complaint states further that the MD & A in the 10–Q(3) should also have disclosed that the several hundred million dollars in withheld payments from vendors, or "vendor borrowing constituted a material deficiency at quarter end", and finally that Project SID was a source of liquidity that should have been identified and separately described.

Defendant's first proposed jury Instruction Number 27 on the claim three Section 13(a) violation referred only to Item 303(b). The SEC's first draft Proposed Instruction Number 34 on the section 13(a) claim three was general and did not identify any alleged misleading statements or omission nor refer Regulation S–K or Item 303. When it was determined the specific alleged misstatements and omissions from the complaint needed to be included on all claims, Defendant's Revised Proposed Instruction Number 27 added the two alleged misstatements and regarding the omissions it quoted only the portion on "Liquidity" from Item 303(a) and noted the

jury would be provided a copy of Item 303. This proposed defense instruction made no reference to "change" anywhere. In discussing what portions of Regulation S–K needed be included in the instructions, it was determined that because Item 303(b) refers to material changes in items listed in 303(a), that those parts of Item 303(a) should be included in the instruction as well as Item 303(b). When the Defendant's proposed iteration of the instruction dealing with the specific misstatements and omissions and Item 303 was thereafter submitted, defense counsel noted they changed the order from the SEC's prior draft that began with the omissions, and they also "slightly rephrased the omissions so that they track the language of Item 303." (May 27, 2009, Transcript, evening session at Tr02308.) Thus the terms "material liquidity event", "material liquidity deficiency", and "delay of vendor payments" as a "material change in an internal source of liquidity" from the defense draft came to replace the Complaint's terms of "overbuy" and "Project SID." In light of the evidence it did not seem this change would have caused any confusion with the jury who clearly knew that it was the SEC's claim that the August overbuy was the "material liquidity" event in the third quarter of 2001 that created the "material liquidity deficiency" in overdue accounts payables that was remedied by delay of vendor payments, the major and essential component of which was Project SID.[16]

---

16. While there was some question about the various terms used for the "delay of vendor payments" or "slow paying vendors"—i.e. "Project SID," "prioritizing invoices", the "AP System" changes, "managing payables," "stretching vendors"—the only *material* change in an internal source of liquidity during the third quarter of 2001" and the only "course of action involving the delay of vendor payments taken ... [that was sufficient] to remedy that [material liquidity] deficiency" was Project SID either alone or in conjunc-

tion with the AP System changes. The latter increased in "borrowings" from vendors beyond the contract terms by approximately $300 million (Plf's Exh. 20, p. 3, Moreland 4/23/09, at TrDepOO 144–47), and SID increased these "borrowings" by approximately $790 million on October 31, 2001, plus or minus 10% according to the undisputed testimony of Assistant Treasurer Mark Moreland and his SID Master Tracking Document ex-

The confusion defense raised is that by starting with the sections on liquidity from Item 303(a) dealing with the annual report before quoting from Item 303(b) the jury would think any requirement from Item 303(a) was necessary in the From 10–Q(3) without the need for them to find that it was a material change from prior reports. Again the Instruction Number 21 concerning Item 303 states:

What I am about to read to you are selected portions of Item 303 that the SEC contends required the allegedly omitted facts to be disclosed. You will also be provided with a full copy of Item 303 and the relevant SEC guidance.

Item 303. *Management's Discussion and Analysis of Financial Condition and Results of Operations*

(a) *Full Fiscal Years.* Discuss registrant's financial condition, changes in financial condition and results of operations. The discussion shall provide information as specified in paragraphs (a)(1), (2), and (3) . . . .

(1) *Liquidity.* Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency. Also identify and separately describe internal and external sources of liquidity, and briefly describe any material unused sources of liquid assets . . . .

Instructions to Paragraph 303(a) . . . .

2. The purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

3. The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations . . . .

5. The term "liquidity" as used in this Item refers to the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash . . . .

(b) *Interim* Periods . . . . The discussion and analysis shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item . . . .

Instructions to Paragraph (b) of Item 303 . . . .

3. The discussion and analysis required by this paragraph (b) is required to focus only on material changes . . . .

Throughout the trial the term "third quarter" or "third quarter of 2001" were repeatedly mentioned in the testimony, and the SEC's arguments and evidence was clear that the Form 10–Q(3) was for an interim period and was not for the full fiscal year filing, which was at times referred to as the Form "10–K." It is inconceivable that this jury, which had some relatively sophisticated members with business work experience, thought that they were dealing with a full fiscal year

hibit. (Plf's Exh. 289A, Moreland 4/23/09, at TrDep00167.)

filing and not an interim filing. It is also not credible that they did not realize that they were dealing with the requirements for a report for an interim period. Regarding that interim reports they were told it requires a "discussion of material changes in those items specifically listed in paragraph (a) of this Item" with that message repeated in telling them that the required discussion and analysis focus "only on material changes." The jury instructions and Verdict Form on the third omission were clear that they had to find that "[t]he Form 10–Q did not identify the delay in vendor payments as a *material change* in an internal source of liquidity during the third quarter of 2001" (emphasis added). Why, when the defense counsel were drafting their proposed instruction to "track the language of Item 303," they only included "material change" in the third omission and not the first two omissions cannot likely be known at this time. It is clear that had they drafted them to include the following bracketed and boldfaced materials, there would have been no objection from the SEC or the Court:

Omissions:

1. The Form 10–Q did not identify a known [**material change involving a**] material liquidity event that occurred in the third quarter of 2001.

2. The Form 10–Q did not disclose that Kmart had a [**material change involving a**] material liquidity deficiency during the third quarter of 2001 or the [**material change selecting a**] course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency.

In retrospect, I wish I had added immediately following the reading the above quoted portions from Item 303(a) and (b): [17]

Members of the jury, I want to be clear that this case involves an interim SEC filing, the Form 10–Q(3). For such interim filings, Item 303(b) requires disclosures of items such as those dealing with liquidity that are listed in 303(a) for the annual filing, only if there was a material change in those items in the third quarter of 2001 compared to the end of the fiscal year or the third quarter of 2000. Thus you must find for each of the three alleged omissions noted above that what was omitted was a material change involving liquidity from those two prior quarterly periods.

Had defense counsel asked for this or a similar instruction such an addition would not have been objected to by the SEC nor rejected by the Court. I do not wish to infer that this was intentionally an "invited error" given the extraordinary professionalism defense counsel demonstrated throughout this case and trial, but this appears to be an issue that defense counsel may have overlooked, which if raised under Fed.R.Civ.P. 51(c) "stating distinctly the matter objected to and the grounds for the objection" that proposed changes would have been accepted. While the defense counsel objected to Jury Instruction Number 21 on other grounds that will be considered later in this opinion, this simply was not one of the grounds presented to me in the jury conference, nor in the defense's formal objections later put on the record prior to charging the jury instructions. Defense counsel objected on the

---

**17.** During the discussion of this instruction, I expressed my frustration with not having some appeal tested jury instructions when I stated: "I mean, what's making this think [thing] tortuously difficult is we're possibly cobbling up a lot of new law here and that's a lot harder." May 27, 2001, Transcript of the evening session, p. 115, 1.8–10. That transcript notes that this third session on jury instructions began at 6:36 p.m. after a fill day of trial and ended at 9:43 p.m.. *Id.* at p. 3 and p. 131.

direct examination of Plaintiff s expert, Dr. Carmichael, that counsel was asking about items to be disclosed under Item 303(a), and this case involved 303(b) (Carmichael 5/21/09, at Tr01431.) Plaintiff's counsel countered that all of the items to be disclosed come under 303(a), and "303(b) cross references 303(a) that defense counsel could raise this distinction on cross examination." (*Id.* at Tr01431–31.) Defense counsel did not pursue this issue on cross-examination nor clearly raise it in the jury instruction conferences. (*Id.* at Tr01474–81.)

It is possible that this issue was not explored on cross-examination of Dr. Carmichael, nor the focus of sufficient attention in drafting the jury instructions, due to the fact that the evidence at trial was so clear, and I think unchallenged, that the magnitude of the liquidity event and liquidity deficiency caused by the August 2001 Schwartz overbuy and Kmart's extraordinary slow pay method of dealing with it and the resulting vendor complaints, were without precedent in Kmart's history as

recalled by many employees having years of experience working at Kmart.[18] While adding a few days delay in paying vendors may have occurred in the past at Kmart, the magnitude of the delays involved in Project SID unilaterally adding thirty or more days were without precedent in Kmart's history. That these events—the overbuy, the resulting liquidity deficiency and the use of Project SID and the AP System changes—were "changes" from any prior Kmart history can hardly be asserted as a issue of disputed fact. While defense counsel during trial dispute the fact that these events were "material" or needed to be disclosed in the Form 10–Q(3), they do not dispute that such events never occurred in any prior quarterly period at Kmart and thus they unquestionably were changes from the reporting periods of the 10–K fiscal report, the prior quarterly report of 2001, and the third quarterly report of 2000. On the disputed question of whether these events omitted from the 10–Q(3) were material, that question was considered by the jury under the "ma-

---

**18.** While Mr. Moreland did not have a long work history at Kmart, as others had, he described Conaway and McDonald approving his new SID program which he described as unusual in degree and scope. (Moreland 6/27/07, at TrDep00028 & TrDep00032.) Mr. Archambeau-who worked for Kmart since 1980, and at headquarters since 1982–noted repeatedly that project SID was not done in the past and "This was totally out of the ordinary from anything we ever done in the past." (Archambeau 5/13/09, at Tr00487–88, Tr00499–500.) Scott Gilbert, who headed accounts payable, also noted that project SID "was something that has never been done before" and he had never seen AP System changes to deal with a liquidity crisis in his 30 plus years at Kmart. (Gilbert 5/13/2007, at Tr00379 & Tr00392.) Although Kmart had a reputation for stretching vendors a few days (Stallkamp 5/18/09, at Tr00838) and had, at times, delayed payments to vendors, Mr. Kearse, who had worked at Kmart since 1974 noted that the Schwartz overbuy was not a normal seasonal buy and that the liquidity

crunch in the third quarter of 2001 was more severe than normal, and vendors not shipping because of non-payment was also not normal. (Kearse 5/20/09, at Tr01051, Tr01072, Tr01104 & Tr01124.) While slow paying vendors had been done before at Kmart adding a day or two (Moreland 6/27/07, at TrDep00032), Mr. Kearse didn't recall it ever being done to the level in the second half of 2001. (Kearse 5/20/09, at Tr01275.) Even Mr. Conaway acknowledged that he did not recall having to prioritize invoices to manage a liquidity crunch of the previous year or his eight years at CVS Pharmacy. (Conaway 2/13/08, at TrDep00330–31.) Karen Lindsey, Treasurer McDonald's administrative assistant, who worked at Kmart since 1972 and for Mr. McDonald since September 2000, testified that beginning in September 2001 and continuing into December, she started receiving phone calls from vendors complaining about late payments, though she had never received them before this time. (Lindsey 5/18/09 at Tr00632–33 & Tr00645–46.)

teriality" standard of *Basic v. Levinson,* and the jury rejected the defense arguments that they were not material. Defendant has not challenged the sufficiency of the evidence supporting that finding but does challenge the instructions on materiality discussed in subsection (3.) below.

Regardless of how the jury instructions on Item 303 could have been improved with further refinement, read as a whole the portions read to the jury did state that the discussion and analysis required for interim period reports involved "material changes" with that point repeated that "[t]he discussion and analysis required by this paragraph (b) is required to focus only on material changes...." They had a copy of all of Item 303 with the portions read highlighted, and that visual layout made it clear that paragraph(b) of Item 303 for "Interim periods" covered only material changes.

Had this case dealt with a full fiscal year filing, then there would have been no need to have included anything from paragraph (b) of Item 303 on "interim filings." Nearly all of the evidence on multiple topics dealt with the third quarter of 2001. Thus, it is reasonable to believe that the jury understood that the only reason they were given any instructions on Item 303(b) on interim filings was because that was the paragraph applicable to the third quarter of a Kmart's fiscal year. For interim filings, portions of Item 303(a) need to be included because 303(b) specifically refers to "paragraph (a)." Thus, it is fair to assume that the jury understood that this case dealt with an interim filing and that they further understood that if the case dealt with the SEC filing for the full fiscal year, then paragraph (a) of Item 303 on "*Full Fiscal Years*" is complete in itself and their instruction on Item 303 would not need to mention of anything from paragraph (b) on "*Interim Periods.*"

With regard to the jury being confused about whether Item 303(b) required a change, the instructions on Item 303, when viewed as a whole, were not confusing, misleading and prejudicial, and that the jury had an adequate understanding of the law.

(2.) *Must all Item 303 Disclosures Affect Future Operations?*

■ Defendant's next challenge to the instruction on Item 303 is based on his argument that it was far from obvious that Kmart needed to discuss the 2001 liquidity crunch caused by the inventory overbuy or the actions taken in response, including the delay in vendor payments, because as of November 27 2001, the liquidity issue caused by the overbuy was over. (Dkt. 139, p. 36 of 75, numbered page 21.)

The defense argues that the instructions on Item 303 failed to stress that a disclosure on a liquidity event was required only when "that will result in ... the registrant's liquidity increasing or decreasing in any material way"—in other words, an event that will have material liquidity implications *going forward.* It does not suggest that an event that has been resolved by the time of filing should be disclosed, even in an annual report." Defendant's counsel argues that:

Item 303(a)(1) (requiring discussion of known trends or known demands, commitments, events, or uncertainties that *"will result in or that are reasonably likely to result in* the registrant's liquidity increasing or decreasing in any material way," and indicating that, where a material deficiency is identified (i.e., a deficiency in liquidity in the future), the registrant should "indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency" (*i.e.,* the course of action that the registrant is implementing to avoid or mitigate the future deficiency)). Instruction 3 to Paragraph 303(a) (which

again applies only to annual reports) does not indicate that a deficiency that has been resolved still needs to be discussed in an annual report (indeed it says nothing about deficiencies at all). The verdict form, however, allowed the jury to impose liability based on "a material liquidity deficiency during the third quarter of 2001," without requiring any assessment of whether it constituted a material deficiency *going forward.*

(Dkt. 139, p. 65 of 75, numbered page 50) (emphasis in original).

This is a mixed legal and factual issue that was at the center of Defendant's argument to the jury regarding Kmart's compliance with Regulation S–K Item 303. Defendant argued that given the other assets of inventory or unencumbered real estate against which Kmart could have borrowed in the third quarter of 2001, and given the short term liquidity problem that was a self inflicted by the overbuy and largely remedied by November 27, there was no material liquidity deficiency going forward that needed to be reported.

To the extent this is an objection to the wording of the instruction on Item 303, like the defense desire for a greater emphasis in the instructions on "material changes," this also was not a concern that was "stating distinctly" at trial under Fed. R.Civ.P. 51(c). But unlike the "material changes" modification that would have been accepted if proposed, this argument would have been rejected because it misstates the law. As noted below, even if the defense theory is correct that the jury should have had additional instructions that they had to find that the effect of the overbuy, the liquidity deficiency and the slow pay means of dealing with it had to be found to affect Kmart's operations going forward, it is hard to seriously question that the jury likely understood these events had a material effect going forward into the fourth quarter and also beyond

the November 27, 2001, reporting date because of the extensive evidence that Kmart was not caught up with overdue vendor payments either at the end of the third quarter or on November 27. While Project SID was suspended for two weeks in mid-December, when CFO McDonald checked with Mark Moreland before the November 27 conference call whether Kmart would be caught up with vendors by November 27 he was told they would not be caught up. (Moreland 6/27/07, at TrDep00091.) While Mr. Conaway testified that the AP System changes were initiated prior to the overbuy and were intended to be permanent, that claim is unsupported by any documentation. Mr. Gilbert's testimony that the AP System changes were initiated in response to the overbuy which was considered a short term problem at the time (Gilbert 5/13/09, at Tr00360–61) is supported by Plaintiff's Exhibits 159 and 135. Defendant did not attempt to contest Gilbert's testimony that AP System changes stayed in place into January 2002. (*Id.* at Tr00378). Other evidence supports a finding that Kmart was never caught up with the vendor payments it intentionally delayed (Sabony 2/28/08, at TrDep00193 and Plf. Exh. 200; Archambeau 5/13/09, at Tr00512–13.)

Defense counsel argued that by November 27, 2001, Kmart's liquidity problem was basically resolved and was not anticipated to be a problem in the future and thus did not need to be reported on the 10–Q(3). The jury in finding against Defendant rejected this argument for one or two possible reasons. First, they reasonably could have determined, and likely did determine, that the liquidity deficiency was "going forward" and was not resolved by October 31 nor by November 27, 2001, the date on which the determination needed to be made of whether there was a material liquidity event and deficiency in the third quarter. Alternatively, if they determined the material liquidity event was fully re-

solved in the third quarter (i.e. by October 31, 2001), it nonetheless needed to be disclosed under Instruction 3 to Item 303(a) requiring disclosure of "matters that have had an impact on reported operations and are not expected to have an impact upon future operations." [19] This language from Instruction 3 to Item 303(a), which was read to the jury, seems to refute Defendant's argument that Item 303 requires disclosure of a material liquidity deficiency only if it is a "material deficiency *going forward*." Defense counsel argue that the "will result in or that are reasonably likely to result" language from 303(a) should be read to exclude a reporting obligation of a known material event that *already had* resulted in a material liquidity deficiency in the quarter. But the plausibility of that interpretation is undercut by the very next sentence which directs that "[i]f a material deficiency is identified, indicate the course of action that the registrant has taken . . . ." This clearly contemplates a need to report or identify a *past* liquidity event that did cause a *past* material liquidity deficiency in the quarter for which a "course of action" was also selected in the quarter. Again, Instruction 3 to Item 303(a) makes it clear that past events in the quarter resulting in past liquidity deficiencies that were fully resolved in the quarter must nonetheless be reported. [20] Finally, the defense reading of the "will result in or that are reasonably likely to result" language makes no policy sense of informing investors about a past event causing a material liquidity deficiency that was resolved, because that information is important to allow them to determine the likelihood of such an event reoccurring.

Yet if, as defense counsel suggests, the material deficiency need be one that not only had an impact on operations for the reported period, but also would have an impact upon future operations, that most likely was the jury's thinking because the impact of project SID and the AP Systems changes, according to the unrefuted evidence from Mark Moreland's SID Master Tracking document was that the incremental borrowings from vendors beyond the contract terms from those two systems were commutatively over one billion dollars at the end of the third quarter "going forward" to the forth quarter and were still over a half a billion dollars on November 27. [21] Basing his opinion on the testimony of witnesses Gilbert, Archambeau,

19. The SEC's 1989 Release on Item 303, which was the major interpretation of Regulation S–K's requirements on Management Discussion and Analysis available in 2001, makes it clear *"Each final determination* resulting from the assessments made by management *must be objectively reasonable, viewed as of the time the determination is made"* (emphasis added). For the 10–Q(3) this objective assessment would be determined based on what Kmart knew on November 27, 2001. SEC Interpretation: Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures, Release Nos. 33–6835; at 13717 (May 18, 1989), [54 FR 22427].

20. Again, Instruction 3 to Item 303(a) reads "The discussion and analysis shall focus specifically on . . . . matters that have had an impact on reported operations and are not expected to have an impact upon future operations. . . . "

21. Assistant Treasurer Moreland identified $790 million in incremental borrowings on October 31, 2001, under Project SID plus approximately $300 million under the AP Systems change, and $263 million under Project SID on November 28, 2001, plus the $300 million under the AP Systems change. He estimated these figures were plus or minus a 10% margin of error. (Moreland 4/23/09, at TrDep00167.) While, Defendant testified that the latter imposed AP Systems change in terms were not intended to be temporary, but permanent, if that is the case then such unilateral extension of vendor payment terms of $300 million could, on its own if Plaintiff's expert Dr. Carmichael's testimony were credited, be a new "internal source of liquidity" that Item 303 required to be disclosed.

Moreland and the trial documents, Plaintiff's expert Carmichael made it clear that the liquidity event continued beyond the third quarter of 2001 and was still occurring on November 27, 2001, because there was still $500 million being held back based on SID and the AP System changes. (Carmichael 5/27/09, at Tr01434–36.) Dr. Carmichael also noted the strain on vendor relations, the risks of their not shipping or paying vendor allowances, and harm to management integrity accompanying this "extraordinary" slow pay system and its coverup story were also material consequences of the slow pay system that continued into the fourth quarter. (*Id.* at Tr01442–51.)

Defendant and defense expert and former Defendant McDonald testified that Kmart did not have a material liquidity deficiency in the third quarter because it could have borrowed against its $8 plus billion in inventory or its other billions in unencumbered real estate. Yet the jury did not accept the existence of alternate means of dealing with the liquidity crisis as relieving Kmart from its obligation under Item 303 to disclose the material change during the third quarter in its internal or external sources of liquidity that Kmart actually selected as the way to deal with its material liquidity deficiency, as Plaintiff's expert, Dr. Carmichael, testified Kmart was required to disclose.[22]

These incremental borrowings from vendors also impacted cash flow not only in the third quarter, but also in the fourth quarter. The overbuy and liquidity deficiency and Project SID created priority demands on available funds to satisfy past due vendor payables if continued shipment of goods was to be maintained. A result of

this was to defer the reduction in payments on borrowings under their bank revolver which was generally accomplished in December of each year. The need for Kmart to reinstitute Project SID in late December after a two week suspension adds to the overwhelming evidence that the liquidity deficiency and Project SID had effects going forward.

The jury was told in Instruction 2 to Item 303(a) "[t]he purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant as determined *by evaluating the amounts and certainty of cash flows from operations and from outside sources*" (emphasis added). Assistant Treasurer Moreland, through exhibits and testimony, showed the jury various forecasts of Kmart's illiquidity on October 10 and November 9 (Plf. Exh. 7 & 4) (*i.e.,* exceeding Kmart's borrowing capacity under the bank revolver) if nothing were done. If cash flows were increased to avoid the illiquidity by slowing the outflow of cash to vendors through the AP Systems changes and Project SID, this could be found by the jury, as Dr. Carmichael testified, to be a material change in a material source of liquidity in the third quarter that needed to be disclosed under Item 303(b). As Dr. Carmichael testified, the fact that Kmart had alternate means of avoiding this liquidity deficiency that was forecast by Moreland does not modify the disclosure obligations under Item 303 to disclose the method of resolving this liquidity shortfall by the slow pay of vendors through the AP Systems changes and Project SID.

The SEC's 1989 Release on Item 303 [23]

---

**22.** Dr. Carmichael testified that the fact that Kmart had alternate means of dealing with its liquidity deficiency in the third quarter of 2001, such as added conventional borrowing, that did not relieve Kmart of its obligation to

report "what they did" to deal with this liquidity deficiency. (Carmichael 5/27/09, at Tr01426–27.)

**23.** Release No. 33–6835 (May 18, 1989) [54 FR 22427].

which was the major interpretation of Regulation S–K's requirements on Management Discussion and Analysis available in 2001 in its Introduction does indicate that narrative disclosures in the MD & A have "particular emphasis" on the future:

> The MD & A requirements are intended to provide, in one section of a filing, material historical and prospective textual disclosure enabling investors and other users to assess the financial condition and results of operations of the registrant, with particular emphasis on the registrant's prospects for the future.

*Id.* at p. 3.

It reiterates the need for the narrative in the MD & A is:

> because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD & A is intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company.

*Ibid.* quoting Securities Act Release No. 6711 (April 24, 1987) [52 FR 13715] at 13717.

The 1989 Release adds:

> [i]t is the responsibility of management to identify and address those key variables and other qualitative and quantitative factors which are peculiar to and necessary for an understanding and evaluation of the individual company.

*Id.* quoting Securities Act Release No. 6349 (September 28, 1981), 23 SEC Docket 962 [not published in the Federal Register] at 964.

While requiring certain historical disclosures to assist in assessing the future prospects of the company, this release distinguishes and separately lists, among a number of topics a MD & A might discuss, "long and short-term liquidity and capital resources analysis" from "prospective information required in MD & A" *Id.* at p. 4. This suggests that not all historical data covered in the MD & A need be prospective. Yet, the 1989 Release notes "Events that have already occurred ... often give rise to known uncertainties." *Id.* Using this case as an example, a past short-term liquidity event and deficiency may cause future uncertainties as to their being repeated and/or their retarding the normal course of paying down the bank credit revolver in December.

The 1989 Release also discusses and distinguishes between "prospective information" which must be disclosed and "voluntarily forward looking disclosures" which, when disclosed with certain disclaimers, are provided "safe harbor" protections from being actionable if the forecast is in error.[24]

Yet, these provisions of Item 303 dealing with "prospective information" and "voluntarily forward looking disclosures" are simply not applicable in the present case because the (i.) overbuy *liquidity event,* its resulting (ii.) a *liquidity deficiency,* and (iii.) the remedy of the AP systems and Project SID *slow pay means of increasing internal sources of cash or liquidity* to meet other bills as they became due were, without question, *past historical events* on

---

24. The 1989 Release distinguishes: (i.) "prospective information" (including a known trend, demand, commitment, event or uncertainty that has not yet occurred) which Item 303 requires to be discussed (unless it is determined not to be reasonably likely to occur) which if it does occur is reasonably likely to have a material effect on the company's financial condition or results of operations; from (ii.) voluntarily forward looking disclosures that are not expected to have such a material effect on the company's financial condition or results of operations.

both October 31 and November 27, 2001. This cannot be a disputed issue of fact. What is a disputed issue is whether these events were material events under *Basic v. Levinson,* and whether (i.) caused (ii.)—i.e. the material liquidity event of the overbuy resulted in a material liquidity deficiency during the quarter, and whether these two events were changes from prior quarters as was the slow pay of vendors to remedy this material liquidity deficiency. If so, as the jury found, then the overbuy was under Item 303(a)(1) a "... known ... event[ ]" that resulted "in the registrant's liquidity ... decreasing in a[ ] material way" (the "material liquidity deficiency"). If this was a "material change[ ]" from prior quarters, which on the evidence presented cannot seriously be questioned, then Item 303(b) required the management "discussion and analysis" to "include a discussion of" it under both Item 303(a)(1) and 303(b) because when "a material deficiency is identified, [the MD & A needs to] indicate the course of action that the registrant has taken ... to remedy the deficiency .... [and a]lso identify and separately describe ["material changes" in] internal ... sources of liquidity."

The 1989 Release reinforces this reading of 303(a). Under **"C. Liquidity—Capital Resources"** the 1989 Release states that "Where a material deficiency in short ...—term liquidity has been identified, the registrant should disclose the deficiency, as well as disclos[e] ... its proposed remedy ...." That section notes that:

Registrants are expected to use the statement of cash flows ... in analyzing their liquidity, and to present a balanced discussion dealing with cash flows from operations. This discussion should address those matters that have materially affected the most recent period presented but are not expected to have short or long-term implications ...."

Again, this makes clear the need to discuss past events that have been resolved and are not expected to have future implications. Of particular note in this section is that the very next sentence gives as an example concerning the "statement of cash flows .... from operations" "(c) levels of financing provided by suppliers...." "Suppliers" are clearly "vendors." This section does not differentiate on the disclosure obligation being dependent on whether the levels of financing supplied by vendors is voluntary under negotiated terms or involuntary and beyond the negotiated terms. Thus, the 1989 Release makes clear that in discussing a short term liquidity deficiencies in the "most recent period," one must disclose the deficiency and its proposed remedy, including "levels of financing provided by suppliers" (*i.e.* vendors), even where the deficiency problem is not expected to have "short or long-term implications" going forward.

The next section of he 1989 Release on **"D. Material Changes"** notes

Some Project registrants did not provide adequate disclosure of the reasons for material year-to-year changes in line items .... Instruction 4 to Item 303(a) requires a discussion of the causes of material changes from year-to-year in financial statement line items "to the extent necessary to an understanding of the registrant's businesses as a whole."

Here the year-to-year changes in Accounts Payable (up $718 million or 28% from 2000) and Inventory (up $440 million or 6% from 2000) would need be disclosed if material. The next section on **"E. Interim Period Reporting"** adds:

The second sentence of Item 303(b) states that MD & A relating to interim period financial statements "shall include a discussion of material changes in those items specifically listed in paragraph (a) of this Item, except that the

impact of inflation and changing prices on operations for interim periods need not be addressed." As this sentence indicates, material changes to each and every specific disclosure requirement contained in paragraph (a), with the noted exception, should be discussed. This would include, for example, internal and external sources of liquidity . . . .

*Id.* (footnote omitted.)

These portions of the 1989 Release make it clear that one must report in interim reports a material liquidity change from year to year or from the prior annual report to the extent it involves a material deficiency, the course of action taken to remedy it (including involuntary "levels of financing provided by suppliers" or vendors) even if the remedy is sufficient so that the material liquidity event is "not expected to have short or long-term implications." This is consistent with the opinion of the SEC Expert Douglas Carmichael.

Thus, Defendant is incorrect that the jury had to be instructed that the material liquidity event, liquidity deficiency or slow pay remedy had to have implications going forward. Thus, the jury could legitimately have found Item 303(b) required disclosure of the material liquidity event, material liquidity deficiency and the slow pay remedy even if it determined it did not effect any quarter beyond the third quarter.

Yet, all of this seems academic, because again, the uncontroverted evidence was that the liquidity deficiency (SID and the AP System changes) likely exceeded one billion dollars on October 31 thus going forward into the fourth quarter and the deficiency was approximately half a billion dollars on November 27, 2001, when the report was filed. Furthermore, as noted above, Dr. Carmichael testified to other aspects of materiality including straining relations with vendors and harming management integrity that also had consequence "going forward."

In addition to instructing the jury only on the sections read to them from Item 303(a) and (b), possibly it would have been preferable also to have read and highlighted in the jury's copy of the 1989 Release the above discussed sections from the 1989 Release. Yet, adding those sections from the 1989 Release to the instructions read to the jury would not have reduced the likelihood of the jury finding a violation of Item 303 but it would have increased it. The jury found the Rules and Instructions sufficient. It cannot be said that these instructions on Item 303(a) and (b), when viewed as a whole, were confusing, misleading and prejudicial. It is believed that the jury had an adequate understanding of the law concerning the interim reporting obligations of Kmart for the third quarter of 2001.

(3.) *Was the Instruction on Materiality Confusing?*

■ Next, Defendants asserts that the instructions and the Verdict Form "used the term 'materiality' in numerous ways without explaining the differences." Specifically the defense objects that:

Jury Instruction No. 21 also quotes Instruction 3 to Item 303, which specifically states that "material events and uncertainties" include "matters that have had an impact on reported operations and are not expected to have an impact upon future operations." This definition of "material" is inconsistent with the definition of "material" under Section 10(b), which is set out in Jury Instruction 22. The Court never instructed the jury that it could not consider this alternate "materiality" definition when interpreting the "materiality" definition in Jury Instruction No. 22.

Dkt. # 139, pp. 67–68 of 75, numbered page 52–53.

Again it is doubtful that the jury found the liquidity deficiency and slow pay of vendors was "not expected to have an impact upon future operations" given the largely unrebutted evidence that its magnitude of this incremental "borrowing" from vendors on October 31, 2001 was over a billion dollars, and still about half a billion dollars on November 27, 2001. Yet, this instruction dealt with omissions under Regulation S–K Item 303, and in Instruction Number 21 which specifically required the jury to find "that the omitted facts were required to be disclosed under Item 303 of Regulation S–K *and that those omissions were material as defined in Instruction 22* on page 30" which was the *Basic v. Levinson* definition (emphasis added). Instruction Number 30 on Claim Three, in referring to material information that may be required by Rule 12b–20, notes that "material" is defined in Instruction Number 22.

It is acknowledged that the SEC in certain releases has specifically noted that "[t]he probability/magnitude test for materiality approved by the Supreme Court in *Basic* ... is inapposite to Item 303 disclosure"; rather, SK–303's disclosure obligations extend considerably beyond those required by Rule 10b–5. (Exchange Act Release No. 34–26831, 54 Fed. Reg. at 22430 n. 27.) Yet, the jury was not told about this lower standard of materiality, but repeatedly required to meet the more stringent *Basic v. Levinson* standard. Instruction Number 22 was the only instruction the jury was given on materiality, and as note above, juries are presumed to follow their instructions. There is no convincing argument that the jury applied any standard of materiality other than that of *Basic v. Levinson* to any of the jury instructions or to any jury Verdict

Form question. If anyone had an objection regarding the instructions on Claim Three, it would be the SEC who could claim that the instructions raised the bar of materiality for finding a violation of Item 303. Maintaining one clear instruction on materiality drawn from *Basic v. Levinson* for all claims lessened the likelihood of confusion, and assured the Jury used that standard in considering the Section 10(b) and Rule 10–b(5) claims. Even though the standard for materiality may have been higher than necessary for Claim Three, the jury specifically found each of the misstatements and omissions to be material. (Verdict Form, Dkt. # 129, Claim Three incorporating Claim Two Question 1.a.ii., 1.b.ii., 1.c.iv., 1.d.iv., 1.e.iv.) Thus, it cannot be said that the instruction on materiality as it related either to Item 303 or Section 10(b), when viewed as a whole, was confusing, misleading and prejudicial. It is believed that the jury had an adequate understanding of the law concerning the materiality standard to be applied in this case.

**B. Claim Two–Aiding and Abetting Kmart's Violation of Section 10(b) of the Exchange Act.**

*1. Jury Findings on Claim Two.*

Claim Two alleges that Defendant Conaway under Section 20(e) of the Exchange Act aided and abetted Kmart in violation of Section 10(b) of the Exchange Act and Rules 10b–5 promulgated thereunder.[25] The SEC's complaint alleged that the two misstatements and the three alleged omissions were the same for each of its three claims against Defendant Conaway. The jury instructions on the alleged list of misstatements and omissions on Claim Two, like Claim Three, incorporated the same list in Instruction Number 21 used in Claim One.[26] The Jury findings for Claim

---

**25.** 15 U.S.C. § 78j(b),17 C.F.R. § 240.10b–5.

**26.** From Instruction Number 21 (boldface added):

Two (which in part were incorporated in Claim Three) were identical for each of the two alleged misstatements: that (i.) each statement was false or misleading; and (ii.) the statement was material; with the additional finding under Claim Two that (iii.) Kmart acted with intent to defraud or with reckless disregard for the truth. (Dkt. # 129, Verdict Form, Claim Two, Questions 1. a. i., ii & iii, and Questions 1. b. i., ii & iii.) The Jury findings for Claim Two regarding each of the three alleged omissions in the 10–Q(3) were, as noted in the preceding section on Claim Three: (i.) that the respective event occurred in the third quarter of 2001; (ii.) that Kmart was required to disclose this fact under Item 303 of Regulation S–K; (iii.) that the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading; (iv.) that the omitted fact was material; with the additional finding for Claim Two that (v.) Kmart acted with intent to defraud or with reckless disregard for the truth. (Dkt. # 129, Verdict Form, Claim Two, Questions 1. c. i., ii, iii, iv., & v., Questions 1. d. i., ii, iii, iv., & v., Questions 1. e. i., ii, iii, iv., & v. .) The jury also found that Charles Conaway had a general awareness that his role was part of an overall activity that was improper, that he knowingly assisted and substantially assisted Kmart in its violation of Section 10(b) and Rule 10b–5. (Dkt. # 129, Ver-

dict Form, Claim Two, Questions 3, 4, & 5.)

2. *Challenge to Use of the MD & A as a Whole as the Statement Underlying Section 10(b) and Rule 10b–5 Liability.*

Defense counsel in their current motion assert that, for the first time in the middle of trial, the SEC changed its theory of the case from challenging the two specifically identified alleged misstatements in the MD & A to contending that the MD & A as a whole was a misleading statement because of three omissions:

> it failed to disclose in the MD & A that [Kmart] had experienced **a material liquidity event** in the third quarter, it had **a material liquidity deficiency** during the third quarter that it remedied by **delaying in vendor payments to vendors,** and that **the delay in vendor payments was a material change in the internal sources of liquidity** during the quarter.

Dkt. 139, p. 46 of 74, numbered page 31. (boldface added.)

Yet, this claim that the MD & A omitted these three items was in the complaint in the section captioned "FALSE AND MISLEADING MD & A". Paragraphs 29 and 31 make it clear that in addition to the two specific challenged misstatements, the SEC was also asserting the $850 million overbuy needed to be disclosed in the MD & A as the cause of the material change in

**Statements:**
1. The Form 10–Q stated, "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities."
2. The Form 10–Q stated, "Inventory increased ... due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position."
**Omissions:**
1. The Form 10–Q did not identify a known **material liquidity event that occurred in the third quarter of 2001.**

2. The Form 10–Q did not disclose that Kmart had a **material liquidity deficiency** during the third quarter of 2001 **or the course of action involving the delay of vendor payments** taken by Kmart's management to remedy that deficiency.
3. The Form 10–Q did not identify the **delay in vendor payments as a material change in an internal source of liquidity** during the third quarter of 2001.

inventory and accounts payable [i.e. omission 1., the "material liquidity event"]. Paragraph 31 asserts that hundreds of millions of dollars attributable to Project SID were past due and Paragraph 32 asserts these same hundreds of millions of dollars of withholding or "borrowing" from vendors via Project SID "constituted a material deficiency at quarter end which should have been identified in the MD & A" [i.e. omission 2., the "material liquidity deficiency"]. Paragraph 32 continues that "Project SID was a source of liquidity that should have been identified and separately described" [i.e. omission 3., "the delay in

vendor payments was a material change in the internal sources of liquidity during the quarter"].[27]

If there was any doubt that Plaintiffs were contending that the entire MD & A was the false and misleading statement under Rule 10b–5 because of omissions, Judge Gadola made that clear in his September 29, 2006, opinion denying Defendant Conaway's and former co-Defendant John McDonald's Rule 12(b)(6) motions. He repeatedly refers to the "10–Q(3)", "the form" and "the MD & A" in the SEC's complaint and in the omissions claim he found sufficiently plead.[28] In addition to

---

27. Again, instead of using the language from the complaint for each omission in the final instructions, Instruction Number 21 used the terms "material liquidity event," "material liquidity deficiency," and "the delay in vendor payments was a material change in the internal sources of liquidity during the quarter" which was language from a proposed defense draft of that instruction in which defense counsel "slightly rephrased the omissions so that they track the language of Item 303." (May 27, 2009, Transcript, evening session at p. 63, 1.15–17.)

28. In first dealing with Mr. McDonald's claim Judge Gadola states:

> Although Defendant McDonald alleges that he cannot determine the time, place, or content of alleged misrepresentation, Plaintiff has sufficiently set forth the facts on which its claim relies. Plaintiff alleges that Defendant McDonald misled investors when he signed the *false and misleading Form 10–Q(3)*. This *form* allegedly failed to fully apprise the investors of the situation Kmart was facing, in particular it failed to apprise them as to material changes in Kmart's accounts payable and merchandise inventory, the change in Kmart's liquidity, and the effects of Project SID on the company's working capital.

Dkt. 24, at p. 7, *Securities and Exchange Com'n v. Conaway*, 2006 WL 2828569, *4 (E.D.Mich.2006) (emphasis added).

Judge Gadola next considers the aiding and abetting claims Two and Three against co-defendant McDonald:

> Plaintiff alleges *the form* was false and misleading because it failed to describe Kmart's material change in accounts payable, in inventory, and in liquidity. Furthermore, the form failed to describe any significant cause for the material change. Although Defendant McDonald disputes the materiality of Kmart's changes, materiality issues are "normally reserved for the jury," *United States v. DeSantis*, 134 F.3d 760 (6th Cir.1998) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

*Id.* at p. 9., 2006 WL 2828569, *5 (emphasis added).

> Defendant Conaway also moves this Court to dismiss Plaintiff's complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). Conaway attacks the motion in the reverse order of McDonald, but his arguments are substantially similar.

*Id.* at p. 12, 2006 WL 2828569, *6.

\* \* \*

> With respect to *the MD & A*, as discussed immediately above, Plaintiff has sufficiently alleged facts that allow a clear inference that *the MD & A was false and misleading* and that Defendant CEO Conaway knew the representations made in *the MD & A did not divulge* the true nature of Kmart's problems or the remedial actions Kmart had subsequently taken.

*Id.* at p. 12–13, 2006 WL 2828569, *7(emphasis added).

> [A review of the] facts readily lead to an inference that Defendant Conaway "knew,

Judge Gadola's 2006 Rule 12(b)(6) decision, my March 31, 2009, Rule 56 ruling on the then two Defendants' motions for summary judgment also refers repeatedly to the "MD & A" or the "10–Q(3)" as being the statement that is misleading or incomplete.[29] Indeed, as Plaintiff's counsel points out Defendant Conaway's own motion for summary judgment notes the

> or was reckless in not knowing" that *the resulting MD & A, was false and misleading*.
>
> * * *
>
> The Court finds that it is entirely reasonable to infer that as CEO Conaway, … knew or was reckless in not knowing that Kmart's subsequent *MD & A was false and misleading*.
>
> * * *
>
> The inference that CEO Conaway's actions led to the subsequent *MD & A failure to describe* Kmart's change in financial position, or the cause of that change, is one that is entirely reasonable and one that is clearly drawn from the facts as pleaded.

*Id.* at pp. 11–12, 2006 WL 2828569, *4 (emphasis added).

29. E.g. "These figures alone could be used by a jury to determine that *the MD & A was misleading and incomplete*."

Dkt. # 86 Page 19 of 42, footnote 5, *Securities and Exchange Com'n v. Conaway*, 2009 WL 902063, *10 (E.D.Mich.2009) (emphasis added).

In discussing a primary finding of a 10b–5 violation regarding Defendant Conaway:

> Yet, there is sufficient circumstantial evidence from which a reasonable juror could conclude that Conaway's course of actions contributed to *the 10Q-(3)*—prepared under the new CFO McDonald—*not disclosing the AP System delay and Project SID and the MD & A not adequately disclosing how Kmart was dealing with its liquidity problem in the third quarter of 2001*.

*Id.* at p. 29 of 42, 2009 WL 902063, *10 (emphasis added).

In listing what a jury could find on the 10b–5 violation:

> *CEO Conaway* orchestrated a fraudulent and elaborate scheme to stretch payments to vendors, coverup and provide false information to conceal that scheme, and that his actions were central in the perpetration of

SEC's claim was that Defendant should have caused Kmart to disclose the overbuy which caused a cash crunch dealt with in part by slow pay.[30] Thus Defendant's objection to a new theory being introduced at trial contending that the MD & A as a whole was a misleading statement is without merit in light of the SEC's complaint and the theories of liability discussed and pursued in this case.[31]

> that scheme and *contributed to the material* misstatements and *omissions in the MD & A section on liquidity in the Kmart 10–Q(3) for 2001*.

*Id.* at p. 31 of 42, 2009 WL 902063, *15 (emphasis added).

In referring back to these possible 10b–5 findings:

> While there are multiple disputed issues of fact, for reasons similar to why a reasonable jury could have found that *the MD & A involved false and misleading statements and did not adequately reveal that Kmart's AP System and Project SID were a primary means for Kmart to cope with its liquidity crisis in the third quarter of FY 2001*.

*Id.* at p. 36 of 42, 2009 WL 902063, *15 (emphasis added).

30. Defendant's first page of his memorandum supporting his motion for summary judgment states:

> The crux of the SEC's claim is that defendants should have disclosed (or caused Kmart to disclose) that, during the third quarter of 2001, the Chief Operating Officer (who is not a defendant in this action) caused Kmart to purchase $850 million in inventory over plan, which caused Kmart to experience a cash crunch that Kmart dealt with in part by slow-paying its vendors.

Dkt. # 63, p. 13 of 32, p. 1. of text.

Later the defense memorandum states:

> The SEC's effort to hold Mr. Conaway primarily liable for alleged misstatements and omissions in the MD & A. . . .

*Id.* at p. 21 of 32, page 9 of text.

31. Defendant argues also that the jury instructions refer to the entire "10–Q" as the statement being challenged, not the MD & A as discussed in the complaint, Judge Gadola's and the October 31, 2009, opinions. Yet, this concern was not expressed during the jury instruction conferences, and the instructions

### 3. *Challenge to the "implied representation theory of liability."*

Defendant contends that the Court adopted an "implied representation theory of liability" and that this theory includes the notion that "a reader of the MD & A would understand the requirements of Item 303." (Dkt. # 139, at p. 49 of 75, p. 32 in text) Defense counsel also asserts that this "implied representation theory" was based on a First Circuit case, *SEC v. Tambone*, 550 F.3d 106 (2008), *vacated pending review en banc* 573 F.3d 54 (1st Cir.2009), for a supposed separate implied representation theory of liability. (*Id.* at 52 of 75, p. 37 in text.) Based on these assumptions, Defendant contends that not only is the theory flawed, but of greater significance neither the jury instructions nor the proofs are adequate to support submitting the case to the jury on this theory.

These assumptions arose from the arguments concerning jury instructions and it misses the mark of those discussions al-

though I likely initiated any confusion. In questioning the SEC on its theory of the MD & A being the misleading statement I first asked Plaintiff's counsel to state their theory as if Item 303 of Regulation S–K did not exist (May 22, 2009, Transcript at Tr01733 & Tr01735–36.) Unfortunately, the challenged sentence providing the context for this initial question for the SEC's position on the 10(b) claim if Item 303 did not exist was the sentence concerning Kmart's inventory increase in the first 39 weeks which below in this opinion I determine as a matter of law is not materially misleading.[32] While questioning whether the sentence could be found to be actionable in the absence of Item 303's disclosure requirement on material changes concerning any liquidity event and/or any liquidity deficiency, I next asked the SEC to put Item 303 back into the analysis:

> The tougher problem is when you put that in, does that then create a context, [a] sort of expectancy of a duty to disclose, such as if I were [selling] a piece of real estate and I fill out the disclosure

could easily have been changed to "the MD & A from the Form 10–Q" if defense counsel seriously thought it was a significant change. Because this was not a concern that was "stating distinctly" at trial under Fed.R.Civ.P. 51(c), it is reviewed under the "plain error" standard of Fed.R.Civ.P. 51(d)(2). The only specific misstatements noted in the jury instructions—and throughout the trial—were from the MD & A portion of the Form 10–Q on "LIQUIDITY AND FINANCIAL CONDITION." Furthermore it is incontestable that the only portion of the Form10–Q that the SEC was challenging was the MD & A on liquidity. Finally, while Instruction Number 21 refers initially to the Form 10–Q, it specifies the MD & A when charging on the omissions: "Second, you must find that the failure to include those omitted facts **rendered the Management Discussion & Analysis section of Kmart's Form 10–Q for the third quarter of 2001 materially misleading.**" (boldface added). Also each question on the jury Verdict Form began noting "With respect to the statement [or "the alleged omission"] **in the**

**Management Discussion & Analysis section of Kmart's Form 10–Q**" (boldface added), and that Verdict Form also makes it clear that its was the MD & A that the jury had to find was rendered misleading by the omissions. All of these references make it clear that it was the MD & A that was being challenged by the SEC. Thus the reference in the jury instructions No. 21 and No. 26 to the "Form 10–Q" instead of "the MD & A section of the Form 10–Q" had no effect in the jury instructions that could conceivably have led to jury confusion or resulted in a different jury verdict. Thus any error did not affect substantial rights as is required by Fed.R.Civ.P. 51(d)(2).

32. I might best have followed my instincts regarding that sentence from the night of May 22, when I noted "If that was all you were going to the jury on, a common-law fraud case, my bet is eight out of ten judges would say let's not waste the jury's time. No reasonable jury could find that that statement is false or misleading as to what it purports to be." (May 22, 2009, Transcript at Tr01739.)

statements on the conditions of the house, and I don't mention that my septic tank commonly bubbles over sometimes in the fall and I'm selling in the spring so I'm glad I won't have to worry about it until the fall [,]and I don't disclose that in that context, then that would be a fraudulent omission.

*Id.* at Tr01739.

The analogy was simply a way of conceptualizing why writing a literally truthful statement that purports to be a MD & A under Item 303 of Regulation S–K was similar to making a literally truthful statement on a real estate disclosure statement. While the statement may the truthful as far as it goes, what the statement purports to be—a real estate disclosure statement or an Item 303 MD & A statement— creates a context or an expectancy in the reader of what is expected to be disclosed. Given this context or expectancy, then if the statement has a material omission of what is supposed to be in the statement, a fraud claim properly can be asserted even for a literally true statement. At the follow-up hearing on jury instructions, after I had been provided and read the *Tambone* case which dealt with a different issue of

whether an implied statement could be inferred from defendants' actions, I returned to the real estate disclosure analogy using the implied statement concept:

> Clearly in that case, that the disclosure statement, which has nothing but truthful statements and makes no mention whatsoever of the septic field one way or the other, that in that case, that the mere making of that statement, *does that not imply that the seller either is asserting that the statement meets the standards [f]or disclosures with regard to the sale of a piece of real estate or implies that they know of no fact, no material fact that is inconsistent with what they said.* I mean, would that not be an actionable fraud case in almost [all] state[s] of the union?

May 26, 2009, Transcript at Tr01844 (emphasis added).[33]

The effort was to conceptualize why "half-truths," or statements that are literally true, can, given the context in which they are made, be actionable in fraud for material omissions. In light of the fact that the MD & A is a creation of both a statute and regulation, it could be seen that when one makes what purports to be

**33.** While under common law in most jurisdictions, sellers had no duty to disclose latent defects, many states now require sellers to complete disclosure forms that list various potential hidden faults. Whether or not those disclosure statutes provide for private rights of action for buyers, a seller's failure to identify latent defects on that form breaches a duty that is often actionable under a fraud theory. *See e.g. Rock v. Voshell,* 2006 U.S. Dist. LEXIS 31383, at *29, 2006 WL 1409734, at *9 (E.D.Pa. May 18, 2006) (denying summary judgment on common law fraud claim in connection with real estate purchase arising from failure to disclose latent defects on real estate disclosure form); *Bauer v. Giannis,* 359 Ill. App.3d 897, 906, 296 Ill.Dec. 147, 834 N.E.2d 952, 960 (Ill.App.Ct.2005) (same); *Schmitt v. Snow,* 2005 Ohio 4698, 2005 Ohio App. LEXIS 4320, 2005 WL 2172390 (Ohio Ct.App. Sept. 8, 2005) (same). As in the present case,

the mere non-disclosure of an item required to be disclosed does not automatically give rise to fraud liability absent the showing of other elements of fraud, but the real estate disclosure statute creates the duty to speak so that material omissions, coupled with reliance and actual damages, constitute actionable fraud. Defense counsel in the Reply brief noted that in Michigan the real estate disclosure form has a specific question on septic tanks. (Dkt. # 153, p. 28 of 48, p. 20 in text, fn. 5). Thus, there would either be a truthful answer or an express misstatement, or if the question was left blank a fraud claim likely would fail for lack of reasonable reliance. While the analogy may not work in Michigan it was just an effort to demonstrate why literally true statements can be actionable because of reasonable inferences drawn from them that are false.

an Item 303 MD & A statement, that MD & A is an implicit statement, or creates a reasonable expectancy in financial analyst or other investors generally familiar with Item 303's requirements, that the facts and information required to be disclosed by Item 303 were disclosed in the MD & A or such facts do not exist.

Defense counsel contest whether the SEC's Regulation s-K Item 303 can provide a context that would permit such an inference. They cite two cases, *United States v. Finnerty*, 533 F.3d 143 (2d Cir. 2008), and *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir.2007), which hold that the fact that investors might *infer* something based on a regulatory requirement set out in New York Stock Exchange Rules or in SEC regulations does not give rise to liability under Section 10(b), because that inference on the part of investors does not create an untrue statement or misleading half-truth by the defendant. Yet, in both of these cases there was no statement made by the defendant

that could be deemed to be misleading because of what is said or not said.[34] Neither case deals with a situation like the present where Kmart unquestionably made a MD & A statement and the question for this Court is what permissible false inferences might the jury be allowed to draw from that statement.[35]

Even without Item 303 existing, as the SEC argues, Kmart's 10–Q(3) MD & A statement on "LIQUIDITY AND FINANCIAL CONDITION," that mentions no significant liquidity event or deficiency in the reporting period, could be read as an implied statement that there was no such material liquidity event or deficiency.

■ It is unquestionable that the law of fraud and Sixth Circuit precedents under Rule 10b–5 allow misrepresentations be found based on implied assertions or reasonable inferences that are false. In *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir.2001) (*en banc*),[36] the court noted that "even absent a duty to speak, a party who discloses material facts in connection with

---

**34.** *Finnerty* was a criminal Rule 10b(5) a. case in which "The government admits that Finnerty made no misstatement The government has identified no way in which Finnerty communicated anything to his customers, let alone anything false." *Finnerty*, 533 F.3d at 148–49. In *Lattanzio*, the civil defendant audit firm, Deloitte & Touche LLP, had made no statement concerning the quarterly reports of Warnaco Group, Inc. "Warnaco's quarterly statements (the August 10–Q, the November 10–Q, and the May 10–Q) were filed within the Class Period, but they did not purport to be audited by Deloitte, did not contain an audit opinion by Deloitte, and were not attributed to Deloitte when they were disseminated." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d at 154. With no statement made, the *Lattanzio* court held that while "federal securities regulations required that Deloitte 'review' the statements, see 17 C.F.R. § 210.10–01(d)" that regulation did not turn Deloitte's total silence regarding these quarterly reviews into a statement that could be found to violate Section 10(b) and Rule10b–5.

**35.** This section II B. deal's with the aiding and abetting claim against Mr. Conaway regarding Kmart's alleged violation of Section 10(b) and Rule 10b–5. Unlike the *Finnerty* and *Lattanzio* cases, there is no dispute in this case that Kmart made the MD & A statement in the 2001 Form 10–Q(3) that is alleged to be misleading. It is acknowledge that there is a major dispute whether Mr. Conaway made any such statement, which is considered in section II C. of this opinion and more particularly in section III on the sufficiency of the evidence.

**36.** *Helwig* was overruled on a different point by *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), which held that the "strong inference of scienter" requirement of The Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67 (codified at 15 U.S.C. § 78u–4 & –5) (1995), requires only that the inference be at least as compelling as any opposing inference that could be drawn from the pleadings, and not the most plausible of competing inferences" as *Helwig* stated.

securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects,'" quoting from *Rubin v. Schottenstein*, 143 F.3d 263, 268 (6th Cir.1998) (en banc).

The Sixth Circuit in *Helwig* was dealing with a private securities action involving quarterly SEC filings and other statements and omissions made by Vencor, a long-term health care provider focused on hospital and nursing services. The Balanced Budget Act, which could have negative implications for medicare payments, was introduced in early February 1997. Two versions passed the House and Senate on June 25, 1997, resulting in a conference report July 30 and the Act was finally signed August 5, 1997. In its first- and second-quarter 10–Q's of 1997, the latter filed July 25, 1997, Vencor stated "[m]anagement cannot predict whether such proposals will be adopted or if adopted, what effect, if any, such proposals would have on its business." In the meantime—from at least February 10, 1997, until October 21, 1997—defendants maintained that they were "comfortable" with projections of fourth-quarter earnings of $0.59 to $0.64 per share and yearly returns between $2.10 to $2.20 for 1997 and $2.60 to $2.65 for 1998. Such sanguine statements led market analysts to recommend Vencor's stock as a "buy." On October 22, 1997, Vencor lowered its estimates of fourth-quarter earnings due to "management's recently completed analysis of the Balanced Budget Act of 1997." The stock price dropped from $42–5/8 per share to $30 per share, a nearly thirty percent decline. The only statement that was made after the August 5 signing of the Budget Act was on or about September 25, when the CFO and CEO informed analysts that Vencor was still "comfortable" with favorable earnings per share figures made before the Budget Act. Projected earnings per share figures can clearly be found to be material facts to investors in the total mix of information. These corporate officers had no duty to speak in September 1997, but they chose to speak on a material issue, and with that came the duty to speak fully and truthfully. The Court noted that by the Budget Act signing date of August 5, if not before, the form of the legislation had become fixed and its impact measurable. In finding Vencor's SEC filings and its September statements actionable under Section 10(b) and Rule 10b–5, the Court noted what fairly could be called Vencor's "implied representations" or "implied statements."

> These predictions and opinions contain "at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *Schneider v. Vennard (In re Apple Computer Sec. Litig.)*, 886 F.2d 1109, 1113 (9th Cir. 1989).

*Id.* at 557 (emphasis added).[37]

Another Section 10(b) case, *City of Monroe Employees Retirement Sys. v. Bridge-*

---

**37.** The *Helwig* opinion then notes the substantial evidence in the case suggesting these implied assertions were not true and indicating that defendants consciously disregarded the warning signs of health care cutbacks. Noting that while not an exact fit, the *Helwig* court, in considering its federal securities fraud actions, compared principles of common law scienter requirements for fraud that can be based on reasonable inferences that can be drawn from statements:

"A defendant *who asserts a fact* as of his own knowledge or so positively *as to imply* that he has knowledge, under the circumstances when he is aware that he will be so understood when he knows that he does not in fact know whether what he says is true, is found to have intent to deceive, not so much as to the fact itself, but rather as to the extent of his information."
PROSSER AND KEATON ON TORTS 741–42 (5th ed. 1984) (citations omitted). On the basis of

*stone, Corp.*, 399 F.3d 651, 675 (6th Cir. 2005), quotes this "implicit factual assertions" language from *Helwig*. As noted in the following section, the *City of Monroe* case upholds the use of disclosure expectancies stemming from certain accounting standards that, when coupled with statements and omissions in the annual report, constitute implied representations that a jury could find to be false.

Judge Gadola in his September 29, 2006, opinion denying Defendant's motion to dismiss also noted that the MD & A could be found false and misleading based in an inference.[38] *Even Oran v. Stafford*, 226 F.3d 275 (3rd Cir.2000), on which the defense relies for another central issue in this case, recognizes that certain statements can be actionable as misleading under Section 10(b) because of an "implicit" representation.[39]

■ The law on fraud and misrepresentations uses various language to describe implied statements or reasonable inferences which, when false, are actionable— "as if,"[40] "may be interpreted,"[41] "is reasonably understood as implying,"[42] "as though he had represented,"[43] "purports to tell,"[44] "may fairly be inferred,"[45] "the

---

these allegations, we conclude that plaintiffs have produced a strong inference that defendants persisted in making favorable predictions and feigning ignorance of the Budget Act with actual knowledge that their statements were misleading. *Id.* at 558. (emphasis added).

**38.** "Plaintiff has sufficiently alleged facts that allow a clear inference that the MD & A was false and misleading...." Dkt. 24, at p. 12, *Securities and Exchange Com'n v. Conaway*, 2006 WL 2828569, *4 (E.D.Mich.2006) (emphasis added).. at pp. 12, 2006 WL 2828569, *7(emphasis added).

**39.** *Oran* held that there was liability for an omission under a duty to disclose theory known as the "duty to update" if "the previous statement contained an implicit factual representation...." *Oran*, 226 F.3d at 286.

**40.** RESTATEMENT (SECOND) OF TORTS § 529. **Representation Misleading Because Incomplete**
Comment: a. A statement containing a half-truth may be as misleading as a statement wholly false. Thus, a statement that contains only favorable matters and omits all reference to unfavorable matters is as much a false representation *as if* all the facts stated were untrue. (emphasis added).

**41.** RESTATEMENT (SECOND) OF TORTS § 539 (1977) **Representation Of Opinion Implying Justifying Facts**
(1) A statement of opinion as to facts not disclosed and not otherwise known to the recipient *may*, if it is reasonable to do so, *be interpreted* by him as an implied statement

(a) that the facts known to the maker are not incompatible with his opinion; or
(b) that he knows facts sufficient to justify him in forming it.
(emphasis added).

**42.** RESTATEMENT (SECOND) OF TORTS § 539 (1977) **Representation Of Opinion Implying Justifying Facts**
Comment on Subsection (1):
a. Frequently a statement which, though in form an opinion upon facts not disclosed or otherwise known to their recipient, *is reasonably understood as implying* that there are facts that justify the opinion or at least that there are no facts that are incompatible with it.
(emphasis added).

**43.** RESTATEMENT (SECOND) OF TORTS § 551. **Liability For Nondisclosure**
(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other *as though he had represented* the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
(emphasis added).

**44.** RESTATEMENT (SECOND) OF TORTS § 551. Liability For Nondisclosure
Comment on Clause (b):
g. A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it *purports to tell* the

implication of an assertion that is false," [46] "the implied assertion," [47] "may be inferred," [48] "is equivalent to." [49] Yet, whatever the language used to explain why a statement, that may be literally true, is misleading, the concept of implied representation is well established both in common law fraud and under the securities law for Section 10(b).

If what is not said is material, and its omission makes the statement, in light of the circumstances under which it was made, misleading, then if the other requirements for fraud are met, the statement is actionable. Stated another way, when one makes such a statement the law imposes a duty to speak fully and truthfully on the material omitted fact or face liability. Thus, if errors were made in the instructions it was not because of the "im-

whole truth and does not. (See § 529). So also may a statement made so ambiguously that it may have two interpretations, one of which is false. (See §§ 527, 528). When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.
(emphasis added).

**45.** RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
a. Nature of the assertion. A misrepresentation, being a false assertion of fact, commonly takes the form of spoken or written words. Whether a statement is false depends on the meaning of the words in all the circumstances, including *what may fairly be inferred* from them. An assertion may also be inferred from conduct other than words.
(emphasis added).

**46.** RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
b. Half-truths. A statement may be true with respect to the facts stated, but may fail to include qualifying matter necessary to prevent *the implication of an assertion that is false* with respect to other facts.
(emphasis added).

**47.** RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
b. Half-truths.
Illustrations:
3. A, seeking to induce B to make a contract to buy land, tells B that his title to the land has been upheld in a court decision.

A knows that the decision has been appealed but does not tell this to B. B makes the contract. As statement omits matter necessary to prevent *the implied assertion* that A's title is clearly established, and this assertion is a misrepresentation.
(emphasis added).

**48.** RESTATEMENT OF CONTRACTS § 159. **Misrepresentation Defined**
Comment:
c. Meaning of "fact." An assertion must relate to something that is a fact at the time the assertion is made in order to be a misrepresentation. Such facts include past events as well as present circumstances but do not include future events. An assertion limited to future events (see § 2), may be a basis of liability for breach of contract, but not of relief for misrepresentation. However, a promise or a prediction of future events may by implication involve an assertion that facts exist from which the promised or predicted consequences will follow, which may be a misrepresentation as to those facts. Thus, from a statement that a particular machine will attain a specified level of performance when it is used, it *may be inferred* that its present design and condition make it capable of such a level. Such an inference may be drawn even if the statement is not legally binding as a promise.
(emphasis added).

**49.** RESTATEMENT OF CONTRACTS § 160. When Action Is Equivalent To An Assertion
(Concealment)
Action intended or known to be likely to prevent another from learning a fact *is equivalent to* an assertion that the fact does not exist.
(emphasis added).

plied representation theory of liability" or any passing infatuation the undersigned might have had with the now vacated *Tambone* case.

■■ In this section on Claim Two the first element the SEC must prove is that Kmart violated Section 10(b) and Rule 10b–5. The SEC contends that Kmart violated Section 10(b) and Rule 10b–5 by making false or misleading statements or omissions in its Form 10–Q(3) is legally viable with or without considering Regulation S–K Item 303. Even if there were no Regulation S–K Item 303 creating certain duties to disclose, following the logic of the SEC under the *Helwig* and *Rubin* cases, a reasonable jury could find Kmart's MD & A of the 10–Q(3) to be materially misleading because "even absent a duty to speak, a party who discloses material facts in connection with securities transactions "assume[s] a duty to speak fully and truthfully on those subjects." " *Helwig*, 251 F.3d at 561.

The jury was provided the MD & A section on "Liquidity and Financial Condition" from Kmart's 10–Q(2) (Plf. Exh. 93) and urged in the SEC's closing to compare it to the same section of the 10–Q(3) (Plf. Exh. 209) and ask themselves "[w]hat happened in the third quarter that didn't happen in the second quarter." (5/29/09 Transcript, at Tr02774–75.) While asked to make the comparison, the jury was not provided a compare copy of the two sections, but a jury comparing those two 2001 quarterly MD & A's would find the following omissions with additions in bold and shadowed type:

*10–Q 2 3 2001*

LIQUIDITY AND FINANCIAL CONDITION

Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities. We had working capital of ~~$4,325~~ **4,096,** ~~$3,733~~ **4,440,** and ~~$3,825~~ **3,751** million at ~~August 1~~ **October 31,** 2001, ~~July 26~~ **October 25,** 2000 and January 31, 2001, respectively. Working capital fluctuates in relation to profitability, seasonal inventory levels net of trade accounts payable (net inventory) and the level of store openings and closings. There were ~~$764 million~~ **1.46 billion** borrowings outstanding under our $1.60 billion Revolver at the end of the second quarter of fiscal 2001. There were ~~no~~ **$1,37 billion** borrowings **outstanding** under our existing credit facilities at the end of ~~second~~ **the third** quarter **of fiscal** 2000.

Net cash used for operating activities for the ~~26~~ **39** weeks ended ~~August 1~~ **October 31,** 2001 was ~~$154~~ **442** million as compared to net cash provided by operating activities of ~~$609~~ **391** million for the same period in 2000. The ~~decrease~~ **increase** in cash ~~provided by~~ **used for** operating activities as compared to the same period of the prior year was primarily the result of lower net earnings, excluding non-comparable items, and higher inventory purchases. Inventory increased by ~~$457~~ **1,906** million during the first ~~26~~ **39** weeks of fiscal year 2001 due to ~~normal~~ seasonal inventory fluctuations, ~~to support our growing beauty and health care and consumables and edibles product lines,~~ and **actions taken** to improve our overall in-stock position.

Net cash used for investing activities was ~~$696~~ **1,129** million for the ~~26~~ **39** weeks ended ~~August 1~~ **October 31,** 2001 compared to ~~$389~~ **754** million for the same period in 2000. The increase in cash used for investing activities was primarily due to higher capital expenditures for ~~point-of-sale equipment,~~ **the expansion of Kmart stores to Kmart Super Centers,** ~~stores~~ **construction of** new Kmart ~~Supercenter stores~~ **Super Centers, expansion of midways to improve easier traffic flow for our customers and to increase visibility of**

**promotional items,** and ~~our~~ an investment in ~~Bluelight.com.~~ point-of-sale equipment.

Net cash provided by financing activities was ~~$869~~ **1,536** million for the ~~26~~ **39** weeks ended ~~August 1~~ **October 31,** 2001 compared to net cash ~~used for~~ **provided** by financing activities of ~~$231~~ **1,093** million for the comparable period in 2000. The increase in cash provided was primarily the result of the issuance of $430 million of 9 7/8% Notes due June 2008 and increased borrowings under the Revolver, partially offset by the paydown of **$262 million** Collateralized Mortgage Backed Securities in July.

In July 2001, we terminated the common stock repurchase program that was initiated in April 1999 **and the trust convertible preferred securities repurchase program initiated in February 2000.** We repurchased approximately 22 million shares of common stock at a cost of approximately $255 million **and 2 million shares of trust convertible securities at a cost of approximately $84 million** under the programs.

**On November 15, 2001 we signed an agreement for the renewal of our unsecured 364–Day Credit Facility ("Facility") for the amount of $400 million. The Facility is scheduled to fund concurrent with the expiration of the current facility on or before December 2, 2001.**

We believe that ~~current~~ **future operating cash flows and our** financing arrangements **(including the Facility)** will be sufficient to meet our liquidity needs for operations and capital demands.

The jury could reasonably conclude from this comparison that Kmart's "LIQUIDITY AND FINANCIAL CONDITION" statement for the third quarter of 2001 indicates that its liquidity situation in that quarter was much like its liquidity situation in the second quarter with nothing out of the ordinary having occurred regarding Kmart's liquidity in the third quarter. Stated another way, based on the evidence presented to the jury and its instructions for Kmart to have violated Section 10(b) and Rule 10b–5 by making false or misleading statements or omissions in its Form 10–Q(3) (Jury Instruction Number 26 incorporating portions of Instruction Numbers 19–23 on Section 10(b) and Rule 10b–5 violations) [50], the jury could reasonably conclude that:

1. this section of the MD & A from the 10–Q(3) implies that nothing of significance happened in Kmart's third quarter of 2001 with regard to Kmart's liquidity;

2. this implication of no significant changes in liquidity was false and misleading given the $850 million Schwartz overbuy moving up Kmart's peak borrowing date and, combined with soft sales, precip-

---

50. Jury Instruction Number 26 notes in part: "The first element that the SEC must prove by a preponderance of the evidence in support of Claim Two is that Kmart violated Section 10(b) and Rule 10b–5 promulgated thereunder.

The SEC contends that Kmart violated Section 10(b) and Rule 10b–5 by making false or misleading statements or omissions in its Form 10–Q for the third quarter of 2001."

While the jury instruction then listed each of the alleged misstatements and omissions separately, these three omissions noted above

in the text—the overbuy (a "material liquidity event"), the liquidity shortfall Kmart experienced ("a material liquidity deficiency") and the slow pay scheme ("the delay in vendor payments")—were included in that list and each omission was found by the jury to be a material fact and the jury further found that each such "omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading." (Dkt. # 129, Verdict Form Claim Two Question 1.c.iii., 1.d.iii. & iv. and 1.e.iii. & iv.)

itating a half billion to billion dollar liquidity shortfall Kmart experienced in the third quarter of 2001;

3. this implication of no significant changes in liquidity was false and misleading given the extraordinary, covert and unprecedented slow pay scheme Kmart undertook to maintain its liquidity in the third quarter of 2001;

4. such a misrepresentation was material because disclosure of each omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available and a reasonable investor would consider each of the omitted facts important to an investment decision concerning Kmart;

5. Kmart in this section of the MD & A chose to speak on the material issue of its liquidity but it did not "speak fully and truthfully" on that subject;

6. Kmart acted with intent to defraud or with reckless disregard for the truth.

Thus, even without any duties that Regulation S–K Item 303 may have created for Kmart to make certain disclosures in the MD & A on liquidity in the 10–Q(3), the evidence is such that the jury could reasonably have found that Kmart violated Section 10(b) and Rule 10b–5 in the MD & A statement it made on November 27, 2001. As noted in footnote 50, the jury did find that each of these MD & A omissions—the overbuy (the "material liquidity event"), the liquidity shortfall Kmart experienced (the "material liquidity deficiency") and the slow pay scheme (the "delay in vendor payments")—were material facts and each such "omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading." They also found each omission was made by Kmart with the intent to defraud or with reckless disregard for the truth. (Verdict Form,

Dkt. # 129, Claim Two Question 1. c. v., 1. d. v. and 1 e. v.)

While the jury instructions did not direct the jury on how or why these three omission could be found to make the MD & A materially misleading, nor did the jury Verdict Form question the jury on how or why they found each omission to be material and how or why they found each omission made the MD & A misleading, such a degree of detail in the jury instructions and verdict forms is not legally required. It was hoped that 41 pages of instructions and a 16 page Verdict Form would be sufficient. What is important is whether the jury was fairly instructed on what the SEC needed to prove for a Section 10(b) and Rule 10b–5 violation and whether their verdict found such a violation. The next significant inquiry is whether there is a reasonable explanation based on the evidence for how or why they reached such a verdict. If there are two or more alternate rationales that might reasonably be found to explain the how and why each juror reached his or her decision, our ignorance as to the exact line of logic each juror followed is not a basis to vacate their collective decision, so long as either line of logic is rooted in the evidence and is reasonable under the law.

Thus, based on false and misleading information the jury could have found the "LIQUIDITY AND FINANCIAL CONDITION" section of the 10–Q(3) implied, the evidence is sufficient to uphold the jury's finding that Kmart violated Section 10(b) and Rule 10b–5 even in the absence of Regulation S–K Item 303. While the defense disagrees, it seems that adding the requirements of Item 303 to the context or the circumstances in which the jury could consider the MD & A was made as discussed in the next subsection, adds to the possible and reasonable inferences available with regard to the MD & A and

reinforces why Kmart's MD & A on liquidity in the Form 10–Q(3) was misleading.

4. *Challenge to Use of Regulation S–K Item 303 as a Basis of Section 10(b) and Rule 10b–5 Liability.*

Defendant's more significant challenge is to the use of Regulation S–K Item 303 to create an actionable duty to speak under Rule 10b–5 and the related instructions on Claim Two and Claim One. Defendant argues that a violation of Regulation S–K Item 303 does not give rise to a section 10(b) violation and that some cases say it is of no relevance to a 10b–5 claim as alleged in Claims One and Two. The SEC, on the other hand, argues that in addition to the duty to "speak fully and truthfully" created by the *Helwig/Rubin* analysis in the prior subsection, Regulation S–K Item 303, with certain additional findings, can create a duty to speak and can lead to a 10b–5 violation.

Because the three alleged material omissions are identical under either legal theory for explaining why these three omissions made the MD & A on "LIQUIDITY AND FINANCIAL CONDITION" misleading in light of the circumstances under which it was made, it seemed unnecessary to risk confusing the jury by giving them instructions on both the Item 303 duty to speak requirement and then on the *Helwig/Rubin* duty to speak fully and truthfully if one chooses to speak on a topic. The SEC did not want to make a violation of Item 303 a precondition for finding Section 10(b) liability, but rather wanted only to allow the jury to consider Item 303 and whether it was complied with in considering whether the omissions were material. The Commission objected to the defense version of Instruction Number 21 that SEC characterized as making a violation of

Item 303 a requirement to finding any of the omissions actionable under 10b–5. (Instructions Conference May 27, 2009, evening, at Tr02296–97.) While possibly muddled in my own thinking, again I was troubled with giving charges to the jury on the duty to speak stemming from Item 303, for which the SEC had advocated citing the numerous cases discussed below, and then charging the jury on the alternate SEC theory of the duty to speak truthfully and completely once one spoke on a subject. I was concerned that using the SEC's alternate theory in the instructions would not "cause anything but confusion." (*Id.* at Tr02298.) The SEC could argue under Rule 10b–5 that Kmart's MD & A on "LIQUIDITY AND FINANCIAL CONDITION" in the 10–Q(3) was misleading because, without it disclosing the three omissions, the MD & A suggested nothing out of the ordinary occurred in the third quarter of 2001 with regard to Kmart's liquidity, when in fact there was an extraordinary and unprecedented liquidity crisis that was address by extraordinary and unprecedented means of stretching vendors. Again because the three omissions were identical under either theory, and because on the Rule 10b–5 claims the jury was going to be required to separately find on the Verdict Form that each omission was material under *Basic v. Levinson* and further find that "the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading," I determined that the jury also should also be required to make a specific finding that the omitted facts were required by the SEC's Regulation S–K Item 303.[51] Such findings were clearly necessary under Claim Three, so this was

---

**51.** The SEC was understandably concerned about the jury instruction and Verdict From being too atomistic in the findings required of the jury. Obviously it wanted the jury to be able to find that, even if one or two of omitted

statements taken alone might not be material and thus their omission not sufficient to make the MD & A on liquidity misleading, that when all three omissions were taken as a combination they were material and the omis-

an issue the jury was going to have to address.

Rule 10b–5 b. makes it "unlawful for any person, directly or indirectly . . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Among the "circumstances" under which a MD & A on "LIQUIDITY AND FINANCIAL CONDITION" in a Form 10–Q for an interim quarter is made, is the fact that Item 303 of Regulation S–K sets out certain things that must be disclosed. If the omissions are sufficiently significant to meet the materiality standard of *Basic,*

*Inc. v. Levinson,* then it seems that if the omissions are also found necessary in order to make the MD & A statement not misleading because of what one would expect the MD & A to include under the requirements of Item 303 of Regulation S–K, then the omission(s) could form the basis for Section 10(b) and Rule 10b–5 b. liability.

Defendant cites then Judge Alito's opinion in *Oran v. Stafford,* 226 F.3d 275 (3rd Cir.2000), and a host of cases citing it, for the proposition that Item 303 of Regulation S–K is irrelevant to whether there is an actionable omission for purposes of Rule 10b–5.[52] The "omitted

sion of all three matters made the MD & A misleading. Claim Two's Instruction Number 26 on the elements of a Section 10(b) and Rule 10b–5 incorporated the instruction on the elements of a Section 10(b) and Rule 10b–5 from Claim One, Instruction Number 19, which included a required finding that the alleged violator "omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Instruction Number 21 required the jury to find that "that the failure to include those omitted facts rendered the Management Discussion & Analysis section of Kmart's Form 10–Q for the third quarter of 2001 materially misleading." While the instructions talked about the omissions as a group, the Verdict Form did require a separate finding as to each omission on whether it was material and on whether its omission made the MD & A misleading "in light of the circumstances under which it was made." Obviously the jury in considering each omission could consider that the other two matters were also omitted because this fact was part of the "circumstances under which [the MD & A statements and each of its omissions considered individually] were made."

**52.** In their brief Defendant cites the following cases as uniformly holding or at least stating that the failure to comply with Item 303 does not give rise to an actionable omission under Section 10(b): *Oran v. Stafford,* 226 F.3d 275, 288 (3d Cir.2000) (affirming dismissal of

claim under Section 10(b) because "SK–303 cannot provide a basis for liability"); *In re Marsh & Mclennan Cos. Sec. Litig.,* 501 F.Supp.2d 452, 473 (S.D.N.Y.2006) ("even if the Complaint's allegations were sufficient to establish a violation of [Item 303 of Regulation S–K], the violation alone would be insufficient to establish Defendant's liability under Section 10(b) and Rule 10b–5"); *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.,* 432 F.Supp.2d 571, 583 (E.D.Va.2006) (alleged violation of Regulation S–K does not establish that defendants had a duty to disclose the information under Section 10(b)); *Alaska Elec. Pension Fund v. Adecco S.A.,* 434 F.Supp.2d 815, 828 (S.D.Cal.2006) ("Plaintiffs' allegations based on SEC Regulation S–K are insufficient to state a Rule 10b–5 claim"); *Wietschner v. Monterey Pasta Co.,* 294 F.Supp.2d 1102, 1118 (N.D.Cal.2003) ("even if Plaintiffs could demonstrate a breach of [Item 303], this would not assist in stating a cause of action under section 10(b) for securities fraud"); *In re Enron Corp. Sec., Deriv. & ERISA Litig.,* 258 F.Supp.2d 576, 632 & n. 63 (S.D.Tex.2003) ("a violation of Item 303 does not establish a duty to disclose that may give rise to liability under § 10(b)"); *In re Pacific Gateway Exch., Inc. Sec. Litig.,* 2002 WL 851066, at *13 (N.D.Cal. Apr. 30, 2002) (plaintiffs could not premise a duty to disclose the slow payment of vendors on alleged failure to comply with Regulation S–K); *In re Quintel Entm't, Inc. Sec. Litig.,* 72 F.Supp.2d 283, 293 (S.D.N.Y.1999) ("To the extent that plaintiffs' § 10(b)(5) claim is based only upon alleged violations of Item 303 of

facts" in *Oran*, that the defendant American Home Products ("AHP") did not make public, involved a failure to disclose when AHP first became aware of certain European case data and Mayo Clinic case studies that showed a possible adverse link between the two drugs (Pondimin and Redux) that AHP sold and heart-valve disorders. Yet the facts in *Oran* are significantly different than the present case in several respects.

First, in *Oran* the omitted information about when AHP first learned of adverse case study data was found by the Third Circuit to be immaterial as a matter of law.

> Prior to [FDA noticing American Home Products Corporation ("AHP") on September 12, 1997, of its own data showing a statistically significant link between Pondimin and Redux and heart-valve disorders], the threat of product liability exposure was purely speculative, and any evidence of when AHP first learned of the adverse Mayo and European data was immaterial as a matter of law.

*Id.* at 286.

In the present case the jury found each of the omitted facts to be material under the *Basic, Inc. v. Levinson* standard, and there is substantial evidence to support these findings.[53]

Second, *Oran* notes that because "AHP never made any prior statement regarding when it learned of the heart-valve data there can be no duty to correct." The court stated:

> AHP never made any factual representation—implicit or explicit—regarding when it was first placed on notice about

potential heart-valve problems. AHP's earlier statements about the Mayo and European data did not relate any incorrect or misleading information about when the company had learned of that data; rather, *they were simply silent on the subject.* In the absence of a misleading prior representation, AHP was under no legal duty to update.

*Id.* at 286 (emphasis added).

In the present case Kmart made an extensive statement on liquidity in its "LIQUIDITY AND FINANCIAL CONDITION" section of the MD & A but that MD & A statement made no disclosure of Kmart's liquidity crisis, its cause, nor that it was remedied by an extraordinary and unprecedented means of stretching vendors. As noted above, the jury in this case found that each of the omitted facts was material and that each was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading.

*Oran* and all courts deciding the issue have held that Section 13(a) of the Exchange Act on a Corporation's reporting obligation, Rule 13a–13 and Regulation S–K Item 303 do not create an implied right of action for a violation of Item 303. These holdings on the question of whether there is an implied right of action under Section 13(a) of the Exchange Act for a violation of its reporting obligation, involve a different question than whether an implied right of action under Section 10(b) and Rule 10b–5 can be based on a violation of Regulation S–K Item 303.

(Dkt. # 139, pp. 50–51 of 75, numbered pages 35–36.)

---

Regulation S–K, it must be dismissed for failure to state a claim."); *Freedman v. Louisiana–Pacific Corp.*, 922 F.Supp. 377, 390 (D.Or.1996) ("because Plaintiffs' lawsuit is brought under Rule 10b–5, [defendant company's] potential duty to disclose must arise from 10b–5, and not from … SK–303").

**53.** While Defendant challenges the conference call statements as not being material as a matter of law, he does not challenge the jury's finding material the thee omissions.

In analyzing the first question of whether there is an implied right of action under Section 13(a), courts would apply the methodology set out by the Supreme Court in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), that the statutory language is the starting point in every case involving construction of a statute. It is clear that nothing in Section 13(a) or all of Section 13 of the Exchange Act or in Rule 13a–13 suggest an implied right of action for a violation of Regulations, such as Regulation S–K Item 303, that implements these reporting obligations.[54] This is a simple non-starter for any implied right of action stemming from Section 13(a).

Section 10(b) of the Exchange Act, on the other hand, has more robust language than Section 13(a) in that Section 10(b)

makes it "unlawful for any person ... *[to] use or employ,* in connection with the purchase or sale of any security ..., *any* manipulative or *deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors* ...." [55] (emphasis added.) Regulation S–K Item 303 clearly is such a regulation promulgated for the "protection of investors." Rule 10b–5 b. makes it "unlawful for any person, directly or indirectly ... to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." Regulation S–K Item 303 is part of the circumstances under which a MD & A statement in a quarterly SEC filing is made.

**54.** Section 13(a) **Reports by issuer of security; contents**

(a.) Every issuer of a security registered pursuant to section 12 shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the proper protection of investors and to insure fair dealing in the security—

 1.such information and documents (and such copies thereof) as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration statement filed pursuant to section 12, except that the Commission may not require the filing of any material contract wholly executed before July 1, 1962.
 2.such annual reports (and such copies thereof), certified if required by the rules and regulations of the Commission by independent public accountants, and such quarterly reports (and such copies thereof), as the Commission may prescribe.

Rule 13a–13, 17 C.F.R. § 240.13a–13

**§ 240.13a–13 Quarterly reports on Form 10–Q (§ 249.308a of this chapter).**

1. (a) Except as provided in paragraphs (b) and (c) of this section, every issuer that has securities registered pursuant to section 12 of the Act and is required to file annual

reports pursuant to section 13 of the Act, and has filed or intends to file such reports on Form 10–K (§ 249.310 of this chapter), shall file a quarterly report on Form 10–Q (§ 249.308a of this chapter) within the period specified in General Instruction A.1. to that form for each of the first three quarters of each fiscal year of the issuer, commencing with the first fiscal quarter following the most recent fiscal year for which full financial statements were included in the registration statement, or, if the registration statement included financial statements for an interim period subsequent to the most recent fiscal year end meeting the requirements of Article 10 of Regulation S–X and Rule 8–03 of Regulation S–X for smaller reporting companies, for the first fiscal quarter subsequent to the quarter reported upon in the registration statement ....
 * * *

(d) Notwithstanding the foregoing provisions of this section, the financial information required by Part I of Form 10–Q shall not be deemed to be "filed" for the purpose of Section 18 of the Act or otherwise subject to the liabilities of that section of the Act, but shall be subject to all other provisions of the Act.

**55.** 15 U.S.C. § 78j

As noted in *City of Monroe Employees Retirement System v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir.2005):

> In order to be actionable, a misrepresentation or omission must pertain to *material information* that the defendant had a *duty to disclose,* two significant limitations to the general policy of disclosure. See, e.g., *Basic,* 485 U.S. at 238, 108 S.Ct. 978 ("[I]n order to prevail on a Rule 10b–5 claim, a plaintiff must show that the statements were misleading as to a material fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant.") (emphasis in original omitted); *In Re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir.1997) ("[T]here is no general duty on the part of a company to provide the public with all material information.").... *A duty to affirmatively disclose "may arise when* there is insider trading, *a statute requiring disclosure,"* or, as relevant to this case, *"an inaccurate, incomplete or misleading prior disclosure." In re Digital Island Sec. Litig.*, 357 F.3d 322, 329 n. 10 (3d Cir.2004) (internal quotations omitted).

*Id.* at 669 (emphasis added).

The Third Circuit in *Oran* also recognized that statutes as well as an incomplete or misleading prior disclosure can provide a duty to disclose. *Oran,* 226 F.3d at 285. Yet, in *Oran* where the undisclosed facts were found immaterial as a matter of law, and there were no prior statements on the same subject, neither an Item 303 nor any common law fraud type of duty to disclose existed.

Unlike (i.) the "aiding and abetting" liability for which *Central Bank* found no support in the statutory language of Section 10(b) of the Exchange Act or in Rule 10b–5, and unlike (ii.) the language of Section 13(a) of the Exchange Act on a Corporation's reporting obligations, its Rule 13a–13, or Regulation S–K Item 303 that have no language suggesting an implied right of action for a violation of Item 303, Section 10(b) of the Exchange Act and Rule 10b–5 do provide language suggesting a possible implied right of action for a deceptive device ... *in contravention of such rules and regulations as the [SEC] may prescribe as necessary ... for the protection of investors.* Again, Regulation S–K Item 303 is such a regulation for the protection of investors and is part of the circumstances under which an MD & A is made.

As noted in *City of Monroe Employees Retirement System,* while the duty to disclose may be created by statute, an omitted fact is not actionable under Rule 10b–5 unless it is material under the *Basic, Inc.* standard and the omitted material fact was necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

If Kmart had been "simply silent on the subject" of liquidity in its 10–Q(3), as defendant AHP had been on its subject in *Oran,* then, as in *Oran,* there would be no section 10(b) and Rule 10b–5 liability for the three omissions even thought they were material under *Basic,* Inc.[56] Also, because not all of the information that Item 303 requires to be disclosed meets the higher standard of materiality of *Basic, Inc.,* failure to disclose those less significant matters may be a violation of Section 13(a) and Regulation S–K Item 303, but they would not constitute a 10b–5 violation. The facts of this cases, however, differ from these two examples and finding 10b–5 liability on these facts is consistent

---

**56.** Mere silence may, under the circumstances, be a violation of reporting obligations of Section 13(a) of the Exchange Act and Rules 12b–20 and 13a–13 and Regulation S–K Item 303 promulgated thereunder, but it is not a violation of Section 10(b) or Rule 10b–5.

with one reading of *Oran*. After finding the non-disclosed matters not material as a matter of law, the *Oran* opinion explains its reasons for not embracing a Item 303 violation as automatically triggering at 10b–5 violation:

> Because the materiality standards for Rule 10b–5 and SK–303 differ significantly, the "demonstration of a violation of the disclosure requirements of Item 303 does *not lead inevitably* to the conclusion that such disclosure would be required under Rule 10b–5. *Such a duty to disclose must be separately shown.*" *Alfus v. Pyramid Tech. Corp.*, 764 F.Supp. 598, 608 (N.D.Cal.1991); see also *Sofamor [Danek Group, Inc.]*, 123 F.3d [394 (6th Cir.1997) ] at 402; [other citations omitted] We find this reasoning persuasive, and thus hold that *a violation of SK–303's reporting requirements does not automatically give rise to a material omission under Rule 10b–5.* Because plaintiffs have failed to plead any actionable misrepresentation or omission under that Rule, SK–303 cannot provide a basis for liability.

*Oran*, 226 F.3d at 288 (emphasis added).

What is the "separate showing" under "that Rule" (which is Rule 10b–5) that was missing in *Oran?* As noted before, the alleged omissions in *Oran* were not material as a matter of law and additionally AHP was "simply silent," and thus had not made a statement that was misleading, under the circumstances, because of the omitted material fact. Both of these "plus factors" missing in *Oran* are involved in the present case-the jury found each omission material under *Basic, Inc.*, and Kmart was not simply silent, but chose to make a MD & A statement on liquidity in its Form 10–Q(3), and the jury found for each of the three omissions that "the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading." (Dkt.# 129, Verdict Form, Claim Two Questions 1.c.iii., 1.d.iii. & 1.e.iii.)

■ Thus, one could read *Oran* as excluding from a possible 10b–5 universe all of the Item 303 disclosure requirements that do not meet the materiality standard of *Basic, Inc.* and limiting 10b–5 liability to cases where is there is a separate showing not only that a MD & A statement is made on a topic required by Item 303, but additionally that (i.) the missing Item 303 fact is material under *Basic, Inc.*, and (ii.) that the absence of the fact makes the MD & A statement misleading "in light of the circumstances under which it was made." Here the jury here was required to make both findings which it did.[57]

If courts were to so interpret the interplay of Section 10(b), Rule 10b–5 b. and the reporting requirements of Regulation S–K Item 303, would such an interpretation pass the second test *Central Bank* set for analyzing the scope of Rule 10b–5—"to infer how the 1934 Congress would have

---

**57.** Items (i.) the materiality requirement and (ii.) the absence of the fact makes the statement misleading are different. Item (i.) on materiality deals with whether a reasonable investor would have found it a significant fact "in the total mix" of what was publically known. Item (ii.) really deals with the duty to disclose—the statement is misleading absent the omitted fact because "in light of the circumstances under which it was made" you would expect the fact to be stated if the fact existed. In the absence of a duty to disclose, the mere fact an investor would like to know the information (*i.e.* materiality) does not make non-disclosure actionable under Rule 10b–5. *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 403 (6th Cir.1997) ("Materiality alone is not sufficient to place a company under a duty of disclosure."). In the present case the duty to disclose is rooted in Item 303 or, alternatively, in the *Helwig/Rubin* standard that if you choose to talk on a subject, you must talk truthfully and completely.

addressed the issue[s] had the 10b–5 action been included as an express provision in the 1934 Act." *Central Bank*, 511 U.S. at 173, 114 S.Ct. 1439. While nearly a cliche, after so any references, is regularly noted that among Congress' objectives in passing the 1934 Act was " 'to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.' " *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (quoting *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963)). *S.E.C. v. Zandford*, 535 U.S. 813, 819, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002).

The 1934 Congress in the Securities Act created a duty to speak in the reporting requirements of section 13(a), and in section 10(b) prohibited deceptive devices in contravention of the SEC's regulations for the protection of investors. Indeed Regulation S–K could be seen as a central pillar of the philosophy of full disclosure the 1934 Congress sought to foster. With regard to a corporation making a MD & A statement on liquidity which purports to be one made in accord with Section 13(a) of the Securities Act, it seem a modest proposition that on the facts of this case the 1934 Congress would have approved, and intended courts to approve, a finding of a Section 10(b) violation when the omitted facts concerning liquidity were required by the Commission's Regulation S–K Item 303, they were material facts under the *Basic, Inc.* standard, and omitting each such material fact made the MD & A misleading in suggesting that there was not any changed liquidity event, deficiency or source of liquidity in the quarter. Thus, the facts of this case would also pass this second test set by the Supreme Court in *Central Bank*.

The "does not lead inevitably" and "does not automatically" language of *Oran* leaves unresolved whether the Third Circuit would accept 10b–5 liability in a Regulation S–K Item 303 situation where there were these "separate showings" as exist in the present case. Similarly, the issue is unresolved in the Sixth Circuit. *In re Sofamor Danek Group, Inc.*, is the only Sixth Circuit case that discusses Item 303 as a possible source of Section 10(b) liability. The court determined that, because the defendant had "no way of knowing" the future impact on operations of the undisclosed matter, the complaint did not sufficiently allege that the undisclosed matter was required to be disclosed under Item 303. *In re Sofamor Danek*, 123 F.3d 394 at 402. Thus, the Sixth Circuit in *Sofamor Danek* did not need to resolve the issue of whether Regulation S–K Item 303 can ever create a duty to speak actionable under Section 10(b) and leaves the question unanswered with a whimsical "[p]erhaps so." After noting Plaintiff's acknowledgment of the cases holding that there is no private right of action under the reporting statute Section 13(a) or the reporting regulation, the opinion raises the 10b–5 issue regarding Item 303:

> The plaintiffs suggest, however, that the absence of a separate cause of action "does not preclude plaintiffs from arguing ... that defendants' disclosure duty under the Rule 10b–5 claim may stem from Item 303." Perhaps so—but for reasons similar to those explained above, we do not find the argument persuasive.

*Id.* at 403.

The reason "explained above" that the Sixth Circuit did not find the argument persuasive in *Sofamor Danek* was that the undisclosed information was either "soft," uncertain, future impact material that was not required to be disclosed under Item 303 or was information otherwise disclosed

or publically available—and thus already in the "total mix" of information and not material. The Court notes that although the company "downplayed" the significance of the FDA warning letter, "any analyst could easily obtain a copy of that letter and could make an independent judgment of its significance." *Id.* at 402. Similarly, the material risk that defendant supposedly kept from the public was in fact disclosed in other public SEC filings of the company: "Each of the company's 10–K forms explicitly mentioned the risk that the FDA might obtain an injunction against any distribution of the [product]." *Id.*

One district court case in this Circuit involving the issue offers little guidance because again the issue was avoided by ruling against Plaintiff on separate grounds. *In re Huffy Corp. Secur. Litig.,* 577 F.Supp.2d 968, 1019–20 (S.D.Ohio2008). The complaint alleged that the company's Class Period Reports on Forms 10–Q filed with the SEC were materially false and misleading in that they failed to disclose known trends, demands, commitments, events and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulations S–K. Without questioning whether Item 303 of Regulation S–K can form the basis for a Rule 10b–5 claim, the *Huffy* court found the allegation to be insufficiently pled because plaintiffs "have [not] indicated what known trends, etc., the Defendants omitted from which 10–Q Reports." *Id.* at 1020.

Other private securities actions seem to have recognized that, even though there is no private right of action for a claim under Item 303 or Section 13(a), Item 303 may provide a duty to disclose and a basis for a claim under Rule 10b–5 for failure to disclose. The Second Circuit in *In re Scholastic Corp. Securities Litigation,* 252 F.3d 63, 70 (2d Cir.2001), reversed a lower court's dismissal of a 10b–5 claim and allowed the case to proceed with Item 303 of Regulation S–K providing the basis for a duty to disclose for Section 10(b) and Rule 10b–5, but that issue was apparently not challenged by the defendant nor briefed by the parties. In *Scholastic,* the Second Circuit recognized that an alleged failure to disclose material adverse trends in book sales in Scholastic's Form 10–Q MD & A as required by Item 303 would provide the basis for Rule 10b–5 liability. While the issue discussed above is hardly the "holding" in *Scholastic,* other courts cite it as if it is. *e.g., In re Corning Inc. Securities Litigation,* 349 F.Supp.2d 698, 715–17 (S.D.N.Y.2004), *citing Scholastic; In re Campbell Soup Co. Secur. Litig.,* 145 F.Supp.2d 574, 590–91 (D.N.J.2001), *citing Scholastic. See also In re NTL, Inc. Securities Litig.,* 347 F.Supp.2d 15, 37–38 (S.D.N.Y.2004), which states without citing any authority "While a violation of Item 303, in some circumstances, may give rise to a claim under Section 10(b) of the Exchange Act, there is no private cause of action for a violation of Regulation S–K."

In *Corning,* plaintiff alleged that in three Form 10–K's, two Annual Reports, and nine Form 10–Q's, defendant failed to disclose information that would have had a material impact on Coming's financial condition. *In re Corning,* 349 F.Supp.2d at 700–01. The "crux of plaintiff s claim is that Corning ... *failed to disclose* material information known to Corning regarding ... potential litigation liability from silicone breast implants in the range of $1 billion." *Id.* at 702 (emphasis added). Defendant argued that "Item 303 does not impose any duty," citing various cases. *Id.* at 716. The court rejected this claim, stating that "the Second Circuit in a subsequent case reversed a district court's dismissal of a Rule 10b–5 claim that was

based on a defendant's failure to make disclosure allegedly required under SK–303." *Id.* (citing *Scholastic,* 252 F.3d at 74).

The court in *Corning* stated that it "must consider Item 303 in connection with plaintiffs' claim under Rule 10b–5." Unlike the *Oran* suggestion, the *Corning* court then asserted "that the relevant portions of Item 303 do not really vary from the case law interpreting Rule 10b–5." After further analysis, the court then held that:

> Considering Rule 10b–5 in conjunction with SK–303 and FASB 5, *it is perfectly clear how the law applies to the present case.* If at the time the financial statements ... were issued, Corning knew of potential liabilities ... with respect to breast implant lawsuits and non-litigation claims, and knew that these liabilities were potentially of such a size *as to materially affect the future earnings of Corning and the general financial condition of Corning, the law required Corning to disclose this.* Such a disclosure would have undoubtedly taken the form of a charge against income *as well as a description of the circumstances. . . . Failure to make such a disclosure would be failure to state material facts, thus creating liability under Rule 10b–5.*

349 F.Supp.2d at 717 (emphasis added). Yet, the court granted defendants summary judgment not because of any legal argument questioning that Item 303 of Regulation S–K could provide the basis for a 10b–5 violation, but rather but because of a failure of any adequate proof that defendants had any reasonable basis to question Corning's 30 years of research and testing that silicone breast implants were safe and adverse effects the exception, nor any showing that the company could have anticipated the FDA January 1992 moratori-

um on further sales which caused a significant stock decline.

*Campbell Soup* involved the failure to disclose the effect of loading practices in quarter-end press releases, SEC filings and annual reports. 145 F.Supp.2d at 581–82. With respect to Item 303, the court noted that the Second Circuit had recently "held that a publisher's failure to disclose trends in declining sales and increasing returns, as required by Item 303, adequately alleged a securities law violation." *Id.* at 591. The court stated that "[t]he *Scholastic* opinion further bolsters the Court's conclusion that Defendants had a duty to disclose their loading and shipping practices." *Ibid.* The court stated, however, that it had "already held that Plaintiffs had sufficiently pled violations" of Rule 10b–5 and thus did not need an alternate Item 303 basis for 10b–5 liability. *Ibid.* The *Campbell Soup* case is particularly significant because it seems to trumpet the Second Circuit's *Scholastic* decision while acknowledging that Item 303 was "unavailable" to it as an independent avenue to liability because it was a district court in the Third Circuit and was compelled to follow *Oran v. Stafford.*

While these cases cited by Plaintiff in support of its position are fewer in number than those cited by the Defendant, all of the cases, with the exception of *Oran,* share one thing in common—they all seem merely to state their position as a given, some citing *Oran* or *Scholastic* to support their differing results, but none of them provide any analysis of the reasons why Item 303, in certain circumstances, should or should not provide a basis for 10b–5 liability. For the reasons stated above, it is believed that the facts of this case have the additional "plus factors" that were missing in *Oran* of a prior statement, one or more material omissions that were required by Item 303, and the omissions made the MD & A misleading under the circumstances. Thus, even the Third Cir-

cuit could accept 10b–5 liability in this case. But if that proposition is wrong, and if *Oran* should be read as always excluding Item 303 from providing a basis for 10b–5 liability, then it is believed that the Sixth Circuit will reject such an extreme position and will rather follow the lead of the Second Circuit in *Scholastic,* possibly articulating some clear limits and guidelines.[58]

While not using Item 303 for the duty to speak, the *City of Monroe* is supportive of this position and particularly instructive in that it uses the expectancies created by accounting standards coupled with what was and was not said in the Annual Report to find implied representations and a duty to speak or face liability if the jury finds the implied representation to be false. In *City of Monroe* Bridgestone's 1999 Annual Report was accompanied by an outside auditor's letter stating that it was prepared "in conformity with accounting principles generally accepted in Japan" and the report stated the Japanese financial statements were prepared in accordance with Japanese GAAP and the Firestone financial statements prepared under U.S. GAAP. Both GAAPs require disclosure of a loss or impairment to assets if probable, and the U.S. GAAP requires disclosure by identification of any loss contingency if it was at least "reasonably possible" but the amount of loss could not be estimated. *Id.* 399 F.3d at 677. Using these general statements regarding accounting stan-

dards on disclosures and the Annual Report's disclosure of various "Contingent Liabilities" or other risks to the market value of its stock, the Sixth Circuit treats the 1999 Annual Report as making "[t]he unmistakable representation, under both the Japanese and American GAAP policies, ... that if a loss or asset impairment was probable, the Annual Report reader would see a discussion of it in some form in the report." *Id.* It goes on to interpret the Annual Report as making what can fairly be characterized as an *implied* "representation that if there were a substantial certainty of such an impairment, that contingency or risk would be disclosed." *Id.* 399 F.3d at 678. It later notes:

The 1999 Annual Report's simultaneous inclusion of the accounting policies, the listed contingencies, and the absence of any mention of a contingency concerning Firestone tires *constituted a representation* that no loss or asset impairment arising from Firestone tire products due to the lawsuits, regulatory scrutiny, or safety-related reasons was "probable" or "reasonably possible."

*Id.* (emphasis added).

This sentence could as easily have used the term "constituted an implied representation." The Court later refers to the implied "no impairment" representation as being material and noted why "a reasonable jury could find that the facts belied that representation." *Id.*

**58.** While there is a real concern that an unrestrained use of Item 303 in conjunction with Rule 10b–5 will lead to a surge in private securities litigation using the "trend" language of Item 303, it is believed that the heightened pleadings requirements of the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4 ("PSLRA") and a rigorous review of the materiality standard under *Basic, Inc.* will provide district courts tools to weed out many, albeit not all, baseless claims early in the litigation. Excessive hostility to private securities litigation risks distorting our securities laws and limiting the protec-

tions they were intended to provide the investing public. While marginal to frivolous strike suits to extort settlements impose great private and social costs from the corporations of this country and their officers, a reasonable balance needs to be maintained in the enforcement of federal securities laws. The courts in *Oran, In re Corning, In re Campbell Soup* and many other cases were able to reject claims where the alleged omissions were not material, though, obviously, these "victories" were at a substantial cost to the "victorious" defendants.

In addition to this implied "no impairment" of assets representation, the Sixth Circuit then combined FASB 5 of the Financial Accounting Standards Board on probable loss contingencies with the omission from the Annual Report's discussion of "Contingent Liabilities" of any losses due to tire replacements, possible mandated recalls or law suits and then it determined that a jury could find another implied representation of "no loss:"

> The second representation from Bridgestone's 1999 Annual Report that a reasonable jury could conclude was actionable was *its effective representation* that there were no actual, material losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires.

*Id.* at 680 (emphasis added).

It notes that this implied representation gave rise to a duty to disclose:

> *Because the 1999 Annual Report represented that there were no actual losses connected to the lawsuits and responses to the regulatory scrutiny of the ATX tires' failures, there was a duty to disclose any material information to the contrary, be it in the form of a reserve, notice of a contingency, or some other form of disclosure.*

*Id.* at 681 (emphasis added).

■ If a combination of these general accounting references with the statements and omissions in Bridgestone's 1999 Annual Report, in light of the disclosure standards drawn from GAAP and FASB, is sufficient to uphold a Rule 10b–5 misrepresentation claim due to material omissions in *City of Monroe*, a similar combination of the introductory and signature pages of the Kmart 10–Q(3) for 2001,[59] selected portions of Item 303 Regulation S–K, and the MD & A statements on "LIQUIDITY AND FINANCIAL CONDITIONS" should support a Rule 10b–5 claim here. In the present case, the disclosure requirements of Item 303 of Regulation S–K replace the disclosure duties the *City of Monroe* found in various accounting standards, and this regulation is likely no more complicated for investment analysts and others who study corporate disclosures for investment or other purposes to understand.

The jury was instructed that:

> The purpose of the discussion and analysis shall be to *provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the registrant* as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources.

Instruction No. 21. (Emphasis added.)

While not read, they were given the 1989 Release on this regulation and Dr. Carmichael testified to the portion of that Release that the MD & A is "supposed to give the investor the opportunity to see the company through the eyes of management." (Carmichael 5/21/09, at Tr01418.)[60] They were instructed that Item 303(b) required disclosure of any material changes in items listed in 303(a)

---

59. The disputed SEC filing begins:
 FORM 10–Q
 [x] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15d OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE QUARTERLY PERIOD ENDED OCTOBER 31, 2001
 The Form 10–Q is signed:
 "Pursuant to the requirements of the Securities Exchange Act of 1934 ...."

60. Dr. Carmichael was paraphrasing the 1987 Release statement, "The MD & A is intended to give the investor an opportunity to look at the company through the eyes of management," quoted in the 1989 Release. (Release No. 33–6835 (May 18, 1989) [54 FR 22427] quoting Securities Act Release No. 6711 (April 24, 1987) [52 FR 13715] at 13717.)

which, on item (1) *Liquidity*, required identification of

> any known ... events ... that ... are reasonably likely to result in the registrant's liquidity ... decreasing in any material way. If a material deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency. Also identify and separately describe internal and external sources of liquidity....

*Ibid.*

They were also instructed that:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations....

*Ibid.*

Dr. Carmichael testified at length about his opinion on the disclosure requirements of Item 303 including a material liquidity event, a material liquidity deficiency and sources of liquidity (Carmichael 5/21/09, at Tr01399–422). He stated his opinion that the Schwartz overbuy of inventory definitely caused a material liquidity event (*Id.* at Tr01423), that there was a material liquidity deficiency in the range of $1 billion (*Id.* at Tr01426 and Tr01437–38), and that the vendor payment delays described by Messrs Moreland, Gilbert and Archambeau were an important source of Kmart's liquidity in the third quarter of 2001. (*Id.* at Tr01438–39.)

Given what was and was not said in the Form 10–Q(3) MD & A on liquidity, given what the jury knew about the disclosure requirements of Regulation S–K Item 303 and what information investors were to be provided, and borrowing the language of the Sixth Circuit in *City of Monroe*, the jury could reasonably find that Kmart's MD & A *"constituted a representation"* that Kmart experienced no material liquidity event, no material liquidity deficiency or no significant change in a material source of liquidity in the third quarter of 2001. Such a jury could further find that those "representations" were false and misleading in the absence of further disclosures.

Even if in my muddled thinking I was wrong in instructing the jury on the 10b–5 claims that they must find the three omissions were required under Item 303 of Regulation S–K,[61] the jury was not instructed that this was a sufficient finding

---

61. This instruction could be determined to be wrong if an expansive interpretation and acceptance of the reasoning in *Oran* is adopted as precluding Item 303 having any relevance to a 10b–5 claim. This instruction could also be determined to be wrong even if such an expansive interpretation of *Oran* is rejected and the *Scholastic* line of case is accepted in certain fact situations. The SEC was correct in its objection to Instruction Number 21 making a finding of an Item 303 violation a necessary element of the 10b–5 claim in this case. For reasons noted in the preceding subsection, the SEC is correct that, even without the existence of Item 303, the jury could find the "LIQUIDITY AND FINANCIAL CONDITIONS" section of the 10–Q(3) was materially misleading because, when compared to the "Liquidity and Financial Conditions" section of the 10–Q(2) (Plf. Exh. 93), it indicates nothing of significance changed with regard to Kmart's liquidity in the third quarter of 2001. Thus, without any finding under Item 303, the jury could find Section 10(b) liability under the *Helwig/Rubin* reasoning. Thus, Instruction Number 21 as given required the jury to make an additional, albeit unnecessary, finding of fact that each omission was required to be disclosed by Item 303. Yet, any such error provides no help to the Defen-

alone to impose 10b–5 liability. Assuming the instructions were given without the requirement of finding a violation of Item 303 a modified excerpt of Instruction Number 21 would, in part, read:

> With respect to the alleged omissions, you must first find ~~that the omitted facts were required to be disclosed under Item 303 of Regulation S–K and~~ that those omissions were material as defined in Instruction No. 22 on page 30. Second, you must find that the failure to include those omitted facts rendered the Management Discussion & Analysis section of Kmart's Form 10–Q for the third quarter of 2001 materially misleading.

Again, Instruction Number 26 on Kmart's violation of Section 10(b) and Rule 10b–5 directed the jury not only to Instruction Number 21 but also to Instruction Number 19 on the basic elements of a Section(b) and Rule 10b–5 claim on making "an untrue statement of a material fact or omitt[ing] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" and acting "with intent to defraud or with reckless disregard for the truth." Instruction Number 19 made it clear that the parties stipulated to the existence of the third and fourth elements on "in connection with the purchase or sale of a security" and use of "an 'instrumentality of interstate commerce' in connection with the securities transactions involved in the case."

If one omits as unnecessary the Item 303 finding from the jury Verdict Form on Claim Two, concerning Kmart's alleged violation of Section 10(b) and Rule 10b–5b., that leaves:

CLAIM TWO QUESTION 1

> [CLAIM TWO QUESTIONS 1. A. AND 1. B. OMITTED & BOLDFACE ADDED]

dant because it raised, and did not lower, what the SEC had to prove. The critical question was whether the instructions a whole and other findings of the jury are suffi- cient to uphold a 10b–5 violation. For reasons stated in the body of this opinion, it is believed they are.

c. With respect to the alleged omission from the Management Discussion & Analysis section of Kmart's Form 10-Q that it did not identify a **known material liquidity event** that occurred in the third quarter of 2001, do you find:

i. That Kmart had a known material liquidity event that occurred in the third quarter of 2001?

Answer: Yes ___✔___ No _____

~~ii. That Kmart was required to disclose this fact under Item 303 of Regulation S-K?~~

~~Answer: Yes ___✔___ No _____~~

iii. That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes ___✔___ No _____

iv. That the omitted fact was material?

Answer: Yes ___✔___ No _____

v. That Kmart acted with intent to defraud or with reckless disregard for the truth?

Answer: Yes ___✔___ No _____

d. With respect to the alleged omission from the Management Discussion & Analysis section of Kmart's Form 10-Q that it did not disclose that Kmart had a **material liquidity deficiency** during the third quarter of 2001 or the course of action involving the delay of vendor payments taken by Kmart's management to remedy that deficiency, do you find:

i. That Kmart had a material liquidity deficiency during the third quarter of 2001 and, if so, remedied that deficiency by a course of action involving the delay of vendor payments?

Answer: Yes ___✔___ No _____

~~ii. That Kmart was required to disclose these facts under Item 303 of Regulation S-K?~~

~~Answer: Yes ___✔___ No _____~~

iii. That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes ___✔___ No _____

iv. That the omitted facts were material?

Answer: Yes ___✔___ No _____

v. That Kmart acted with intent to defraud or with reckless disregard for the truth?

Answer: Yes ___✔___ No _____

e. With respect to the alleged omission from the Management Discussion & Analysis section of Kmart's Form 10-Q that it did not identify the **delay in vendor payments as a material change in an internal source of liquidity** during the third quarter of 2001,

i. That the delay in vendor payments was a material change in an internal source of liquidity during the third quarter of 2001?

Answer: Yes _____✔_____ No _____

ii. That Kmart was required to disclose this fact under Item 303 of Regulation S-K?

Answer: Yes _____✔_____ No _____

iii. That the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10-Q, in light of the circumstances under which it was made, not misleading?

Answer: Yes _____✔_____ No _____

iv. That the omitted fact was material?

Answer: Yes _____✔_____ No _____

v. That Kmart acted with intent to defraud or with reckless disregard for the truth?

Answer: Yes _____✔_____ No _____

2. That Charles Conaway had a general awareness that his role was part of an overall activity that was improper?

Answer: Yes _____✔_____ No _____

3. That Charles Conaway knowingly assisted Kmart in its violation of Section 10(b) and Rule 10b-5?

Answer: Yes _____✔_____ No _____

4. That Charles Conaway substantially assisted Kmart in its violation of Section 10(b) and Rule 10b-5?

Answer: Yes _____✔_____ No _____

Did Charles Conaway aid and abet one or more violations by Kmart

Corporation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder as to the Kmart Form 10-Q for the quarterly period ending October 31, 2001?

Answer: Yes ___✓___ No _____

Thus, it seems that the jury instructions and Verdict Form—with or without the requirement that the jury find that the three omitted facts were required to be disclosed by Item 303 of Regulation S–K—charged the jury on their need to find all of the necessary elements of a Section 10(b) and Rule 10b–5 violation. The findings on the Verdict Form, under either scenario, support a finding under Claim Two of a Section 10(b) and Rule 10b–5 violation by Kmart and Defendant Conaway aiding and abetting that violation. The jury findings on each of the three omissions that

(1.) the omitted fact was material, and

(2.) that the omitted fact was necessary in order to make the Management Discussion & Analysis section of the Form 10–Q, in light of the circumstances under which it was made, not misleading

are sufficient to establish a Kmart Section 10(b) and Rule 10b–5 violation in Claim Two.

While the Defense would have liked more directed language in Instruction Number 21 to what a reasonable investor would have understood regarding the requirements of Item 303, it is believed that with the testimony of Dr. Carmichael, the testimony of investment analyst Beder on what were his concerns regarding the Form 10–Q(3) and the related conference call, the Form 10–Q(3), the Jury Instructions on what was to be provided to investors, and the related Verdict Form, the jury had an adequate basis, when combined with their general knowledge and experience, to determine whether the MD & A section on "LIQUIDITY AND FI-NANCIAL CONDITIONS" section of the 10–Q(3) was materially misleading due to the fact that a reasonable investor could read it as indicating that Kmart experienced no change in the third quarter of 2001 regarding a material liquidity event, a material liquidity deficiency or a material source of liquidity because that was the section of the Form where federal regulations required such material changes to be disclosed. Thus, it cannot be said that the instructions on the Section 10(b) and Rule 10b–5 in Claim Two, when viewed as a whole, were confusing, misleading or prejudicial. It is believed that the jury had an adequate understanding of the law concerning the alleged securities fraud violation standard to be applied in this case.

### C. Claim One—Defendant Conaway's Violation of Section 10(b) of the Exchange Act.

Defendant's legal arguments on the asserted errors related to jury instructions on Regulation S–K Item 303 and Section 10(b) and Rule 10b–5, discussed above in relation to the aiding and abetting Claim Two, are also made with respect to Claim One regarding Mr. Conaway's primary liability for violations of Section 10(b) and Rule 10b–5. The legal analysis and conclusion is the same with respect to both claims.

Under Claim One Mr. Conaway also challenged Instruction Number 20 and the SEC's case law and facts regarding whether he could be found to have caused the misstatements or omissions in the Form 10–Q(3) which he did not prepare or sign and denies having read prior to its filing. Discussed in greater detail below, the jury

was told that the SEC need not prove that Mr. Conaway signed, drafted, or wrote the Form 10–Q so long as the SEC proved that he caused the false statement or caused the material omissions to be made. Because the cases cited by the government to support a finding of primary liability against a person who did not directly make the alleged misstatement are highly fact dependent, it is believed that the Defendant's arguments challenging this Claim One Instruction Number 20 on the facts of this case are best considered in Section III of this opinion along with the Defendant's multiple and substantial other claims that the evidence in this case is insufficient to uphold the jury's findings of liability on any of the claims.

## III. DEFENDANT CONAWAY'S CHALLENGES TO THE SUFFICIENCY OF THE EVIDENCE.

### A. Sufficiency of the Evidence Legal Standard.

 The Sixth Circuit follows a "policy of reluctance to overturn the jury's verdict" based on the sufficiency of the evidence. *Barnes v. Owens–Corning Fiberglas Corp.*, 201 F.3d 815, 821 (6th Cir. 2000). A court may grant such a motion when it is of the opinion that the verdict is against "the clear weight of the evidence." *Id.* at 820. However, new trials are not to be granted on the grounds that the verdict was against the weight of the evidence "unless that verdict was unreasonable," *Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir.1996). Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper. *See id.* at 1048. "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir.1967) (citation omitted)..

### B. Credibility Issues Regarding Defendant Conaway.

Defense counsel in their reply brief (Dkt.# 153.P.1) indicate that Mr. Conaway should be granted judgment as a matter of law because of facts independent of Mr. Conaway's credibility. Yet, on Claim One whether there is sufficient evidence to uphold the jury finding that Mr. Conaway caused the MD & A of the 10–Q(3) not to include the overbuy or the exceptional system of slow paying vendors that Kmart undertook, and whether he did this with adequate scienter, are fact questions critically dependent on Mr. Conaway's credibility as well as others upon whom he relies. If there is sufficient evidence to uphold Claim One, such evidence would also be adequate to uphold Claims Two and Three. Clearly, if Mr. Conaway's version of the facts were accepted, the jury would have reached a different result on Claim One and the other two claims. Thus, before reviewing the sufficiency of the evidence of the three claims it warrants a review of the various areas where, viewing the evidence in the light most favorable to the SEC, the jury could reasonably have found Mr. Conaway to have acted in misleading ways, where they could have found that he outright lied to various individuals or groups, and where the jury could have found that he lied under oath in his deposition or at trial.

The pattern of such misrepresentations could have been found by the jury to chart a clear course of covering up the magnitude of Kmart's liquidity crisis in the third quarter of 2001 triggered in large part by the Schwartz overbuy, a further pattern of covering up the extraordinary steps taken to slow pay vendors, and finally his involvement in contriving and repeatedly publishing a false cover story involving the eLMO systems convention. The evidence upon which the jury found that Mr. Cona-

way caused the omissions from the MD & A in the 10–Q(3) rest in a significant degree on what Mr. Conaway said, what he did, what he maintained silence on when others, such as Mr. McDonald, did or said things that could be found to be deceptive.

### 1. *Mr. Conaway's Involvement in Misleading Financial Representations to the Board.*

Mr. Conaway clearly knew by the end of August 2001 of the "outrageous" overbuy that "blindsided" his CFO Boyer. By mid-August Assistant Treasurer Moreland was forecasting negative liquidity exceeding $100 million by Kmart's peak borrowing date of November 9. (Plf. Exh. 4, at p. 2 & 4.) A negative liquidity of $67 million on October 10 was projected in the August 31, 2001, Liquidity Forecast, which factored in the $850 million August 8–September 5 incremental overbuy information. (Plaintiff's Exh. 7, at p. 1 & 2.) Moreland indicated this forecast went to the ELT to help determine how to manage Kmart's liquidity problem, and was not given to the Board. (Moreland June 27, 2007, at TrDep00053–56.) An interim liquidity forecast, using a + 5% comparative sales for the third and fourth quarter over the prior year, showed a $ 217 million liquidity cushion on November 9. (Plf. Exh. 5., at p. 2 & 3) The "final" version that went to the Board's Finance Committee in mid-August showed a $544 million liquidity cushion. (Plf. Exh. 6, p. 2 & 4.) Similar optimistic liquidity cushion forecasts were made by John McDonald and Charles Conaway in a September 10 power point presentation to their bankers.

Defense counsel asserted at trial that while companies run a wide variety of positive and negative scenarios on the future, the figures on liquidity given to the Board were the management's best estimate of the realistic forecast. While the jury could possibly accept this as true for the August figures given to the Board, or possibly the

September 10 figures given the bankers, a jury's confidence in whether the Board and Kmart's bankers were getting what Kmart's management objectively thought were the most realistic figures could start to erode in light of the Mr. Moreland September 9 projections prepared for Mr. Conaway and his ELT showing Kmart exceeded its borrowing capacity by $455–$641.8 million on November 7. (Plf. Exhs. 9 & 10.) While Kmart's rosy hopes for a 3% increase in sales in the third quarter with its new BlueLight Always strategy might be considered reasonable by the jury as late as September 10 when Mr. Conaway made his Bank presentation, the jury could legitimately have found that after the September 11, 2001, terrorist attach even a zero comp sales projection was optimistic, and thus Moreland's liquidity deficit of over half a billion dollars (with its $600 million reduction in future receipts of inventory and zero comp sales) was the scenario that should have guided a forthright CEO, at least in disclosures that could be made in confidence to his Board of Directors. (Plf. Exh. 12.) (Board Member Stallkamp testified that certain information could be provided to the Board in confidence that could be used in overseeing the company for the benefit of the stockholders. Stallkamp 5/18/09 at Tr00774–75.) Thus, while showing a $449 million contraction from the August 10 $544 million liquidity cushion, a jury could find the $96 million liquidity cushion forecast in the September 17, 2001, Board Package (Plf. Exh. 65) was not being forthright with the Board in light of the multiple negative liquidity forecasts being run for Mr. Conaway and his ELT which the jury could conclude were the more realistic scenarios.

Were this the only evidence of efforts to mislead the Board and others about Kmart's liquidity situation it might not be worthy of mention. While denied by Mr.

Conaway, the jury could also have believed Board member, and Board Finance Committee Chairman, Thomas Stallkamp, when he testified that Mr. Conaway did not tell the Board at the September or the October Board meetings about the Schwartz overbuy nor about the two extraordinary and unilateral methods of dealing with the liquidity crisis using the changes in the Accounts Payable System and the Moreland system (i.e. Project SID). Mr. Stallkamp testified that it was his belief that all changes in vendor payment terms discussed with him and the Board in August, September and October had been negotiated with the vendors. (Stallkamp 5/18/09, at Tr00730–31, Tr00836, Tr00754–55, Tr00758–59, Tr00769–71, & Tr00774.) Mr. Stallkamp, as who served in various executive positions in supply and purchasing in his twenty years at Chrysler including its 1980's turnaround, had experience in dealing with past due billings to supply chain vendors. (*Id.* at Tr00707–08.) He testified had he been informed about these slow pay practices at Kmart in the fall of 2001, it would have been significant and he would have opposed such unilateral action, which beached contractual payment terms and upset suppliers, particularly for a retail company like Kmart that did not make a product and was totally dependant on good relations with its vendors to supply product to operate. (*Id.* at Tr00779–81.)

A jury could also conclude that management's October 18 Board package (Plf Exh. 114, at p. 27) was not being honest with the Board when it projected a $158 million liquidity cushion for Kmart's peak borrowing date. It was not disclosed that this positive liquidity cushion was built on unilateral and undisclosed stretching of vendors beyond terms amounting to over $900 million as of October 18 when this forecast was made.[62] The jury could conclude that these $900 million were committed funds, and such sums should have been subtracted from the liquidity cushion in order to make an honest presentation to the Board. Board Member Stallkamp testified that he understood the liquidity cushion to be calculated after all of the bills were paid. (Stallkamp 5/18/09, at Tr00745.) The jury could also conclude that by early October, those most informed at Kmart had abandoned hopes that improved sales from the prior year would readily bail Kmart out of its liquidity problems. On October 4, 2001, the working group who were deselecting invoices for payment and managing the cash crisis— Messrs. McDonald and Kearse, Jellinek and Moreland-believed Kmart faced negative 3% comparable sales until Thanksgiving and cumulative negative cash flow into December. (Plf. Exh. 18, at p. 2, Moreland 6/27/07, at TrDep00072–73.)

### 2. *Mr. Conaway's Misleading Statements and Actions at Kmart.*

a. *The Growing Debt, Vendor "Noise" and Talking Points:* By October 12 it was known that Kmart's sales were flat for September compared to the prior year while Walmart and Target's sales increased. (Plf. Exhs. 71 at p. 1, & 114 at p. 3.) With the introduction of the AP System changes and Project SID, vendor calls and

---

**62.** Mr. Moreland noted that the liquidity cushion numbers in October would have been worse if the effects of Project SID were factored in. (Moreland 6/27/07, at TrDep00074.) Plaintiff's Exhibits 289A & 20 show $628 million in vendor borrowings under project SID on October 18 and an estimated additional $300 million in AP System borrowings from hardline vendors. Gilbert and Moreland make it clear that the $300 million in AP System delays were in addition to the delays caused by prioritizing invoices under Project SID. (Gilbert 5/13/09, at Tr00404; Moreland 6/27/07, at TrDep00073–74 & Moreland 4/23/09, at TrDep00143–46 & TrDep00150 & TrDep00163–64.)

complaints were escalating. Growing concerns of vendors gained wider publicity. The extensive October 25 New York Times article noted payments stopped in September without explanation and questioned if Kmart was seeking "to squeeze vendors." (Def. Exh. 22A at p. 2.) Two days later Mr. Conaway received an urgent email from CFO Boyer noting the growing difficulty in managing "the mounting payment issue with vendors" and "the 'noise level' coming from our vendor community and their factors is increasing." (Plf. Exh. 76.) He warned Mr. Conaway that increased purchases forecast for November would prevent Kmart being "able to work down our nearly $800 million in past due invoices." Kmart responded to the rumors and vendor complaints with Talking Points to give its merchants and others a consistent story to explain the vendor payment delays. While Mr. Conaway denied seeing or knowing what was in Talking Points (Plf. Exh. 35), a reasonable jury could conclude that the core message of Talking Points— blaming the delays in payments to vendors as being caused by terming logic problems in Project eLMO—came out of a November 2, 2001, meeting of Mr. Conaway with the core members of his ELT including Mark Schwartz, Jeff Boyer and Cecil Kearse. Treasurer McDonald was called up to the meeting to take notes on what became Talking Points. (McDonald 5/28/09, Tr02646.) The jury could conclude that Mr. Conaway knew that the real reasons vendors were not being paid was Kmart's intentional implementation of the AP System changes and Project SID with his knowledge and concurrence because of Kmart's liquidity problems.

b. *The November 13 Levin Letter:* The jury could conclude that Mr. Conaway knowingly repeated this false story involving a "breakdown ... on our hardline and soft line integration" to Jerry Levin, CEO of Sunbeam, in his letter of November 13. (Plf. Exh. 112.) It was clear from Mr. Levin's faxed letter of November 12 that he had been told the delays in payment were due to "the difficulty of a major system change" (i.e. eLMO). (Plf. Exh. 107.) The jury could reasonably conclude that because the eLMO conversion project was adding the softlines at Kmart to the eLMO system that already handled the hardlines, that eLMO would not cause a problem with payment of hardline vendors like Sunbeam.[63] Thus the jury could reasonable conclude that Mr. Conaway's reference to the hardline and soft line computer integration breakdown in his letter to Mr. Levin was a knowing misrepresentation.

c. *Conaway Statement to the New York Times:* With the second and longer New York Times article of November 8 raising questions of "Kmart's ability to pay off the money it owes," the jury could conclude that Mr. Conaway's statement to the Times that "Kmart is not short of cash" was another knowing misrepresentation to cover up the liquidity crisis. (Def. Exh. 23A, at p. 4.)

---

**63.** Mr. Gilbert made it clear that Project eLMO affected only the addition of softline items, nothing in that conversion caused problems in paying invoices excepting a few softline invoicing issues that were corrected before their due date, and nothing in eLMO caused late payments on hardline invoices that were not affected by the conversion. (Gilbert 5/13/09 at Tr00424–26.) There was no eLMO terming logic problem in project eLMO. (*Id.* at Tr00429–30.) Mr. Archambeau who was responsible for Project eLMO as it related to accounts payable confirmed it hand no effect of Kmart's ability to pay vendors and any softline "glitches" were identified and corrected before the invoice due date. (Archambeau 5/13/09 at Tr00502 & Tr00505–06.) The eLMO cover story was a "total falsehood." (*Id.* at Tr00506.)

d. *Conaway's November 14 Voice Mail to his Employees:* There jury could also reasonably conclude that Mr. Conaway's Voice Mail message to his employees on November 14 that "nothing could be further from the truth" in reference to rumors that Kmart was 1.5 billion dollars behind with its vendors was misleading when Moreland's documents indicated Kmart was behind nearly one billion dollars on November 14.[64] (Plf. Exh. 318, Nov. 14, 2001, at p. 56.) The jury could conclude Mr. Conaway made other false and misleading statement in that message when, after acknowledging Kmart did "push suppliers hard," he said:

The company couldn't be any healthier from a working capital standpoint and the realty is [ ] in fact all vendors are almost current. Within the next seven to ten days we will be a hundred percent current. We have great liquidity. We have some $250 million of excess in our credit revolver. . . .

(*Id.* at 57.)

In reality on November 14 any remainder on the credit revolver was built on the nearly billion dollars in overdue invoices and on November 22 Kmart was not "a hundred percent current" with its vendors, but could be found by the jury to still be over $700 million behind.[65]

e. *Conaway's November 27 Meeting with Employees:* On November 27, the day of the analyst conference call, many Kmart employees were assembled to hear from Mr. Conaway in person. A videotape of that employee meeting was shown to the jury. (Plf. Exh. 232 videotape.) The jury

could have found several statements made in that address to be misrepresentations. After acknowledging "Now the reality is, did we stretch some of our suppliers too far? Absolutely. That's a fact. The reality is, as we sit today, people are being paid, and they're being paid based on the terms we negotiated." *Ibid.* The jury could find that on November 27 many, if not most, Kmart vendors were not being paid on negotiated terms. Mr. Conaway added:

Now you say, Chuck, where does all the noise come from? Well, clearly some of it is we pushed people too hard, we've had some systems issues. The other thing is, people don't realize, we've cut out 25 percent of our vendor base.

*Ibid.*

Here, of the three reasons that Conaway identified as causing the noise from vendors, the jury could find that two were accurate, but the third, suggesting "systems issues," was yet another effort of Mr. Conaway to push the false eLMO cover story. Mr. Conaway added: "We have 600—as we stand here today, we have 600 million dollars of borrowing capacity on our credit facility and 400 million dollars of cash. Right, John? Is that the number?" (*Ibid.*) The jury could find the $600 million statement to be misleading and was another Conaway misrepresentation to mask Kmart's liquidity problem because on November 27 any existing borrowing capacity on the revolver was built on over $500 million overdue to Kmart's vendors.[66] The jury could also conclude that Mr. Conaway

64. Plaintiff's Exhibits 289A & 20 show $653 million in vendor borrowings under project SID on November 14 and an estimated additional $300 million in AP System borrowings from hardline vendors.

65. Plaintiff's Exhibits 289A & 20 show $479 million in vendor borrowings under project SID on November 23 and an estimated addi-

tional $300 million in AP System borrowings from hardline vendors.

66. Plaintiff's Exhibits 289A & 20 show $263 million in vendor borrowings under project SID on November 27 and an estimated additional $300 million in AP System borrowings from hardline vendors.

misrepresented the facts to his employees when he said:

> Now a lot of businesses, growth businesses, they're actually cash flow negative. When you're in a certain spot you can do that. We're not there. So the reality of the health of the business, with those facts, we're very healthy. We have a very healthy business.

The jury could reasonably find that on November 27, when the overdue vendor invoices were taken into account, Kmart was "cash flow negative" in reality, and not "a very healthy business."

 f. *Conaway's November 27 Conference Call:* In addition to the Conaway statements in the November 27 conference call that the SEC specifically challenged as misleading in its complaint (and which will be discussed below under the sufficiency of the evidence analysis) the jury could also have reasonably concluded that Mr. Conaway made or acquiesced in Mr. McDonald making other misleading statements in that conference call.

 In the conference call, Mr. Conaway repeated the statement made to the employees group that:

> as of today, we have over $600 million in borrowing capacity over our existing credit facility and over $400 million in cash. And at any point of time, during any point during the entire year, we've had a minimum of $300 million in cash on hand."

Plf. Exh. 242 at p. 20.

Assistant Treasurer Moreland characterized this statement as a "creative way of looking at the balance sheet." (Moreland 6/27/07, at TrDep00092–93.) He made it clear that the $300 million in cash or cash equivalents was not available for use in operations to pay bills or payroll because this cash was needed to operate the Kmart's 2,000 stores which each had 20–25 cash registers. (*Id.* at TrDep00093.)

 Mr. McDonald asserted:

> As we discussed last quarter, we're aggressively pursuing competitive payment cycles. This is not a blanket policy to extend terms. We are working with vendors individually, · partnering with them to create the right and the best relationship for both parties.

(Plf. Exh. 242, at p. 17)

Mr. Moreland testified that this assertion did not characterize what Kmart was doing in the third quarter with Project SID which was not "partnering with vendors." (Moreland 6/27/07, at TrDep00092.)

 The jury could reasonably conclude that these statements were misrepresentations and efforts by Conaway and McDonald, with Conaway's acquiescence, to mask the true liquidity situation of Kmart in the third quarter of 2001 and to mask the fact that the overwhelming number of vendors who were disgruntled were not being negotiated with over terms, but were being stretched by Kmart's unilateral actions.

 Mr. McDonald noted the new eLMO integration of hardlines and softlines and its "new accounts payable system"

> This system implementation did have some issues along the way. As of today, the majority of the issues related to our accounts payable system … have been resolved. We're nearly caught up concerning our processing.

Plf. Exh. 231 and 242, p. 18.

 In addition to the portion of the conference call specifically challenged in the complaint, Mr. Conaway also referred to the "systems issues" mentioned by Mr. McDonald and added "This has been corrected and it's working, as planned." (*Id.* at p. 20.) The jury could reasonably conclude that, because there was no eLMO systems problems causing accounts payable delays, these were misstatements by McDonald, reiterated by Mr. Conaway, to support the Kmart cover story of Talking Points that

the late payments were due to eLMO's systems problems and not because of intentional decisions by Mr. Conaway and his subordinates. The jury could also have reasonably concluded that when later, in response to Mr. Beder's question, Mr. Conaway repeated "right now, systems fully integrated [a]nd its working fine," that was another misrepresentation supporting the Talking Points cover story that eLMO had systems issues in terming logic that needed to be corrected. (*Id.* at 29.) Immediately following this Conaway statement, Mr. McDonald added "we're fully caught up at this point as I said. And, you know, we're on our way. I don't see any further integration issues as relates to the—to the vendors." (*Ibid.*) The jury could conclude that with Kmart being over $500 million behind in vendor payments according to Mr. Moreland's exhibits, this was another false statement by Mr. McDonald in which Mr. Conaway acquiesced by his silence.

g. *Conaway's Lies to his Board:* In addition to the misstatements the jury could find Mr. Conaway made to vendor Levin, to his employees in person and in Voice Mails and to analysts at the conference call, the jury could also find that Mr. Conaway told lies to his Board of Directors. Board Finance Chair Thomas Stallkamp testified that while increases in inventory were disclosed to the Board in August and later in the September and October Board materials, it was not revealed that this was not with the approval of CEO Conaway and, until November, he believed it was in accord with the plan.[67] (Stallkamp 5/18/09, at Tr00729 & Tr00766–68.) He testified that he learned about the President Mark Schwartz's August $850 dollar overbuy that Conaway had not approved at the November Finance Committee meeting the day before the Board meeting. (*Id.* at Tr00797.) The Board was upset at this unauthorized purchase at a time when liquidity was tight, and they asked for a meeting alone with CEO Conaway after the Board dinner. Mr. Stallkamp testified that Mr. Conaway told the Board that they had not been informed of this earlier in August, September or October because he was not aware of it then. (*Id.* at Tr00797.) The jury could have found that Mr. Conaway lied to the Board about when he learned of the Schwartz overbuy to justify his not earlier explaining to the Board the dimensions of the overbuy and the degree to which it aggravated the liquidity situation in the third quarter.

The jury could also have credited Mr. Stallkamp's testimony over that of Mr. Conaway and found that at a November breakfast meeting, where Mr., Stallkamp expressed concern over the rumors in the press about vendors not being paid on

---

**67.** Although the August Inventory Summary on page 29 of the 37 page September Board Package noted a negative $825 million inventory variance to "commitment" or plan, which Mr. Conaway identified as the "overbuy," the jury may not have believed Mr. Conaway in his suggestion that this indicated Mr. Stallkamp was mistaken in saying the Board was not told about the Mark Schwartz unauthorized overbuy until November. (Conaway, 5/27/09 at Tr02122–23, Def. Exh. 119, p. 29.) There is no evidence that this page 27, and Mr. Schwartz's unauthorized overbuy, was discussed at the September Board meeting that had to be shortened and done by telephone due to 9/11's impact on airline transportation. While this Board package exhibit has Mr. Conaway's handwritten notes and things underlined or circled in various sections to show items Mr. Conaway may have wanted to highlight for the Board, this $825 million inventory has no such notation, underlining or circle. The Board minutes (Plf. Exh. 66) make no reference to any overbuy, and Mr. Conaway's September 20, 2001, follow up letter to the Board is similarly silent on any "overbuy," and indeed talks about a need for "an additional $300–500 million more inventory in the immediate term." (Plf. Exh. 113 p. 2.)

time, that Mr. Conaway told him the eLMO cover story to explain the vendor payment problem. (*Id.* at Tr00801–03.) The jury could also have believed Mr. Stallkamp that Mr. Conaway repeated this eLMO IT explanation to the full Board at their November Board dinner and again to Mr. Stallkamp at a second breakfast meeting in December. (*Id.* at Tr00804–05.)

The jury also might have questioned Mr. Conaway's representation in his December 29, 2001, letter to the Board that, after disclosing sales being off 2.6% in November and down 4% in December, he stated "As we have now passed our peak borrowing date and we have renegotiated our short term credit facility we are comfortable with our working capital going into fiscal year 2002." (Plf. Exh. 183, p. 2.) While evidence about Kmart's January 22, 2002, bankruptcy was excluded from the trial, the jurors were aware from the testimony of Mr. Gilbert and Mr. Archambeau that in December after Project SID had been suspended for a couple week, it was necessary to start it up again the week before Christmas, and they interpreted this as meaning Kmart was again short of money. (Gilbert 5/13/09, at Tr00439–43 & TR00463–4; Archambeau 5/13/09, at Tr00512.) Both also testified that Kmart was never completely caught up with its vendors, and while Project SID had a short hiatus in December, the roughly $300 million dollar AP System changes continued through December and into January. (Gilbert 5/13/09, at Tr00439–43 & TR00464; Archambeau 5/13/09, at Tr00513.) While Mr. Conaway testified that these AP System changes were intended to be permanent, there is no other evidence supporting this nor suggesting this unilateral change was agreed to by the vendors or the Board. (Conaway 5/27/09 at Tr02084–85.) Again, the AP Systems changes were identified by Mr. Conaway as an accounts payable management tool separate from the extended dating changes

that started payment terms from the date of receipt and not the date of order. (Conaway 2/13/08, at TrDep00338.)

### 3. *Mr. Conaway's Misrepresentations Under Oath.*

In addition to the multiple times the jury could find Mr. Conaway acted in deceitful ways while CEO at Kmart, there are an equal number of times the jury could have found he misrepresented matters while under oath.

The jury could have believed Board member Stallkamp that Mr. Conaway did not inform the Board in August, September, October or November of his decision to unilaterally add days to payment terms without the consent of the vendors. (Stallkamp 5/18/09 at Tr00730–31, Tr00740–41, Tr00773–74, Tr00779, & Tr00798.) Thus, the jury could have found that Mr. Conaway was not leveling with them when he suggested in his testimony that he did disclose this to the Board at the September and October telephonic Board meetings. (See text and transcript discussing Conaway 5/27/09 at *Id.* at Tr02116–17 and at Tr02144 in **I. Background Facts C. Communications with the Board.** above)

The jury could believe that had Mr. Conaway disclosed to the Board, or to Mr. Stallkamp individually, that he approved unilateral delays in payments without the consent of the vendors, Mr. Stallkamp would not have forgotten this because he testified that he would have opposed this move and raised it with the Board as to "what's going on." (Stallkamp 5/18/09, at Tr00741 & 00781.) In support of Mr. Stallkamp's testimony, CFO Boyer, who participated in the August, September and October board meetings, did not believe the Board had been adequately informed about Kmart's unilateral decisions and believed there was a need at the November 20 Board meeting to "have a conversation

with the board that would clarify all elements of our cash management system, including Project SID." (Boyer 7/19/07, at TrDep00399–40.)

Similarly, the jury could have disbelieved Mr. Conaway's testimony that his use of the term "manage ... account payables" in paragraph b. of his September 20 letter to the Board meant unilaterally stretching or slow paying vendors "separate and above from supplier terms" as "I explained to them in the September Board Meeting." (Conaway 5/27/09, at Tr02132.) The jury could have believed that the most that was actually disclosed to the Board in the fall of 2001 were: (i.) The "extended dating" unilateral changes with vendor knowledge that Kmart would pay from the date of receipt of goods and no longer from the date of the purchase order; and (ii.) efforts to negotiate with vendors for better, more competitive terms, under the working capital initiative described by Messrs. Moreland, Boyer and Archambeau. (Moreland 6/27/07, at TrDep00099; Boyer 7/19/07, at TrDep00382–83; Archambeau, 5/13/09 at Tr00470–71.) Mr. Conaway's handwritten notes—"extended dating—supplier terms"—on his September Board package could be interpreted by the jury that these were the two items Mr. Conaway discussed with the Board, and not the unilateral and more dramatic delays in vendor payments imposed by the AP System changes and Project SID. (Def. Exh. 119, at p. 20.)

While disputed by Defendant that the AP System changes were a temporary response to the Schwartz overbuy (Conaway 5/27/09 at Tr02084–85), the jury could conclude that unlike extended dating or the working capital initiative that began before the Schwartz overbuy, the AP System change undertaken in August and September were, like Project SID, a measure taken in response to the Schwartz overbuy in order to maintain Kmart's liquidity.

The testimony of Gilbert, Archambeau and Moreland was that these AP System changes were implemented in mid-August and in early September in response to the cash management problem caused by the August overbuy. (Plf. Exh. 159, Gilbert 5/13/09, at Tr00359 & Tr00363; Archambeau 5/13/09, at Tr00472–73; Moreland 4/23/09, at TrDep00145–45.) Plaintiff's Exhibit 20, page 3, notes "cash flow management changes," including the two waves of the AP System changes, that were instituted "[s]ince August ....", and the dates on Plaintiff's Exhibits 159 and 135 support that testimony. At the time he implemented the AP System changes in mid-August, Mr. Gilbert, assistant controller of accounts payable, was told the liquidity problem caused by the Schwartz overbuy was a short term problem that should be resolved by the end of September. (Gilbert 5/13/09 at Tr00361.) Mr. Archambeau also testified that he believed the AP System changes were temporary. (Archambeau 5/13/09, at Tr00479.)

The jury could conclude that Mr. Conaway's false testimony on the AP System changes being permanent was intended to support his defense thesis that Kmart was caught up with paying its vendors in early December (and thus slow pay was not a "material" event in the third quarter of 2001). Mr. Archambeau testified that the AP Systems changes continued throughout 2001 and Mr. Gilbert confirmed that Kmart was never within 200 million dollars of being caught up with vendors in 2001. (Archambeau 5/13/09, at Tr00512; Gilbert 5/13/09, at TR00464.)

While Mr. Conaway may have told the Board at the October telephonic meeting that they were trying to get from a 33 day payment cycle to 38–41 days as his October Board package notes indicate (Plf. Exh. 27, at sec00125305), the jury could find that there was no clear disclosure that

this was being done unilaterally as opposed to being negotiated with vendors as Mr. Stallkamp thought. (Conaway 5/27/09, at Tr02143–44.)

The jury could also have disbelieved Mr. Conaway's testimony that he talked with Mr. Stallkamp at his November breakfast meeting about "stretching vendors" and "prioritizing invoices." (*Id.* Tr02145–46.) The jury reasonably could have believed Mr. Stallkamp's testimony that denied being told about this unilateral program by Mr. Conaway at the November breakfast meeting and said Mr. Conaway blamed the vendor payment delays on an unintentional eLMO "IT system glitch" what would be fixed. (Stallkamp 5/18/09, at Tr00802–03.)

The jury could reasonably determine that the reason that Mr. Conaway was trying to convince them that he had disclosed to the Board and to Mr. Stallkamp the unilateral imposition of extended terms on vendors was to support his defense premise that Kmart's slow paying of vendors and Project SID were not a secret. Having the jury believe Project SID and intentional slow pay were not a secret would support Mr. Conaway's defense theory that he had no desire, and gave no direct or indirect message to Mr. McDonald, that slow pay or Project SID were not to be disclosed in the MD & A of the 10–Q(3). While Kmart may have had a reputation, as Mr. Stallkamp and Mr. Gilbert confirmed (Stallkamp 5/18/2009, at Tr0089, Gilbert 5/13/09 at Tr00453–54.), of being a bit late in paying vendors such as mailing payment on the due date, the jury could reasonably have credited the testimony of Ms. Lindsey and Messrs. Moreland, Gilbert and Archambeau that the extraordinary and unprecedented slow pay efforts of the AP System Changes and Project SID were kept to a small group of Kmart employees, and were not generally known at Kmart or to the public. (Lindsey 5/18/09, at Tr00638–29 "behind closed doors"; Moreland 6/27/07, at TrDep00026 "very limited"; Gilbert 5/13/09 at Tr00392 "top secret" & Tr00488 not "publically" known at Kmart; Archambeau, 5/13/09, at Tr00487–88; see also Kearse 5/20/09, at Tr01138 "not speaking to cash flow or slow pay would be the best course.") The September 2001 "Project SID Process Overview" (Plf. Exh. 11) presentation to Conaway was headed " * * *Confidential* * * " and Mr. McDonald before leaving took Conaway's copy noting he "did not need to have it." (Moreland 6/27/07, at TrDep00027.) Indeed a jury could conclude that Project SID, and probably the AP System changes, would not have worked had they been generally known, because if widely known a far greater number of vendors would likely have stopped or threatened to stop shipping without prior payment. The jury could also have determined that maintaining the secrecy of these unilateral efforts was the reason Messrs Conaway, Kearse, McDonald and others on the ELT knew Kmart needed a consistent cover story, which gave birth to Talking Points and the fabricated eLMO terming logic lie. The fact that the cover story for the one billion dollar slow pay schemes in late-October and in November began to unravel in the press and in "rumors" at Kmart (Lindsey 5/18/09, at Tr00696)—possibly leading to Mr. Conaway's November 14 and 27 admission to his employees that Kmart "pushed suppliers hard," or "pushed [vendors] too hard" and "stretch[ed] some of our suppliers too far" (Plf. Exh. 232 videotape)—does not mean efforts were not made to keep it a secret.

In addition to the jury reasonably concluding that Mr. Conaway was deceiving them in his testimony that Project SID and the bulk of Kmart's unilateral efforts to slow pay vendors were not a secret and were revealed to the Board, the jury could also believe that Mr. Conaway lied to them

when he repeatedly asserted that he did not know what vendors were being told and when he told them "I assume anything that we put in a talking point would be truthful." (Conaway 2/13/08, at TrDep00333, TrDep00339, TrDep00340, TrDep00341, TrDep00342 & Conaway 5/28/09, at Tr02631.) The jury could reasonably have determined that Mr. Conaway's "maximum feasible deniability" defense was based in part on his being "out of the loop" in not knowing what was in Talking Points, and thus not knowing what vendors were being told, his belief that whatever McDonald and Kearse came up with in Talking Points was truthful, and his belief, allegedly from his senior vice-president over the $8 billion apparel and jewelry softlines (Nagler 4/18/08, at TrDep00346), that eLMO actually caused major invoices payment problems that was putting her part of the BlueLight Always initiative in jeopardy. The jury could reasonably conclude that all of these premises were based on Conaway lies.

The jury could reasonably determine that Mr. Conaway knew full well that the major "noise" coming from the vendor community was because of Project SID that he approved the week after Labor Day 2001. He and the ELT got weekly reports in their discussions concerning liquidity, and his CFO in an October 27 "I'm very worried" email told him that with their being $800 million behind in "past due invoices" "the situation is getting more difficult to manage and the 'noise level' coming from the vendor community and their factors is increasing." (Plf. Exh. 76.)

The jury could reasonably conclude that Mr. Conaway did not believe Project eLMO was causing any significant invoice payment problems, and that he patently lied under oath when he testified that Lorna Nagler told him that "they couldn't process invoices" because of Project eLMO and that her part of BlueLight Always was

in jeopardy because of system integration issues of Project eLMO and the inability to process invoices. (Conaway 2/13/08, at TrDep00334–35.) Lorna Nagler testified that she had no knowledge of project eLMO causing problems with invoices being paid, and she would have been made aware of that had it been a problem. (Nagler 4/18/08, at TrDep00349.) She was also clear that she never told Mr. Conaway that they "could not process invoices because of Project eLMO" or that her part of BlueLight Always was in jeopardy because of because of Project eLMO or "eLMO system integration issues." (*Id.* at TrDep00351.)

The jury could reasonably conclude that in order to bolster his claim that he did not know what vendors were being told or what was in Talking Points, Mr. Conaway chose to deny his multiple uses of the Talking Points central eLMO lie. Thus, Mr. Conaway denied at trial writing the November 13 letter to Sunbeam's CEO Levin. Regarding the letter to Mr Levin, with what the jury could conclude were eLMO code words—"breakdown . . . on our hardline and soft line integration"— the jury could reasonably believe Mr. Conaway's earlier deposition testimony where he testified that he likely dictated the letter by voicemail from the field. (Plf. Exh. 108; Conaway 1/22/03, at TrDep00309–10.)

In addition the jury could have reasonably concluded that Mr. Conaway lied to them at trial when he denied telling Mr. Stallkamp and the Board that the only reason for the delay in vendor payments was problems with eLMO. (Conaway 1/22/03 at Tr02147–48.) The jury could reasonably believe the contrary testimony of Mr. Stallkamp that he and later the Board in November were not given any other reason than the eLMO "IT system glitch" story for the vendor payment delays. (Stallkamp 5/18/09, at Tr00802–05.)

Given the multiple facts that: (i.) this eLMO storyline was the direct product of a November 2 meeting Mr. Conaway had with Mark Schwartz, Jeff Boyer and Cecil Kearse; (ii.) to which Treasurer McDonald was called up after the meeting to take notes on what became Talking Points (McDonald 5/28/09, Tr02646); (iii.) Conaway's Outlook Calendar for November 2 showed an entry "Vendor Talking Points w/ John, Cecil, Mark, Jeff" (Plf. Exh. 190 at November 2, 2001); and (iv.) Mr. Conaway on multiple occasions used variants of the eLMO systems integration issues cover story, the jury could reasonably believe that Mr. Conaway was fully aware that Talking Points had the eLMO excuse as its central premise and his denials under oath of knowing what was in Talking Points or what vendors were being told were lies.

Mr. Conaway asserted that the most important thing vendors cared about was when they would be paid, not the reasons they were not being paid. (Conaway 2/13/08, at TrDep00339) It is unclear if Mr. Conaway actually believed this or asserted it as an indirect partial justification for Talking Points that was closer to the truth for most vendors that they would be paid by the "end of November" or "Early December" than it was on why they were not being paid on time. Yet, if Mr. Conaway actually did believe, as he told the jury, that vendors did think why they were not being paid was not so important to them—and would not threaten or stop shipping if they knew it was because Kmart faced a major cash crisis—then the jury could question why Conaway, Kearse and McDonald went to such an elaborate top down step of getting Talking Points drafted to assure all vendors would be given a consistent and plausible excuse for why vendors were being paid late.

Regarding what vendors were being told when they called to ask about their grossly overdue invoices, it is somewhat unclear if Mr. Conaway thought giving them only the eLMO excuse was a lie, or merely "not disclosing." [68]

Possibly the most significant conflict in the testimony involved the November 8, 2001, meeting with CFO Boyer and Mr. Conaway that led to Boyer's discharge. That morning the New York Times questioned "Kmart's ability to pay off the money it owes," to which Mr. Conaway responded "Kmart is not short of cash." (Def. Exh. 23A, at p. 4.) It was two weeks after Mr. Boyer's "I'm very worried" email to Conaway warning of the increasing ven-

68. After Mr. Conaway identified 6 things that affected timing of vendor payments—1. the AP System changes, 2. extended dating to date of receipt of goods, 3. prioritizing invoices (SID), 4. moving softline vendors from 30–60 days, 5. other unspecified policy changes, and 6. eLMO, the following exchange took place:

Q. You would agree, would you not,-you would agree with me that there is never an appropriate reason that would justify you or Kmart people lying to vendors?
A. Yeah, I don't think you have to lie. No. I don't think that that's appropriate. That's not necessary. You clearly don't have to disclose everything, but you don't have to lie to them.
Q. So in your view if you don't disclose everything that's going on when they ask a question and what you don't disclose would be responsive to their question that's not lying?
A. No. No, I—
Q. That's not lying?
A. If they ask a question, yes. And you determine that you're not going to disclose the information to them, no, that's not disclosing. That's not lying.
Q. No, no, you are disclosing. You're disclosing one-sixth of the information, eLMO?
A. Right.
Q. That's not lying?
A. Well, that's inaccurate then, yes.
Q. That's a lie?
A. If—if the reason—if that is not directly pertaining to it, yes.
(Conaway 2/13/08, at TrDep00338–00344.)

dor "noise level" over Kmart's $800 million delinquency on "past due invoices." (Plf. Exh. 76.) Mr. Boyer testified they went through each of the 27 page PowerPoint document that he provided Mr Conaway and the meeting ended calmly with Mr. Conaway approving Mr. Boyer contacting Jay Henderson, an independent PWC partner in Chicago, to provide a quality review on Kmart's accounting methods for vendor assessments. (Boyer 7/19/07, at TrDep00395 & at TrDep00411, Plf. Exh. 97.) Conaway testified repeatedly that Boyer never got past the Jim Adamson talking points which would have been the first 8 pages of the 27 page presentation. (Conaway, 5/28/09, at Tr02510–13.) Boyer then raised the allowances issue again, questioned the integrity of Kmart's PWC chief auditor, Joseph Murphy, and suggested a "strategic bankruptcy." (Conaway, 5/27/09, at Tr02176–85.) Mr. Conaway said he realized he had to let Boyer go. (Conaway, 5/27/09, at Tr02186.) Far from the calm ending Boyer described, Mr. Conaway said he told Boyer his claims were serious and his decision making was flawed concerning Murphy, "[i]rrational", and he had serious concerns about Boyer's ability and behavior and responsibility as a fiduciary agent for the company. (*Id.*, at Tr02187–88.) On cross examination, Mr. Conaway specifically denied reviewing the page that covered "Credibility" issues with the Board, Rating Agencies, Banks and the Street, and which page also noted Kmart "[m]ay need to plan for bankruptcy filing" as a financing contingency, and ended "Discuss issues with the Board at November Board Meeting." (Plf. Exh. 97, at p. 18, JNB 000023, Conaway, 5/28/09, at Tr02512–13.) He denied that the writing and doodling on a prior page including an

arrow and box at the lower right corner was his (Plf. Exh. 97, at p. 17, JNB 000020, Conaway, 5/28/09, at Tr02510.) He also denied that the arrows and circles on a subsequent page were his. (Plf. Exh. 97, at p. 22, JNB 000027, Conaway, 5/28/09, at Tr02513–14.) When shown his acknowledged doodlings on the October Board package, he again denied the November 8 doodles on Exhibit 97 were his. (Compare Plf. Exh. 27, p. 2, SEC00125305 with Plf. Exh. 97, at p. 22, JNB 000027.) He said the arrows were different, apparently referring to the solid headed arrows on the October Board Package and non-solid headed arrows on the November 8 exhibit. Yet, were one to compare November 8 arrows with his acknowledged doodlings on his September Board package, similar non-solid headed arrows were found on several pages (Compare Plf. Exh. 97, at p. 22, JNB 000027 with Def. Exh. 119 at DP 027202, DP 027217, DP 027219, DP 027222, DP 027223.) Also if Mr. Conaway was suggesting his arrows had solid headed arrow, one of those is also found on what was likely his copy of the November 8 Boyer presentation. (Compare Plf. Exh. 97, at p. 2, JNB 000007.) On page 27 of the November 8 Boyer presentation, in handwriting similar to that of Mr. Conaway on his September and October board package, is written the name "Jay Henderson," the PWC partner in Chicago that Boyer used to work for and whom he recommended do another review of the vendor allowances issues. (Boyer 7/19/07, at TrDep00411; Compare Plf. Exh. 97, at p. 22, JNB 000032 with Plf. Exh. 27, p. 2, SEC00125305 & Def. Exh. 119, at p. 3–12.) [69] This is not to suggest the jury made these arrowhead and handwriting comparison, but given the general similari-

**69.** Given the limited number of persons who would have had access to this Power Point presentation, and given the fact that Jeff Boyer would likely have no need to make a notation of the name "Jay Henderson," his former

work colleague, it is plausible that Mr. Conaway wrote this name on page 27of his copy of the presentation when Boyer mentioned this individual.

ty of the doodlings, arrows, circles and small hand writing on each of these three exhibits which the jury had shown to them at various points in the trial, given the limited number of people who might have written or made marks this November 8 Boyer one-on-one presentation, and given the motive for Mr. Conaway to deny making the multiple markings past page 8 of the exhibit, the jury could reasonably disbelieve Mr. Conaway's denials concerning the handwriting and doodling on the November 8 Boyer exhibit, and further disbelieve his denial of reviewing pages after page 8 as Mr. Boyer testified they did. The jury could reasonably believe that Mr. Conaway did not want to acknowledge his CFO raising with him on November 8 "Credibility" issues with the Board, Rating Agencies, Banks and Wall Street. The jury could reasonably believe that Mr. Conaway did not want to acknowledge his CFO raising with him on November 8 the need for a discussion of these financing issues, and likely the hundreds of million in past payments occasioned by Project SID, at the upcoming November 20 Board Meeting.

The jury could reasonably conclude that after Mr. Boyer's October 27 email and his 27 page PowerPoint presentation to Mr. Conaway on November 8, Mr. Conaway realized that he had a CFO who was highly scrupulous and "very worried", not just about how Kmart booked its allowances, but also about Kmart's mountains of debt, and about the non-disclosure to the Board and others of how that debt was actually being managed through Project SID. The jury could conclude that Conaway realized that his CFO wanted to start working on improving Kmart's credibility problems at the November 20 Board meeting with a discussion of the financing issues including the "[s]ignificantly negative—close to $500

million negative" cashflow shown on that same page of his presentation. (Plf. Exh. 97, at p. 22, JNB 000032.) The jury could reasonably believe that Mr. Conaway did not level with them when he said the reason he decided to fire Mr. Boyer was because of his revisiting the allowances issue and questioning the independence of their auditor, Joseph Murphy. As the jury could recognize, and as testified to by Board member Stallkamp, at this point in Kmart's turnaround efforts, this was a bad time to fire a CFO. (Stallkamp, 5/18/09, at Tr00790.) The allowances and Murphy issues could have been managed by Mr. Conaway with his Board Audit Committee Chair James Adamson and with his Finance Committee Chair Stallkamp, at least for a couple more months until Kmart worked its way through the cash crisis it was facing and the new 365 day bank credit revolver was renewed in December. The jury could reasonably believe that Mr. Conaway did not level with them when he said the other reason he decided to fire Mr. Boyer was because he suggested a "strategic" bankruptcy. While Mr. Boyer's November 8 presentation did raise the "financing contingency plan" that "may" include the "need to plan for bankruptcy filing" (Plf. Exh. 97, at p. 18, JNB 000023), and Mr. Boyer may have identified in that meeting financial advantages bankruptcy relief might bring regarding Kmart's closed and underperforming stores, the jury could reasonably believe that with Kmart approaching one billion dollars in past due debt on November 8, that Kmart's taking contingency plans that may involve bankruptcy was not about a strategic bankruptcy that was "ludicrous," "nonsensical, not necessary," as Conaway apparently suggested to Mr. Stallkamp on November 8 and the Board the next day. (Stallkamp 5/18/09, at Tr00790.) [70] Rather,

70. Plaintiff's Exhibits 289 A & 20 show $679million in vendor borrowings under project SID on November 8 and an estimated

the jury could reasonably believe it was a good faith concern, one that Board member Stallkamp noted he would have made a difference in how they viewed the Boyer discharge. (*Id.*) The jury may also have believed that Mr. Conaway not only exaggerated the "ludicrous" nature of Boyer suggesting a "strategic bankruptcy" to justify his firing of him, but also exaggerated that Boyer was not a team player, and outright misrepresented the facts that Boyer "asked for a second opinion on an accounting issue outside of the normal channels without anybody's approval." (*Id.* at Tr00789.) The jury could reasonably believe that Mr. Boyer did not go outside the management structure and that he got Mr. Conaway's approval for all reviews of the allowances accounting review, including on November 8 in Conaway's authorizing followup with PWC's Jay Henderson.

The jury could reasonably believe that the central, or "but for," reason Conaway wanted Boyer out as CFO was Conaway's concerns about the degree to which Boyer wanted to level with the Board at the November 20 Board meeting about Project SID and the magnitude of the vendor stretching, the possible disclosure that the eLMO cover story was a lie, and finally, and probably of greatest significant, Mr. Conaway's concerns about how his CFO, after improving his "credibility" with the Board on November 20, would deal with the "credibility" issue with the other three audiences Boyer identified on November 8—the Rating Agencies, the Banks and Wall Street. (Plf. Exh. 97, at p. 18, JNB 000023.) The disclosures to the Board could be done in confidence, but these three audiences Boyer thought Kmart had credibility problems with were "public." And as Mr. Boyer noted, the November 8 meeting with Mr. Conaway was not intended to discuss telling the public about

additional $300 million in AP System borrow-

Kmart's efforts involving stretching vendors, because "[t]he typical time that you would do that is in the preparation of a 10Q, and we had not started the preparation of the 10Q yet." (Boyer 7/19/07, at TrDep00415.) The jury could reasonably believe that as former CFO at CVS Pharmacy and later CFO at its parent corporation Melville Corporation (Conaway 5/27/09, at Tr02009), Mr. Conaway was also well aware of that. Thus, the jury could reasonably conclude that after the November 8 meeting, Mr. Conaway realized the risks he faced to keeping from public disclosure Project SID, and Kmart's extraordinary means of managing liquidity in the third quarter, if Boyer remained as CFO in preparing the 10Q for Kmart's third quarter of 2001. The jury could reasonable believe, that the real reason Mr. Conaway fired Mr. Boyer was to avoid the risks that his scrupulous, "very worried" CFO would push for fuller disclosures on Kmart's liquidity problems and the means of dealing with them in the Form 10Q-(3) than Mr. Conaway wanted given his belief and hope that the "cash crisis" would soon be over.

### C. Challenge to Claim One–Primary Liability for a Violation of Section 10(b) and Rule 10b–5.

■ Defendant's central and most appealing legal and sufficiency of the evidence argument is that because "[i]t was undisputed at the trial that Mr. Conaway did not sign, draft, edit, or even review the Management Discussion & Analysis ("MD & A") portion of the Form 10–Q," and without contradiction he testified that he did not "tell anyone what should or should not be included in it" then it follows "there was no evidence that Mr. Conaway caused

ings from hardline vendors.

any false statements or omissions in the MD & A." (Dkt. # 139, at p. 5–6.)

The jury was instructed:

The SEC need not prove that Mr. Conaway personally made the misrepresentation or that he omitted the material fact.

It is sufficient if the SEC establishes that Mr. Conaway caused the statement to be made or the fact to be omitted.

The SEC need not prove that Mr. Conaway signed, drafted, or wrote the Form 10–Q filed with the SEC for Mr. Conaway to have made a misrepresentation or omitted a material fact in the Form 10–Q so long as you find Mr. Conaway, through his actions or inactions, sufficiently responsible for what was said in the 10–Q or what was omitted that he could fairly be said to have caused the false statement or caused the material omissions to be made. Mr. Conaway cannot be liable for a statement based solely on his position in the company.

Jury Instruction No. 20.

In denying the Defendants Rule 50(a) motion while the jury was absent, I reiterated "Mr. Conaway cannot be found liable for a statement based solely on his position in the company" but noted that

his position is relevant and[,] when[ ] coupled with certain other actions and certain acquiescence in the actions of others, can be the basis of liability.

* * *

Certain roles of individuals and the [ ] power that comes with that particular role could, in certain circumstances, be

so powerful that a hint becomes a directive to be followed.

5/21/09 Transcript, at Tr01351.

Analogizing to Henry II's lament leading to Archbishop Thomas Beckett's death,[71] I noted that "Henry had signed no order. Henry had made no plans. Henry had read no plans made by others for the execution. Henry had given no command. Yet, in the aftermath, all of England rose up against Henry over this murder." (*Id.* at Tr01352–53.)

Defendant argues in its motions that:

There was, however, no evidence that Mr. Conaway made so much as a hint that slow pay should be misrepresented in or omitted from the MD & A, so this cannot be a basis for upholding the jury's verdict.

In fact, the "cues" or "hints" that Mr. Conaway was sending were just the opposite, and could not have been interpreted as a directive that the slow payment of vendors not be disclosed in the MD & A.

(Defendant's Renewed Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, Dkt. # 139, at 12.)

While defense counsel in their current motions argue that the evidence is overwhelming that Mr. Conaway never explicitly or implicitly directed that the slow payment of vendors be kept secret, and no evidence connects Mr. Conaway with the Form 10–Q, they rely on asserted facts and arguments made to the jury and apparently rejected by them. The facts asserted are that key witnesses, particularly former co-defendant McDonald, and Boyer, and Lindsey testified that slow pay was not a secret at Kmart in the third quarter of 2001, and that Conaway even discussed

---

**71.** "[W]ill know one rid me of this troublesome priest?" (5/21/09 Transcript, at Tr01352.)

stretching vendors with his employees in blast emails mails and at group employee meetings. (McDonald 2/28/09, at Tr02653 & Tr02656; Boyer 7/19/07, at TrDep00387; Lindsey 5/18/09, at Tr00696.) McDonald even said that Project SID was discussed with employees at the Friday employee rally nearly every Friday. (McDonald 2/28/09, at Tr02656.) He testified he also told Mr. Stallkamp in November about prioritizing invoices after being asked how they were doing with getting caught up with vendors. (*Id.* at Tr02654.)

Yet, the jury could reasonably have disbelieved any testimony that prioritizing invoices and Project SID were not secrets, and the jury could rely on the testimony of Messrs Moreland, Gilbert and Archambeau as well as Lindsey that it was to be kept secret. Because he testified before McDonald, Mr. Stallkamp was not specifically questioned about any November 2001 meeting with McDonald on stretching vendors. Yet, Mr. Stallkamp had testified that he did not know about the intentional prioritizing of invoices or Project SID until the fall of 2002, and concerning the November 2001 press and other rumors on vendor delays, he was satisfied with the only excuse given him which was the delay was caused by a "computer glitch." (Stallkamp 5/18/09, at Tr00802–05 & Tr00814–14 Tr00851.) Lindsey, McDonald's Secretary, who took his many calls from vendors, learned about Project SID from overhearing portions of the daily meetings Moreland and Gilbert had in McDonald's office, but she did not disclose that to McDonald because she was not supposed to know about Project SID and it was talked about behind closed doors. (Lindsey 5/18/09, at Tr00635–36 &

Tr00638–39.) She testified that the associates in accounts payable initially believed the late pay was due to the computer conversion, but "after a while" talk and rumors led some to know Kmart was selecting which vendors to pay. (*Id.* at Tr00696.) In discounting certain of the McDonald testimony, the jury could also consider his potential bias because he had for years been a co-defendant and he settled with the SEC a month before trial because he "just had enough." (McDonald 2/28/09, Tr02646–47.) The jury could question McDonald's credibility when he testified he believed the eLMO story was the reason vendors were not being paid. (*Id.* at Tr02634 & Tr02661.) Even Mr. McDonald's asserted source for his alleged belief that eLMO was causing the late payment, Cecil Kearse, ultimately acknowledged to the jury that the cash flow problem, and "definitely not" eLMO, was the cause of late payments. (*Id.*, at Tr02657 & Kearse 5/20/02, at Tr01206–07.) [72] The jury could also have found that McDonald contradicted his earlier testimony that Project SID was discussed nearly every Friday at the employees' meeting, when McDonald later denied that SID was discussed at the Friday meetings and noted that what was discussed was about when vendor payments were going to be caught up. (McDonald 2/28/09, at Tr02661–62.)

In addition to arguing that the facts are insufficient to uphold a jury finding that Mr. Conaway caused the misstatements and omissions in the 10–Q(3), the defense lawyers argue that the SEC's cases also provide insufficient support for such a novel theory of Defendant's alleged wrongdoing.

**72.** Given Treasurer McDonald's close working relationship with Assistant Treasurer Mark Moreland—who ran Project SID and reported on it regularly—it would be difficult for a jury to accept that Mr. McDonald did not know that it was Project SID and the AP System changes, and not eLMO, that caused nearly all of the late payments in the third quarter of 2001.

None of the cases on which the Court relied for its holding on summary judgment that Mr. Conaway could be primarily liable if he caused the statements or omissions to be made even remotely suggests that primary liability could be imposed based on a mere hint, or on a perception by the actual speaker that the defendant would prefer that something not be disclosed.

(Defendant's Renewed Motion for Judgment, Dkt. # 139, at p. 14.)

Defense counsel note that the SEC chose not to pursue control person liability against Mr. Conaway for the actions of Mr. McDonald under Section 20(a) of the Exchange Act, and thus must establish primary liability not because of Conaway's control of McDonald, but based solely on Conaway's conduct. The defense team point out that all of the cases cited by the SEC where primary liability was found even though the statement at issue was not directly made or publically attributed to the defendant, the defendant either was the originator of the statement and passed the statement on to a third party, knowing it would then be communicated to investors, or the defendant created the statement and was responsible for it having been issued. (Defendant's Reply Memorandum in Support of His Renewed Motion for Judgment, Dkt. # 153, at p. 6) They question the SEC's failure to discuss the facts or make any attempt to analogize to the cases it cites in support of its liability theory.

Those cases are: *City of Monroe Employees Retirement Sys. v. Bridgestone Corp.*, 399 F.3d 651, 686 n. 29 (6th Cir. 2005), (primary liability may attach if the plaintiff can show that the subsidiary "Firestone communicated misleading results to Bridgestone," its parent, and thus that Firestone "was the originator of Bridgestone's misrepresentations" about the quality of the Firestone ATX tire); *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d 398, 407 (S.D.N.Y.1998) (defendant subsidiary Kidder could be primarily liable for misrepresentation by parent company, GE, where the Kidder was "the original and knowing source of" and "controlled the content of the information" and "knew or should have known that misrepresentation would be communicated to investors" by the parent GE because "[w]hen GE opened its mouth regarding Kidder, Kidder's words came out"); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir.1996) (defendant could be primarily liable for making false statements to securities analysts and journalists where the defendant intentionally used these third parties to disseminate false information to the investing public); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225–26 (10th Cir.1996) (accountant's misrepresentation is actionable as a primary violation if it is shown that he knew or should have known that his representation would be communicated to investors); *SEC v. KPMG LLP*, 412 F.Supp.2d 349, 375 (S.D.N.Y.2006) (engagement partners in the audit firm of Xerox were sufficiently responsible for audit opinion to be considered "the source" of the opinion published by Xerox, and primary liability can attach when "the individual was sufficiently responsible for the entity's speech such that he could properly be said to have made the false statement"), and two Rule 10b–5 a. cases *S.E.C. v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1471 (2nd Cir.1996) and *Scholnick v. Schecter*, 752 F.Supp. 1317 (E.D.Mich.1990).

While the defense seeks to discount. *First Jersey Securities* as not applicable because it involved control-person and scheme liability under Rule 10b–5 a., and not misrepresentation or omission liability under Rule 10b–5 b. as the present case, *First Jersey* did also involve primary liability—and not only control person liability—

of Robert Brennan whose role as Chairman of the Board and Chief Executive Officer in orchestrating First Jersey's wrongdoings has some parallels in this case involving Chairman of the Board and Chief Executive Officer Conaway. (*Id.* at 1271–72; Conaway 5/27/09, at Tr02010–11.) The *First Jersey* case notes, albeit likely in *dicta* that "[p]rimary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.' " (*Id.* at 1471, citing *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994)).[73] *First Jersey* also found that this central power factor Brennan "orchestrated every facet of First Jersey's branch office network" where the investors were misled. (*Id.* at 1459.) Defense is correct *First Jersey* was a fraudulent device or scheme case under Rule 10b–5 a., and not a misstatement/omissions case under Rule 10b–5 b., and thus did not involve causing a statement to be made as the other cases cited by the SEC.[74]

While each of the Rule 10b–5 b. cases cited by the SEC involved misrepresentations and not omissions, there is no principled reason to find that the facts in these cases exhaust the universe of factual patterns in which one can be found liable for causing another to make or omit making certain statements. It might be noted that the precedential scope of this case will be limited in that Section 302(a) of the Sarbanes–Oxley Act of 2002, Pub.L. 107–204, 116 Stat.745 (2002), now requires a corporation's principal executive as well as its chief financial officer, to certify the financial and other information contained in the issuer's quarterly and annual reports.[75] Thus, legislation, and not a case such as this, restrains future CEO's deniability defense that they did not prepare or sign deceptive quarterly or annual reports.

**D. Evidence in the Record Supporting the Jury's Finding that Charles Conaway Caused the Form 10–Q Violations.**

*1. Evidence that Charles Conaway Caused the Three Omissions:*

■ In determining defendant Conaway's involvement in both the misleading statements and omissions in Kmart's 2001 Form 10–Q(3), the jury saw a corporate power structure with leadership exercised decisively, and often deceptively, from the top. As Kmart's Chief Executive Officer and Board Chairman, Conaway headed the

**73.** *First Jersey* adopts this language but adds "primary liability" from *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517–20 (2nd Cir.1994), a 10b-(5) b. case where the two defendants made the misrepresentations. *Azrielli* was decided two weeks before *Central Bank* and may have involved one or more other defendants who did not make the representation but assisted in the fraudulent deal. Because it cites a pre-*Central Bank* aiding and abetting case as support for this language, the *First Jersey* reference to "primary liability" goes beyond the holding of its supporting authority.

**74.** It is unclear why the SEC cited generally *Scholnick v. Schecter,* 752 F.Supp. 1317 (E.D.Mich.1990), a pre *Central Bank* case involving primary and aiding and abetting scheme liability, and not Rule 10b–5(b) liability, as least as originally pled.

**75.** Sections 302(a)(2) and (3) of the Sarbanes–Oxley Act, 15 U.S.C. §§ 7241(a)(2) and (3), require certification by both the CEO and CFO that a quarterly or annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading; and that the financial statements, and other financial information included in the report, fairly present in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report.

company's response to the liquidity crisis in the third quarter of 2001 that threatened his historic turnaround efforts. While downplaying at trial his past working relations with John McDonald (Conaway 5/28/09, at Tr02381–82), the jury could have taken Conaway's words literally when in November 2001 he introduced McDonald to Kmart employees twice as being his "right hand person" for eight years at CVS and at Melville Corporation. (Plf. Exh. 318, November 12, 2001, at p. 6.) The jury could have concluded that throughout the period from the Schwartz August overbuy crisis through the November 27 analyst conference call, McDonald was the primary person at Conaway's right hand at each step and he was learning what his boss and benefactor wanted.

A central pillar of the Kmart response to the overbuy was to mask the fact that Kmart did not have the cash it needed to pay debts as they came due. As Treasurer, McDonald worked closely with Assistant Treasurer Mark Moreland and, like CEO Conaway, he knew the dire deficit predictions that Kmart faced if sales did not improve significantly from the prior year. Yet, McDonald churned out optimistic projections for the Board of Directors. It was he who prepared the Liquidity Forecast documents in the September Board Package. (Boyer 7/19/07, at TrDep00381.) He was also involved in the optimistic picture prepared for Kmart's bankers where McDonald made the September 10 presentation in tandem with Mr. Conaway showing comfortable liquidity for Kmart against its revolver. McDonald learned that even after 9/11 with its likely dire consequences for sales, the lesson from the leader was to cover up the liquidity crisis and its cause, even from the Board Finance Committee and other members of the Board to whom Conaway promised liquidity would be his number one priority. (Plf. Exh. 113.) Conaway wrote those words on September 20, just days after he met with McDonald and Moreland and gave his full support to the birth of Project SID. McDonald witnessed Conaway endorsing Project SID and its "hung up in processing" element that would keep vendors in the dark. (Plf. Exh. 11; Moreland 6/27/07, at TrDep00025–26.) The jury could conclude that at that meeting Conaway confirmed for both Moreland and McDonald the need for Project SID to be kept secret to prevent vendors from stopping shipments. (*Id.* at TrDep00026–27.) When Moreland indirectly raised the propriety of Project SID, Conaway and McDonald's comforted him chuckling "that such a scheme is done in every LBO." (*Ibid.*) Before leaving Mr. McDonald retrieved the " * * *Confidential* * * Project SID Process Overview" memo, which the jury could interpret as the effort of a loyal lieutenant to protect his boss in case the elaborate and deceptive scheme later came under critical scrutiny.

When Workbench was shut down, this also was a necessary step to blind vendors to the truth of Project SID. Later McDonald's Talking Points would falsely blame the Workbench shutdown as well as late payments to vendors on Project eLMO (Plf. Exh. 35), even though McDonald knew it was shut down due to the volume of calls from unhappy vendors to keep them in the dark. (Conaway 2/13/08, at TrDep00332.)

While there is no evidence McDonald read Conaway's November 13 letter to Sunbeam's Levin using the eLMO "hard lines and soft lines integration" excuse for late payment (Plf. Exh. 108), it is clear that McDonald knew the eLMO integration cover story which he used in response to the great number of calls he received. (Sabony 2/28/08, at TrDep00203–12; Beder 12/17/07, at TrDep00295; & Plf. Exh. 193A.) Mr. Mc-

Donald, on or about November 2, 2001, was called to Mr. Conaway's office to take notes on what became Talking Points. (McDonald 5/28/09, at Tr02645–46.) The jury could conclude that in detailing the creation of Talking Points to McDonald, Conaway was directing McDonald to fabricate a script based on the eLMO "cover story" for Kmart's merchants and accounts payable people to communicate to vendors. While testifying that he believed Talking Points was true and eLMO did cause vendor payment problems (McDonald 5/28/09, at Tr02657–58), the jury could conclude that Mr. McDonald, like Moreland, Gilbert, Archambeau and Kearse, knew that Kmart's cash shortage, AP System changes and Project SID were the causes of vendor payment delays and not Project eLMO. Indeed Moreland says it was McDonald who fabricated the "750,000 affected invoices" in Talking Points. (Moreland 6/27/07, at TrDep00087.)

The jury could also assume that McDonald read the lengthy November 8 New York Times article that questioned "Kmart's ability to pay off the money it owes," to which Mr. Conaway responded "Kmart is not short of cash." (Def. Exh. 23A, at p. 4.) The jury could conclude that Treasurer McDonald, who regularly met with Moreland and Gilbert on Project SID, knew the actual depths of Kmart's past due debt to its vendors, which involved over $700 million in early November (Plf. Exh. 289A.) Thus, the jury could have reasonably determine that both on November 8 and on November 2, Conaway was again reinforcing the lesson to subordinate

McDonald that it was okay to lie in order to cover for Kmart's liquidity crisis. Indeed, the jury could conclude that the lesson of the Conaway New York Times statement and his November 2 Talking Points directive to McDonald was that lies were the expected response of Kmart's executive officers to cover for the liquidity crisis and for the intentional delays in vendor payments.

While there is no evidence that CFO Boyer involved his Treasurer McDonald in preparing the November 8 Power Point presentation for CEO Conaway that raised the "[s]ignificantly negative-close to $500 million negative" cashflow dilemma and urged fuller discussion on Kmart's financing at the November 20 Board meeting to improve credibility with the Board (Plf. Exh. 97, at p. 22, JNB 000032), the jury could conclude that Mr. McDonald got a powerful message the next day from Conaway's firing of Boyer who, like McDonald, had been brought on at Kmart just months before. In addition to McDonald being promoted to Boyer's CFO position on November 9, the jury could conclude that McDonald learned how tentative the tenure of that position was if the occupant was not a "team player." [76]

The jury could conclude that McDonald received Conaway's November 14 Voice Mail to his Employees with its "[Kmart] couldn't be any healthier from a working capital standpoint"/"[w]e have great liquidity" assertions. (Plf. Exh. 318, Nov. 14, 2001.) [77] The jury could also conclude that McDonald knew Kmart was at the time

---

76. While one might also assume that Mr. McDonald would realize that Conaway could not possibly fire a second CFO without facing blistering Board and other scrutiny, the jury could conclude that there was nothing in the record indicating Mr. McDonald was as scrupulous as Boyer or a risk taker.

77. Conaway tells him employees:

The company couldn't be any healthier from a working capital standpoint and the realty is [ ] in fact all vendors are almost current. Within the next seven to ten days we will be a hundred percent current. We have great liquidity. We have some $250 million of excess in our credit revolver. . . .
(Plf. Exh. 318, Nov. 14, 2001 at 57.)

still nearly a billion dollars behind in vendor payments.[78] Thus, the jury could reasonably conclude that Mr. Conaway was again teaching McDonald that the executive officers at Kmart exaggerate or twist the truth when needed to cover Kmart's liquidity problems.

When the new CFO McDonald prepared the Board Package for the November 20 in person Board meeting, it reported an actual liquidity cushion of $97 million for the peak borrowing date of November 7, 2001, as opposed to the $158 liquidity cushion reported in the October Board forecast. (Compare Plf. Exh. 121, at CC–0096859 to Plf. Exh. 114, at p. 27, CC–0013601.) Again, this liquidity cushion was built on vendor payment delays of Project SID and the AP System changes and the liquidity cushion was not, as the Board understood, computed "after all of the payables were accounted for." (Stallkamp 5/18/09 at at Tr00745.) As noted above, the jury could find the total committed funds for past due accounts payables on November 7 to be a billion dollars—$700 million being held back on November 7 under Project SID in addition to the $300 million under the AP System changes. (Plf. Exh. 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163–64.) Thus, the jury could conclude that instead of the liquidity cushion of $97 million on November 7 that McDonald reported to the Board, Kmart was illiquid by nearly a billion dollars.

Once elevated to CFO, the jury could conclude that McDonald attended the November Board functions (Plf. Exh. 121 shows McDonald made a Board Presentation at that meeting), and McDonald likely witnessed Conaway's tardy disclosures to the Board about the unauthorized Schwartz August overbuy. He may also have witnessed Conaway's lie to the Board

about Project eLMO causing the vendor payment delays and Conaway's further lie to the Board that he had not been aware of the Schwartz overbuy in August, September or October.

With the November Board package preparation and the Board meeting completed, with the Board still in the dark about Project SID or about the AP System changes being done without vendor consent, and with the Board comforted by the eLMO "cover story," the jury could conclude that Mr. Conaway had reason for confidence that his new CFO had passed his first test as his "right hand person," proving he was a team player not likely to rock the boat with the Board or others on "credibility" issues and "significantly negative" cashflows as Boyer had threatened. The jury could conclude that Conaway needed no "one on one" with McDonald to be assured that the next critical documents to be prepared by McDonald—the 10–Q(3) and conference call script-would make no unwanted disclosures concerning how Kmart had maintained its liquidity in the third quarter of 2001.

The jury could assume Mr. Conaway, as CEO, surely had access to the 10–Q(3) prior to its filing on November 27, notwithstanding his denials of having seen it. Also, as note above, the third quarter 2001 Conference Call Book introduced by Plaintiffs (Plf. Exh. 242), which included a copy of the Form 10–Q(3), contains the final hand-corrected conference script actually used, whereas Defendant's Exhibits 115 and 138 do not contain either the final script nor the Form 10–Q(3). (Compare these exhibits to the actual conference call transcript, Plf. Exh. 57.) In my denial of Defendant's Rule 56 motion and his Rule 50(a) motion, I determined that before facing the questions of a critical audience in

---

**78.** Plaintiff's Exhibits 289A & 20 show $653 million in vendor borrowings under project SID on November 14 and an estimated additional $300 million in AP System borrowings from hardline vendors.

conjunction with the filing of the 10–Q(3), the jury could reasonably conclude that Mr. Conaway did review the MD & A of the 10–Q(3) to assure himself that nothing stated there was inconsistent with his understanding of what was or was not to be disclosed in the "LIQUIDITY AND FINANCIAL CONDITION" section. While that reasoning still stands, it is not necessary. Both of those rulings were made before hearing Kurt Eichenwald's statements that his studies of corporate fraud revealed the common motivating factor is not greed but arrogance.[79] Eichenwald's premise fits well the facts of this case. The jury could have concluded that Mr. Conaway, with an arrogance that comes with great power, was confident from his prior experiences with McDonald at Kmart and before, and in reviewing the conference call script that had been prepared by McDonald, that the MD & A in the 10–Q(3), like the script, revealed no Kmart secrets that Conaway and McDonald had been orchestrating for months, and the eLMO cover story was still viable for future use. The jury could find: that the conference call script and the Form 10–Q were prepared in tandem under McDonald's direction; and that Conaway could be certain that on an issue as central to the company as the liquidity crisis, the MD & A would not contradict the statements he would read to the investing public on the conference call.

Conaway knew McDonald had been a trusted ally at every step in the conception and execution of Kmart's response to the liquidity crisis and the means and lies needed to cover that up. Given Conaway's many lessons by example, including the importance of being a team player to survive at Kmart, the jury could reasonably conclude that Conaway knew the faithful McDonald would see to it that the Form 10–Q MD & A toed the party line and would not disclose Kmart's August overbuy, its negative impact on liquidity and the intentional delay in pay scheme in discussing how Kmart handled its liquidity in the third quarter of 2001.[80]

The jury could also note that trusted colleague McDonald took the lead in the conference call in introducing the false eLMO systems integration excuse, noting "[t]his system implementation did have some issues along the way." (Plf. Exh. 57. at p. 18.) Conaway later picks up on this:

> We've clearly [caused] some systems issues, as John mentioned. During our accounts payables conversion, certain invoices involved with the integration were dropped and [this] has clearly caused some confusion" and [a]lso, given the magnitude of [process], system and people changes, we will have other bumps in the road, illustrated by the Elmo conversion.

(*Id.* at 19 & 25.) The jury could also notice how eager, even obsequious, McDonald was during the call to help his boss complete sentences, for instance in Conaway's response to analyst Eric Beder who asked about vendor account payables.[81] It

---

**79.** Kurt Eichenwald, Author of The Informant, A True Story (Broadway Books 2000) National Public Radio, WEEKEND EDITION SUNDAY, September 20, 2009, "The Serious Story Behind The Informant," Liane Hanson Interview with Kurt Eichenwald. http://www.npr.org/templates/player/mediaPlayer.html?action=1&t=3&islist=true&id=10&d=09-20–2009, last visited September 20, 2009.

**80.** The jury, were it asked (which it was not), could find that the actions and examples of Mr. Conaway in dealing with Kmart's liquidity problem in the third quarter of 2001 sent a message to his "right hand person" McDonald that was far clearer that Henry II's lament, "Will no one rid me of this troublesome priest."

**81.** Eric Beder:

> And in terms of the vendors and the payables, what has been the, I guess-what has been the biggest problem with the vendors.

is McDonald who reiterates the false statements that "As of the end of the third quarter, our (peak) [borrowings] were approximately 1.4 billion which is comparable to last year. We continue to have ample liquidity under our credit lines, as well as cash on hand of greater than $300 million." (Plf. Exh. 57, at 16.) This was less of an exaggeration than Conaway's statement that day to his employees.[82]

At trial Mr. Conaway and McDonald both outlined the reasons they believed Kmart was not going to run out of money after the overbuy because of various methods they had available for raising cash—cutting future receipts, having clearance sales, borrowing against merchandise or real estate, laying off employees, delaying capital expenditures. (Conaway 5/27/09, at Tr02077–Tr02083; McDonald 5/28/09, at Tr02649–Tr02652.) Conaway chose not to pursue additional borrowing from banks because of the costs and because the overbuy problem was considered "self-inflicted" and in "six to ten weeks it would be over." (Conaway 5/27/09, at Tr02081 & Tr02127.) Yet, as McDonald acknowledged, that depended on sales. (McDonald 5/28/09, at Tr02648.) And even with a good Thanksgiving, sales did not materialize as hoped. Given the third quarter sales were below expectations,

down 2.2% from the prior year's third quarter, the jury could note that the "six to ten weeks" from early September, peaking in early November, actually ran well beyond ten weeks and into December with venders never fully paid up—not within $200 million. (Gilbert 5/13/09 at TR00464.) This was all known to McDonald and Conaway by the November 20 Board meeting. Thus the jury could conclude that what had begun as a self-inflicted problem that Conaway and his Treasurer McDonald though could be "managed" with SID grew to a billion dollar enterprise that Moreland noted was still not over when McDonald checked with him before the November 27th conference call. (Moreland 6/27/07, at TrDep00091.) By the time of filing the 10–Q(3) Conaway and McDonald no longer had the earlier option or the time for secured borrowing or any of the other options they had outlined as being available in September. Had Conaway chosen any of the alternatives, most of which were relatively public actions, Kmart might have overcome the third quarter liquidity crisis and would not have faced a disclosure problem in late November. But the decision made in September that was dependent on secrecy and deception, created a disclosure dilemma in November unless one accepts the defense theory that this

I—should—have they had problems understanding what's going on here or are they just, you know, just want to get paid, I guess, quicker?
(Plf. Exh. 57., at 28.)
Conaway:
 Well, I think we had—there was some clearly, Eric, some, you know, communication issues. And so, that was one piece. We didn't communicate as quickly as we should. And then, I think there is a—you know, there was a lot of noise from small group of suppliers.
McDonald: Yeah, (inaudible) those who were part of the 25 percent (inaudible)
Conaway:
 Yeah, I mean, you got to remember, we cut a quarter of our suppliers. So those people

aren't very happy with us. So other than that, that's it. I mean, we've, like we said, right now, systems fully integrated [a]nd its working fine....
McDonald:
 (inaudible) we've fully caught up at this point, as I said. And, you know, we've on our way. I don't see any further integration issues as relates to the—the vendors.
 *Id.* at 28–29.

**82.** Mr. Conaway stated: "We have 600—as we stand here today, we have 600 million dollars of borrowing capacity on our credit facility and 400 million dollars of cash. Right, John?" (Plf. Exh. 232 videotape)

was not a material liquidity event that required disclosure. The jury could conclude that both Conaway and McDonald realized in late November that to disclose in the MD & A or conference call either the overbuy and its accelerating the annual liquidity problems or to disclose Project SID and its intentional delay in vendor payments as a source of liquidity in the third quarter would expose their prior lies about why vendors were not being paid, and it would also expose their having kept the Board in the dark about how they were "managing" payables. These were the "credibility" issues that Boyer wanted to address and the jury could conclude got Boyer fired.

From the above review of the evidence in the light most favorable to the SEC, a jury could reasonable conclude that CEO Conaway taught McDonald well what was expected of him and could conclude that Conaway caused the three material omissions in the MD & A to be made by McDonald. (Dkt. 129, Claim One Questions 3, 4, & 5.) Coupling that with the jury's finding that the omissions rendered the MD & A misleading and that Mr. Conaway "acted with intent to defraud or with reckless disregard for the truth," which is discussed in a later section, these findings would support a finding that Mr. Conaway violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. (*Ibid.*)

 Because Rule 10b–5 b. makes it "unlawful for any person, directly or indirectly ... to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," it seems that if the SEC proves that an individual with scienter caused a statement to omit a material fact necessary to prevent the statement made from being misleading, that person causing the omission could be found liable for a Section 10(b) violation even if s/he did not "make" the statement that was rendered misleading because of the omission. While I have not found any cases on point, it seems inconceivable that if someone, with scienter, caused a material omission to be made in a statement filed with the SEC resulting in the statement filed being materially misleading, that person could escape securities fraud liability in an SEC enforcement action by a defense that "the 'statement' was 'made' by someone else, whom I got to leave out the material information that made the statement fraudulent." [83] As the defense points out, the cases cited by the SEC where an individual or entity was found indirectly liable under Rule 10b–5 b. all involved affirmative misstatements, not omissions, and thus each case addressed the conditions needed to find the defendant made the challenged misstatement. See discussion above on *City of Monroe Employees Retirement Sys., In re Kidder Peabody Sec. Litig., Warshaw, etc. cases.* While indirectly causing a material omission in a statement may be less common than indirectly causing an "untrue statement of material fact," there is no principled reason to exempt from liability the defendant who indirectly caused the omission of a material fact when the harmful consequences to the investing public are the same. Thus, because the jury in answering the Claim One questions 3,4, and 5 found with respect to each of the charged omissions that Charles Conaway: (i.) made the omission or caused the omission to be made; (ii.) the omission was material, (iii.) was necessary in order to make the Management Discussion & Analysis section of

---

**83.** Unlike a private securities fraud action, attribution and reliance are not required elements in SEC enforcement actions. *Compare Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir.1998) and *SEC v. First Jersey Securities,* 101 F.3d 1450, 1471 (2nd Cir. 1996).

the Form 10–Q, in light of the circumstances under which it was made, not misleading; and (iv.) that Charles Conaway acted with intent to defraud or with reckless disregard for the truth, these findings are sufficient to support their finding that Charles Conaway violate Section 10(b) of the Securities Act and Rule 10b–5.

### 2. Evidence that Charles Conaway Caused a Misstatement in the MD & A.

In addition to its findings on the alleged fraudulent omissions, the jury made further findings under Claim One Questions 1 and 2 with respect to the two alleged affirmative misstatements in the MD & A of he Form 10–Q:

> Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities.

and

> Inventory increased ... due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position.

(Plf. Exh. 209, at 13.)

With respect to each alleged misstatement the defense contends that the evidence is insufficient to uphold a the jury's finding that Charles Conaway made the statement or caused the statement to be made. In addition the defense argues that both statements are factually true, and thus the evidence is insufficient for a jury to find that either statement is materially misleading.

### a. Was there a Materially Misleading Statement ?

The first alleged misstatement:

> Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities.

(Plf. Exh. 209, at 13.)

■ Defendant notes that Assistant Treasurer Moreland testified that this statements was true as did defense expert Avram Tucker. (Moreland 6/27/07, at TrDep00124; Tucker 5/21/09, at Tr01561.) Mr. Tucker explained slow paying vendors was not a "source" (where you get cash) of working capital like income from sales or borrowings from banks, but rather a decision about how to spend the cash you have. (Tucker 5/21/09, at Tr01564.) While delaying vendor payments is related to liquidity and managing liquidity, it is not a "source" of liquidity. (Id. at Tr01565.) According to Mr. Tucker, Kmart's only sources of working capital were—as it stated in the MD & A—cash flows from operations (i.e., sales) and borrowings under its revolver and other credit agreements. Plaintiff's expert, Dr. Carmichael, defined sources of liquidity as "how and where do they get the cash to keep operating," giving the same two examples of cash from sales and bank borrowings that Mr. Tucker gave. (Carmichael 5/21/09 at Tr01406–07.) He later included in such sources of liquidity vendor payment delays as a material source of liquidity during the quarter. (Id. at Tr01438–39.) He did not express a specific opinion that the statement in Kmart's MD & A was false. Other witnesses suggested that adding days to payment terms were essentially extending the "loans" Kmart was getting from vendors. (Boyer 7/19/07, at TrDep00382; Moreland 6/27/07, at TrDep00011.) The defense argument is that slow pay is not a primary source of liquidity or working capital, and thus the challenged sentence cannot be found to be materially misleading.

Given the fact that this challenged misstatement on the primary sources of working capital is the first sentence in the MD & A's section on LIQUIDITY AND FINANCIAL CONDITION, and the fact that a jury could conclude that "working capital" and "liquidity" were often used at Kmart to mean the same thing[84]—cash

---

**84.** Referring to the Mr. Conaway's "signifi- cant progress on several of our working capi-

available for operating expenses—the jury could have reasonably considered this sentence to assert that Kmart's primary sources of liquidity in the third quarter were cash flows from operations and borrowings under its credit revolver.

█ Statements that are literally true can be misleading when the context in which they are made is considered.[85] This opening statement in the LIQUIDITY

AND FINANCIAL CONDITION section of the MD & A is the major statement focusing on how Kmart maintained its liquidity in the third quarter, but makes no mention of an exceptional undertaking involving slow pay that was essential to Kmart's liquidity.

The sentence read as part of that entire section could be found to imply that the company's ordinary operations and exist-

tal initiatives" in his October 12, 2001, letter, Board finance chair Stallkamp interpreted "working capital" to be a synonym for liquidity. (Stallkamp 5/18/09 at Tr00768, & Plf. Exh. # 71 & 180, p. 2.) In his September 20, 2001, letter to the Board promising that liquidity would be his number one priority, Mr. Conaway notes at the beginning that cancelling inventory receipts, new accounts payable terms and reducing capital expenditures will help ensure "liquidity" and later refers to these elements as components of "working capital." (Compare Plf. Exh. # 113 p. 1 with p. 3.) In his November 14, 2001, Voice Mail to his employees in nearly the same breath he boast "The company couldn't be any healthier from a working capital standpoint .... We have great liquidity." (Plf. Exh. 318, Nov. 14, 2001, at at 57.) Conaway's December 20, 2001, letter to the Board in the same paragraph refers to "our liquidity cushion" and "our working capital position" in back to back sentences. (Plf. Exh. 183, p. 2.) In cross examination at trial on Kmart possible approaches to dealing with its "liquidity problem" including the AP System changes and Project SID, Mr. Conaway was asked "And both intended to address the liquidity crunch during the third quarter of both of them?" to which he responded "Both of them a component of, yeah, managing our working capital plan during that." While noting "working capital" is current assets minus current liabilities, defense expert Tucker acknowledged that it is an important measure of liquidity" (Tucker, 5/21/09 at Tr01559, Tr01563 & Tr01566) Even Defendant's brief on the current motion refers to "liquidity (i.e., working capital)" in arguing why slow paying vendors was not a source of working capital. (Def. Brief Dkt. # 139, at 19.)

**85.** *McMahan v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990), re-

versed a district court's summary judgment noting:

We disagree with the district court's atomistic consideration of the presentation of the debenture holders' right to tender. The district court concluded that defendants had not misled plaintiffs because the information they included in the written and oral representations was "literally true". We think, however, that when read as a whole, the defendants' representations connoted a richer message than that conveyed by a literal reading of the statements. The central issue on all three claims is not whether the particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have mislead a reasonable investor about the nature of the debentures.

*See also SEC v. C.R Richmond Co.*, 565 F.2d 1101, 1106–07 (9th Cir.1977) (advertisements violated antifraud provisions of Investment Advisors Act because they were "deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of material fact was false."). *SEC v. Fitzgerald*, 135 F.Supp.2d 992, 1028 (N.D.Cal.2001):

A defendant's statements must be viewed as part of a mosaic to see if those statements, in the aggregate, created a misleading impression. The proper test is not the literal truth or the materiality of each positive statement, but the overall misleading impression that it combines to create.

(quoting *In re Genentech, Inc. Securities Litigation*, 1989 WL 106834 at *3 (N.D.Cal. 1989)). The court in *Genentech* explicitly rejected any requirement that plaintiffs in a securities fraud action "link every alleged omission to an affirmative statement and ... explain how the omitted fact caused the affirmative statement to be misleading." 1989 WL 106834 at *3.

ing credit revolver were the only primary sources of liquidity, and further that these two sources provided Kmart with enough liquidity to run the business in that quarter. A reasonable jury could find that Kmart's covert and unilateral slow pay initiatives of the AP System changes and Project SID, involving incremental "borrowings" from vendors of $1.09 billion on October 31,[86] were, as Dr. Carmichael testified, a material source of liquidity for Kmart in the third quarter of 2001. Given the fact that these "loans" from vendors, as Boyer and Moreland called them (Boyer 7/19/07, at TrDep00382; Moreland 6/27/07, at TrDep00011), were at their peak approximately 68% of the $1.6 billion credit revolver, a jury could reasonable conclude that they were a primary source of liquidity for Kmart in the third quarter of 2001. Given the largely undisputed evidence that this extraordinary slow pay system used in the third quarter of 2001 was different is scope and magnitude from any prior period at Kmart, the jury could find this to be a material change in sources of liquidity from any prior period at Kmart.

Part of the context for this sentence for investors and the jury is also Kmart's prior quarterly statement on liquidity. (Plf. Exh. 93.) When compared to the same section of the Form 10–Q(2), as the jury was invited to do in closing argument, the sentence could be read as indicating that during the third quarter of 2001 there had been no material change in the primary sources of liquidity from the prior quarter of 2001. (Compare Plf. Exhs. 93 with 209.) When read in light of Regulation S–K 303(b) requiring MD & A "discussion of material changes in those items specifically listed in paragraph (a) of this Item" as the jury was instructed (Instruction No. 21),

the jury could find that this sentence, read with that entire section on LIQUIDITY AND FINANCIAL CONDITION, implied there that during the third quarter of 2001 there had been no material change in Kmart's primary sources of liquidity from the annual report for prior "Full Fiscal Year[ ]." The jury in its Verdict Form under Claim One, Question 5 e., found the failure to "identify the delay in vendor payments as a material change in an internal source of liquidity during the third quarter of 2001" was a material omission. It cannot be said that Kmart's covert intentional slow pay scheme was so insignificant that no reasonable jury could have found it to be material. Rather the jury could reasonably find that disclosure of the unprecedented slow pay system would have significantly altered the total mix of information available to investors and would have been considered important to a reasonable investor in making an investment decision involving Kmart. Thus, considered in context, the jury could reasonably find the sentence "Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities" to be materially misleading without inclusion of the extraordinary slow pay system as a third source of working capital or liquidity in the LIQUIDITY AND FINANCIAL CONDITION section or elsewhere in the MD & A of the Form 10–Q(3).

■■■ The second challenged sentence is:

Inventory increased by $1,906 million during the first 39 weeks of fiscal year 2001 due to seasonal inventory fluctua-

---

**86.** Plf. Exh. 289 A shows $790 million on October 31, 2001, incremental borrowings from vendors by selecting certain invoices for 30 or more days delay under Project SID, and this figure does not include the additional estimated $300 million of incremental borrowings under the AP Systems changes. (Plf. Exh. 20.)

tions and actions taken to improve our overall in-stock position.

Plf. Exh. 209, at 13.

It was given to the jury in an abbreviated form:

Inventory increased ... due to seasonal inventory fluctuations and actions taken to improve our overall in-stock position. . . .

Jury Instruction No. 21 and Verdict Form Claim One Question 2.

Again, while the Schwartz overbuy may have obtained merchandise earlier than anticipated by Kmart's business plan, it was clearly obtained largely for the launch of BlueLight Always and thus to improve Kmart's overall in-stock position as much uncontested testimony demonstrated. (Moreland 6/27/07, TrDep00124 & TrDep00142; Kearse 5/20/09 at Tr01254; Stallkamp 5/18/09, at Tr00827; Conaway 5/27/09, at Tr02066–67.) Again Moreland and others testified that this sentence was a true statement. (Moreland 6/27/07, TrDep00124, Conaway 5/27/09, at Tr02240–41, Tucker 5/21/09, at Tr01548.) Defense expert Tucker demonstrated from an exhibit showing Kmart's weekly purchases for both 2000 and 2001 (Def. Exh. 1) that by the end of the third quarter (week 39), the decreases in purchases compared to the prior year for weeks 34–39 more than offset the excess purchases in the prior weeks 27–33 of that quarter which constituted the Schwartz overbuy. (Tucker 5/21/09, at Tr01538–40.) Defense Exhibit Number 1 demonstrates that by the end of the quarter Kmart had cut its receipts in weeks 34–39 by roughly $949 million from 2000 levels more than enough to offset the $839 million Schwartz overbuy for weeks 27 through 33. Kearse testified

the cuts in receipts did not off-set the overbuy (Kearse 5/20/09, at Tr01273–74.) Stallkamp testified and Kmart's November Board package shows that Kmart at the end of the quarter still had $600 million more inventory for the year than its plan. (Stallkamp 5/18/09, at Tr00795–96; Plf. Exh. 118, at CC–0096841.) Yet, that was the result of sales for the quarter being down 2.2%, or $180 million, as well as inventory being up $440 million for the full 39 weeks. (*Id.* at CC–0096835 & Plf. Exh. 198 at p. 2.) Defense Exhibit Number 1 on Kmart's purchases by week shows that the increase in inventory receipts over 2000 came from the first 26 weeks of 2001 and not the third quarter (weeks 27–29) which had $110 million fewer total receipts than in the third quarter of 2000.[87]

It is true that the Schwartz overbuy may have been a material liquidity event (moving up the peak borrowing date) as Dr. Carmichael testified, causing a material liquidity deficiency that Kmart remedied by slow pay of vendors (as well as reducing receipts). As a result, that overbuy, its effects and Kmart's response needed to be disclosed in the liquidity discussion of the MD & A in order to explain, in significant part, why Kmart had an unprecedented liquidity deficiency in that quarter, unlike prior quarters, so inventors could weigh whether this problem was likely to be repeated. Yet that "failing" of the MD & A was found by the jury in Verdict Form finding in Claim One Question 3 on the omissions—"that Kmart's Form 10–Q ... did not identify a known material liquidity event that occurred in the third quarter of 2001," which was the Schwartz overbuy. Nothing in that overbuy in weeks 27–33, which was offset in weeks 34–39, affected

87. In an August 17, 2001, letter to the Board of Directors, Mr. Conaway told the Board that the second quarter ended with $283 million more inventory than the prior year due in large part to efforts to improve in-stock position for his new BlueLight Always sales initiative. (Plf. Exh. 110.) The Form 10–Q(2) shows inventory increases of $457 million in the first 26 weeks of the fiscal year. (Plf. Exh. 93.)

the *purposes* of those increases in receipts for the first 39 weeks which were due to seasonal inventory fluctuations (i.e. build up inventory before the Thanksgiving and Christmas holiday season) and to improve Kmart's overall in-stock position for its BlueLight Always and other routine sales.

The SEC asserts this sentence is misleading because it implied the purchases were normal, made in the ordinary course of business ("seasonal inventory fluctuations") and that the inflated inventory balance at the end of the quarter was according to plan ("actions taken to improve our overall in-stock position.") Yet, in this 10–Q(3) Kmart omitted the adjective "normal" from "seasonal inventory fluctuations" that was in the 10–Q(2) (*Compare* Plf. Exhs. 93 with 209 or see compare copy of the 10–Q(2) and 10–Q(3) above in subsection II. B. 3.)

The first challenged sentence dealing with Kmart's primary sources of working capital being cash flows from operations and borrowings under its bank credit facilities could be found to imply that there is not a third primary source of liquidity. The jury could reasonably find that, contrary to the implication of this sentence, there was a third primary source of Kmart maintaining third quarter liquidity involving the one billion dollar slow pay scheme. Thus, the jury could find this sentence was materially misleading in suggesting that were only two, and not three, primary sources of liquidity in the third quarter of 2001. Yet, unlike this first challenged sentence, the second challenged sentence does not mask any third reason for why Kmart purchased $1.906 million more inventory in the first 39 weeks than in 2000. Nor does it touch on any topic for which it could be deemed a fraudulent half truth. Had the Schwartz overbuy of weeks 27–33 not been more than offset in weeks 34–39—e.g. had this inventory come in above plan in the final weeks of the third quarter causing the net inventory amount for the quarter to be inflated by those purchases—the SEC's argument would be stronger. But here we are dealing with the sum total of purchases for the first 39 weeks—which nets out the overbuy in weeks 27–33 with the reduced receipts in weeks 34–39. With the net receipts for the third quarter of 2001 being lower than third quarter of 2000, any increase in overall inventory as of October 31, 2001, is as much or more attributed to the 2.2% sales decline in the third quarter of 2001 (which is shown in Kmart's financials) and to increased purchases in the first 26 weeks of 2001 over 2000, than to Schwartz overbuy. Unlike the first challenged sentence that carries with it an implication that there is no a third primary source of working capital or liquidity, this second challenged sentence is not only factually true as far as it goes, but does not carry any false implication concerning liquidity or other matters that can be found materially misleading. Had I given the jury the full sentence instead of the fragment, their determination might have been different. Whether that is the case or not, this finding as a basis for the Section 10(b) liability under Claim One and Claim Two should be vacated as not supported by sufficient evidence.

This is not to say that looking to the "LIQUIDITY AND FINANCIAL CONDITION" section of the MD & A as a whole, and comparing it to the MD & A for the second quarter of 2001, and comparing it to the material liquidity crunch in the third quarter, its cause and the extraordinary slow pay means used, in a substantial part, to deal with it, that the jury could not find the MD & A to be materially misleading as a whole in that it implies nothing significant with respect to liquidity occurred in the third quarter of 2001 compared to the second or other prior quarters. But again, that failing of the MD & A was found by the jury in Verdict Form

Claim One Questions 2. 3. and 4. when it found each of three omissions were necessary to be disclosed in order to make the MD & A not misleading. As noted above, that jury finding can be upheld with or without consideration of Item 303 of Regulation S–K.

### b. *Did Conaway Cause the Misstatement?*

 Considering the other argument of Defendant that no jury could reasonably find that Mr. Conaway caused these misstatement to be made, this and the above sufficiency argument on the second alleged misstatement, are the Defendant's arguments causing me the greatest pause. Viewing the evidence in the light most favorable to the SEC, how is it that a jury could be allowed to find that Mr. Conaway indirectly caused the "primary sources" misstatement to have been made?

The jury could conclude that McDonald, from the behaviors and decisions made by Conaway, knew that in addressing liquidity in the " "LIQUIDITY AND FINANCIAL CONDITION" section of the MD & A, as a team player, he was to continue the Conaway inspired coverup of: (i.) any material liquidity event such as the Schwartz overbuy occurring in the third quarter of 2001; (ii.) any material deficiency caused thereby, and (iii.) the extraordinary steps taken to maintain liquidity in the delay in vendor payments through the AP System changes and Project SID. While reductions in new receipts in October offset the Schwartz overbuy of August and early September, the decline in sales of $180 million or 2.2% for the quarter (down 1.5% for comparable stores) (Plf. Exh. 121, at CC–0096831 & CC–0096834 & CC–0096836; Def. Exh. 5, at CC–0577229), and additional receipts from he first 26 weeks of he fiscal year left CFO McDonald with inventories up $440 million or 5.6% above the prior year (Def. Exh. 5, at CC–0577230) and $600 million over plan (Plf. Exh. 121, at CC–009641–42). Kmart also had an increase in long term debt due within one year (i.e. the 365 day credit revolver) of $183 million or 62%) over the prior year and an increase in accounts payable of $718 million up 28% from the $2.56 billion the prior year. (Def. Exh. 5, at CC–0577230.) With the dramatic increase in inventory and borrowings under the credit revolver and from vendors through the AP System changes and Project SID (i.e. the $718 million increase in accounts payables), Mr. McDonald had to discuss Kmart's liquidity in the MD & A "to give the investor an opportunity to look at the company through the eyes of management." [88] Yet, the jury could conclude that Mr. Conaway had created an atmosphere where it was clear to Mr. McDonald knew that his CEO did not want disclosed a major source of Kmart's remaining liquid in the third quarter of 2001—the extraordinary slow pay methods McDonald and Conaway devised and implemented to manage Kmart's liquidity or working capital.

If McDonald were looking for guidance on how to deal in the MD & A with Kmart's dramatic increases in revolver borrowing and in accounts payable in the third quarter of 2001 and how to describe Kmart's liquidity or working capital situation without offending the CEO, he might look to the Form 10Q-(2) that CEO Conaway had signed on August 21, 2001. (Plf. Exh. 93, at p. 10 & 14). The jury was invited by Plaintiff's counsel in closing to look at that document and compare it to the 10–Q(3). (Plf. Exh. 209, p. 13.)

The "LIQUIDITY AND FINANCIAL CONDITION" sections of Form 10–Q(2) and Form 10–Q(3) both began:

---

**88.** Securities Act Release No. 6711 (April 24, 1987) [52 FR 13715] at 13717.

Our primary sources of working capital are cash flows from operations and borrowings under our credit facilities.

Thus, the jury could find that the "primary sources" statement is identical to the MD & A statement Mr. Conaway made and signed the prior quarter. While a similar sentence may well be found in many prior Kmart MD & As, they were not put in evidence, nor is there any suggestion that such a sentence was misleading in any prior quarterly report. The only MD & A the jury had to compare to that prepared under, approved by and signed by McDonald in November 2001 was the August 2001 MD & A prepared under, approved by and signed by Mr. Conaway. The jury could reasonably conclude that "team player" McDonald, in determining what words to use in describing Kmart's liquidity without the risk of offending his boss, decided to use his boss's very own language from the MD & A in the Form 10–Q(2). To paraphrase *In re Kidder Peabody Sec. Litig.* "[w]hen [Kmart] opened its mouth regarding [liquidity in the Form10–Q(3) MD & A], [Conaway's] words came out." [89] Thus, viewed in the light most favorable to the SEC, there is sufficient evidence for a jury to find that Mr. Conaway caused the alleged misstatement to be made.

**E. Were the Conference Call Statements of Mr. Conaway violations of Section 10(b) and Rule 10b–5.**

■ The defense also challenges the sufficiency of the evidence to uphold the jury's verdict on the two challenged statements from the November 27, 2001, analyst conference call. The first was Mr. Conaway's statement, "We've clearly caused some systems issues, as John [McDonald] mentioned. During our accounts payable conversion, certain invoices involved with the integration were dropped and has clearly caused some confusion." (Jury Instruction No. 21; Plf. Exh. 57 at 20) The second alleged misstatement was in response to an analyst Eric Beder's question, "And in terms of the vendors and the payables, ... what has been the biggest problem with the vendors?" to which Mr. Conaway responded "... And then, I just think there is a—you know, there was a lot of noise from a small group of suppliers." (Plf. Exh. 57 at 28–29.)

Defense counsel argue that there was no evidence adduced at trial that the challenged statements were material, or that they were made with fraudulent intent. They note that first challenged statement regarding invoices being "dropped" was drawn from the conference call scripted remarks that were vetted by the Chief Financial Officer McDonald, General Counsel, Controller, head of investor relations, other attorneys, accountants, financial professionals, outside auditor, and all of the Company's Executive Vice Presidents. They note others indicated that eLMO caused invoice problems. Defense argues that Mr. Conaway's statement about "a lot of noise from a small group of suppliers" is so vague and non-specific as to be immaterial as a matter of law. *See City of Monroe Employees Ret. Sys.*, 399 F.3d at 669 ("federal courts everywhere have demonstrated a willingness to find immaterial as a matter of law ... statements that are so vague, [and] so lacking in specificity ... that no reasonable investor could find them important to the total mix of information available") (internal quotation omitted).

These statements cannot be evaluated in isolation from the surrounding facts and circumstances to which they relate. The jury could reasonably understand that Mr. Conaway and McDonald, while acknowledging certain sales and other negative

---

**89.** *In re Kidder Peabody Sec. Litig.*, 10 F.Supp.2d at 407.

information in the conference call that could not be masked, wanted to release the Form 10–Q(3) without disclosing the severity of the liquidity crisis in the third quarter, and without disclosing the magnitude of the extraordinary slow pay system they had initiated. While vendor payment delays were widely known, and inside Kmart and possibly in the press the "secret" of Kmart's unilateral action may have begun to unravel and was suspected by skeptics, the jury could find that Conaway and McDonald—in their own actions and in their devising Talking Points in early November and in their November 27 remarks—were still trying to blame the bulk of the vendor complaints either on Project eLMO or on the 25% of the Kmart vendors with whom Kmart stopped doing business which was an added "excuse" for vendor complaints by November 27. Again, the jury could reasonably find that Project eLMO was "definitely not" the reason vendors were not being paid (Kearse 5/20/09, at Tr01206–07; Gilbert 5/13/09, at Tr00505–56; Archambeau 5/13/09, at Tr00502 & Tr00505–06; Moreland 6/27/07, at TrDep00087). The jury could further find that Mr. Conaway and McDonald, like Messrs Kearse, Moreland, Gilbert and Archambeau, knew this and that any eLMO vendor payment problems were "very isolated" if they existed at all. (Archambeau 5/13/09, at Tr00505.) There was not introduced into evidence even one documented vendor invoice payment delay caused by Project eLMO, and the computer conversion according to Archambeau and Gilbert had no effect on hardlines vendors that made up Kmart's largest group of vendors.[90]

As noted before, as least two individuals on the conference call, analyst Eric Beder and factor Maurice Sabony, were interested in Kmart's liquidity given the negative rumors and bad press. (Beder 12/17/07, at TrDep00276; Sabony 2/28/08, at TrDep00212–13.) Both were familiar with the eLMO systems story line prior to November 27. (Beder 12/17/07, at TrDep00282; Sabony 2/28/08, at TrDep00200–09.) In conference call preview notes Mr. Beder prepared for his investment clients the day before the conference call, he outlines that the "Conference call must be forum to put to bed continued stream of negative rumors and bad press." (Plf. Exh. 174, p. 1; Beder 12/17/07, at TrDep002876.) He also referenced the "newspaper reports questioning the financial stability of the company." (*Id.* at TrDep002877.) His notes state:

> With the continuing uncertainty in the retailing sector, the turnaround story at Kmart has become muddled, as declining comps, a poorly time CFO replacement, a stream of bad press and a string of rumors have served to shake investor confidence in the continuing turnaround at the company.

(Plf. Exh. 174, p. 1.)

Mr. Beder knew that it was these issues regarding Kmart's lack of liquidity that

---

**90.** Defense counsel point to other disclosures by Conaway earlier in the conference call noting that "[a]t the end of the third quarter, we increased the number of vendors participating in Elmo from 30 to 230 ...." (Plf. Exh. 57 at 4.) They argue that Mr. Conaway made clear in this statement that eLMO could only affect 1–2 ½% of Kmart's 5,000–7,000 vendors. (Conaway 5/27/2009, at Tr02219–20.) It would take a very sophisticated listener to tie this passing reference on page 4 of the conference call script to either Mc-Donald's statement on eLMO implementation issues on page 18 or Conaway's accounts payable integration/dropped invoices statement on page 20 of the script. Indeed, McDonald, who was responsible for the conference call script (Conaway 5/27/09, at Tr02214) may not have recognized the implications of this early reference to the credibility of his Talking Points which clearly used eLMO as the sole excuse for delays in vendor payments.

Mr. Conaway was referring to when he stated:

> Now that John has reviewed the progress we made on working capital, I want to review some facts so everyone is clear and we can eliminate any misinformation that's clearly been circling in the marketplace.

Plf. Exh. 57, at p. 19; Beder 12/17/07, at TrDep00283.

The second of Mr. Conaway's five points in this review was the first challenged statement and a reference to the vendors that Kmart had cut:

> We've clearly caused some systems issues, as John mentioned. During our accounts payable conversion, certain invoices were dropped and has clearly caused some confusion. This was magnified by eliminating a quarter—that's right, a quarter, 25 percent of our entire vendor base. This has been corrected and it's working as planned.

Plf. Exh. 57, at p. 20.

Mr. Beder understood the "systems issues" referred to by Conaway and McDonald was the alleged problems with Project eLMO. (Beder 12/17/07, at TrDep00282 & 00284–85.) Mr. Beder asked his question about "vendors and payables" in order to get a further confirmation concerning the rumors on why vendors were not getting paid. (*Id.* at TrDep00286–87.) The full response was:

> Mr. Conaway: Well, I think we had—it was some clearly, Eric, some, you know, communication issues. And so, that was one piece. We didn't communicate as quickly as we should. And then, I just think there is a—you know, there was a lot of noise from a small group of suppliers.
>
> McDonald: Yeah (inaudible) those who were part of the 25 percent (inaudible)"
>
> Conaway: Yeah, I mean you got to remember, we cut a quarter of our suppliers. So those people aren't happy with

us. So other than that, that's it. I mean, we've, like we said, right now, systems fully integrated [a]nd it's working fine.

> McDonald: (inaudible) we're fully caught up at this point, as I said. And, you know, we're on our way. I don't see any further integration issues as relates to the—to the vendors.

Def. Exh. 57, at 29.

Mr. Beder understood Mr. Conaway's answer as indicating the problem with vendors related to those vendors Kmart had cut and to those whose payments were delayed due to the eLMO conversion and this latter problem had not been adequately communicated to the vendors. (Beder 12/17/07, at TrDep00287–88.) Mr. Beder stressed the importance of what management says. (*Id.* at TrDep00269–70.) Based on these answers Mr. Beder thought Mr. Conaway "squarely address the issues" causing him concern, Kmart's liquidity was okay going forward and the late payments problems due to eLMO "were gone." (*Id.* at Supp.1996–89.) Because the eLMO problem was resolved, he did not mention it in his analyst report written the next day after reading the MD & A and listening to the conference call. (*Id.* at Supp.1996–92.) That report maintained a "buy" rating for Kmart stock and noted that the "Conference call was the key focus.... Investors were squarely focused on the conference call which was intended to provide further guidance on the most ambitious turnaround ever attempted in retailing." (Plf. Exh. 175, at 1; Beder 12/17/07, at TrDep00294.)

Mr. Beder was asked:

> Q. And if Mr. Conaway and Mr. McDonald had indicated that Kmart was intentionally slow paying its vendors without their consent, would you have included that information in your November 28th note?
>
> A. Yes.

Q. And why?

A. It's material. It goes to the heart of how effectively they can turn around the company and whether they have the liquidity to do it.... [Liquidity] goes to the heart of whether they can get goods on the shelves and operate their business.....

Q. So, in your—so, if a company is unable to pay its bills on time, that is something you believe to be important?

A. Yes. It's a major negative.

*Id.* at TrDep00294–95.

The jury could determine that Mr. Conaway's "We've clearly caused some systems issues" statement was a conscious misrepresentation continuing to push the false eLMO excuse for the vendor late payments that Mr. McDonald had introduced in his earlier conference call remarks and which Kmart's merchants and accounts payable personnel had been pushing to the vendors for a month with Talking Points. The jury could determine that the "lot of noise from a small group of suppliers" was the second "excuse" he and McDonald were pushing to explain vendor complaints and mask the real reason for most vendor complaints.

The defense argues this "lot of noise" statement was an impromptu answer to an unanticipated question and thus should be held to a less demanding standard than a prepared statement. Mr. Conaway got a jury instruction on that so it could be argued in closing. (Jury Instruction No. 24.) Yet, the jury could reasonably have rejected this argument because they could find that it was highly anticipated that Conaway might be asked about complaints over late vendor payables given the ru-

mors "circling in the marketplace," as Mr. Conaway noted, and the adverse press speculation. The jury could also note that the answer was hardly "impromptu" in that it was a summary repetition of Mr. Conaway's scripted second point to what was "circling in the marketplace"—poor communications with vendors over the eLMO problems and 25% of Kmart's vendors got cut.[91]

The defense notes that these scripted remarks were reviewed by many executives, general counsel and the outside auditor with no cautions or suggested corrections. Yet, the jury could conclude this was not a certification of the script's accuracy for three reasons. First, other than McDonald who took the lead on the preparing the script (Conaway 5/27/09, at Tr02214), there is no clear showing that any of the others reviewing it were privy to the nature and scope of the slow pay system nor privy to what the jury could conclude was the illegitimate birth of Talking Points and the fabrications about Project eLMO. Cecil Kearse, who was privy to both, was apparently not on this review team. Thus, the jury could reason that if the true nature and magnitude of the slow pay scheme and the truth about eLMO not being the real cause for the "noise" from vendors was kept from Kmart's Board of Directors, it was likely the true nature and magnitude of slow pay and the truth about eLMO was kept to a "very limited" number of people as Moreland said about SID. (Moreland 6/27/07, at TrDep00026.) In house counsel and Kmart's outside auditor might know nothing more on this issue than Kmart's Board of Directors. Second, the wide-spread use of the fabricated eLMO "cover story" with Talking Points

---

**91.** Compare the quoted portion in the text (Def. Exh. 57, at 29.) with:

We've clearly caused some systems issues, as John mentioned. During our accounts payable conversion, certain invoices were dropped and has clearly caused some con-

fusion. This was magnified by eliminating a quarter—that's right, a quarter, 25 percent of our entire vendor base. This has been corrected and it's working as planned. Plf. Exh. 57, at p. 20.

and other repetitions by Conaway, Mc-Donald and others may have given it a "life of its own"—causing it to be believed by others, such as those reviewing the conference call script, who had no reason to question it. While eLMO apparently did generate an erroneous purchase order, there is no evidence this was not caught before the merchandise was received, nor is there any documented showing of even one softline invoice payment being delayed due to eLMO.[92] The third reason the jury might not take silence of the reviewing audience of the November 27 script as a certification of its accuracy was the possible chilling effect the precipitous firing of CFO Boyer had on others who might fear taking any actions that might brand them as not being a "team player."

As to evidence supporting the materiality of these two "covers" for the primary reason for vendor discontent, the jury needed nothing more than the testimony of analyst Eric Beder who noted the centrality of liquidity and a company's ability to pay its bills on time to Kmart's turnaround chances. The jury could also conclude that by November 27, 2001, any tardy disclosure of the AP System changes or Project SID—or disclosing an inability to pay your bills on time—would be a, as Beder testified, a major negative regarding Kmart's liquidity, likely causing a disruption in vendor shipments and a greater decline in stock prices than the 11% drop that occurred without this disclosure. Thus, the jury could conclude that these two "cover" stories were material in the total mix of information available to the investing public because they were presented repeatedly to give comfort to those skeptical about Kmart's having sufficient liquidity to meet its expenses and to mask the "major negative" truth that throughout most of the third quarter of 2001 Kmart

did not have enough liquidity to pay its bills on time without stretching vendors and lying about it.

While Mr. Conaway and Kmart in August and September of 2001 might have pursued alternative means of paying its bills other than the extensive slow pay scheme chosen, this does not negate the materiality of the real course of action that they did pursue, nor the materiality of deceptive statements made to mask the truth and quiet the skeptics. The information being hidden was not otherwise available in the total mix of information other than in unconfirmed rumors. And instead of confirming the truth of those rumors, Mr. Conaway's admitted in his prepared remarks that his goal was to discredit those rumors and to "eliminate any misinformation that's clearly been circling in the marketplace." In that conference call, including his responses to Eric Beder's question, Mr. Conaway was successful in satisfying Mr. Beder that the vendor complaints were only from two sources, and the eLMO part was remedied. In reliance on Mr. Conaway's reassurance, Mr. Beder maintained his "buy" recommendation. The jury could reasonably have concluded that Mr. Beder's recommendation would have been different, or at least highly qualified, had Mr. Conaway in the conference call not been successful in his continued deceptions. Thus, there is sufficient evidence that each of the statements, considered in context, was material and misleading.

## F. Evidence in the Record Supporting the Jury's Conclusion that Conaway Acted with Scienter.

 *Scienter* is a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, 96 S.Ct. 1375, 47

---

**92.** Again, the undisputed evidence is that the eLMO conversion had no adverse effect on

hardline vendors who were already in the system.

L.Ed.2d 668 (1976). "Recklessness" satisfies the scienter requirement in the Sixth Circuit. *PR Diamonds, Inc. v. Chandler,* 364 F.3d 671, 681–82 (6th Cir.2004); *In re Comshare Inc. Secs. Litig.,* 183 F.3d 542, 550 (6th Cir.1999); *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985); *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1024 (6th Cir.1979). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known it." *PR Diamonds,* 364 F.3d at 681 (quoting *Mansbach,* 598 F.2d at 1025).

 Defense argues that Mr. Conaway had absolutely no reason to believe that Kmart's MD & A disclosures were not complete and accurate. (Defense Memorandum, Dkt. #139 at 20.) While acknowledging he was CFO at CVS and Melville Corporations, he contends he was not primarily responsible for public disclosures. (*Id.* at 20–21.) At Kmart he asserts he had reason to rely on the Disclosure Committee that prepared the Form 10–Q(3). (*Id.* at 21.) Relying in part on testimony from his expert Avram Tucker that the liquidity issue caused by the overbuy was over by November 27,[93] he argues that it was far from "obvious" that Kmart needed to discuss the liquidity crunch caused by the inventory overbuy and actions taken in response. He argues that because the SEC expert and defense expert disagree over whether there was a material liquidity event and deficiency in the third quarter of 2001, his actions were at most negligent, and not reckless or intentional.

Had the defense demonstrated that members of the Disclosure Committee, other than CFO McDonald, knew the true nature and extent of the slow pay scheme of the AP System changes and Project SID, this argument might have carried more weight with the jury. Similarly, had a legal or accounting expert—fully informed about the underlying facts-given an opinion before November 27, 2001, that the disclosures were adequate, that also might have had a greater impact on demonstrating Mr. Conaway's good faith belief than did a hired litigation consultant firm whose team was paid several hundred thousand dollars for its after the fact opinion. While Mr. Conaway denied knowing what was in the MD & A, or had he known, he denied knowing it was not legally adequate, the jury could have rejected this portion of his "maximum feasible deniability" defense. As a MBA from one of the nations leading business schools, and as former CFO of Melville Corporation and CVS who admitted knowing liquidity needed to be discussed in the MD & A (Conaway, 5/28/09, at Tr02402–03), the jury could reasonably assume that Mr. Conaway knew, or was reckless in his stubborn refusal to acknowledge, that Kmart's liquidity discussion in its MD & A for the third quarter could not cavalierly ignore the most significant liquidity crisis in Kmart's history, its causes and the various means of dealing with it. The jury could reasonably conclude that while the Schwartz August overbuy had been off-set by reduced October purchases, that overbuy had moved up Kmart's peak borrowing date and precipitated an unprecedented material liquidity crunch which was aggravated by 9/11 and other negatives affecting sales, leaving Kmart with an inventory glut and a billion dollar backlog of overdue vendor bills at the end of the third quarter.[94] The jury

---

**93.** As noted above the cut in receipts in October more than offset the Schwartz overbuy of August as September. (Def. Exh. 1.)

**94.** Moreland's Project SID Master Tracking Document shows $790 million overdue invoices on October 31, 2001, in addition to the $300 million under the AP System changes.

could conclude that this liquidity crisis was not resolved in the third quarter, nor by November 27, and conclude further that it would be obvious to any fair minded CEO that an appropriate discussion and analysis of Kmart's liquidity in the third quarter of 2001 would include the causes and the means of dealing with this unprecedented liquidity crisis including Kmart's unparalleled slow pay system. The jury could conclude that Mr. Conaway knew of the problem, its cause and Kmart's means of dealing with it, and further knew, or was reckless in not knowing, that these material facts needed to be discussed in the liquidity portion of the MD & A. The jury could also find that Mr. Conaway took multiple and decisive steps, including repeated deceptions, to assure that these disclosures were not made. The jury may properly regard the Defendant's extensive pattern of deception, and his discharge of CFO Boyer who repeatedly raised with him Kmart's enormous backlog of overdue invoices, as evidence that he intended to deceive the investing public in the Form 10-Q's MD & A and on the conference call. *In re Qwest Comm. Intern. Sec. Litigation*, 387 F.Supp.2d 1130, 1147 (D.Colo. 2005). Even if the jury were to credit Conaway's story that he never considered whether he was required to disclose Kmart's liquidity crisis, the jury could well find this level of detachment to be "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *PR Diamonds*, 364 F.3d at 681.

█ Similarly with regard to the conference call, the jury could reasonably conclude that McDonald and Conaway in their prepared statements and handling of Eric Beder's question wanted, by indirection, to deflect attention from the adverse press rumors and that they both used the eLMO excuse and 25% of disgruntled discontinued vendors as the two pronged cover story to masks the depths of Kmart's liquidity problems in the third quarter. These two "cover stories" that Conaway highlighted helped him and Kmart to discredit the rumors and hide the real reason for the bulk of the "noise" from the vendor base, which Mr. Boyer told Mr. Conaway a month earlier was from "past due invoices" exceeding $800 million because of Project SID. (Plf. Exh. 76.) Mr. Conaway acknowledged that his conference call remarks were to discredit the rumors and "eliminate any misinformation that has been circling in the market place," The jury could conclude that those rumors were true and not "misinformation," and conclude further that Conaway's efforts to counter or eliminate them was a conscious effort to mislead his conference call audience. The jury could conclude these two "covers" were important deceptions as part of the larger deceptions Conaway and McDonald had been orchestrating for months culminating in the misleading and incomplete MD & A, and that such a consistent pattern of deception was evidence of intent to deceive, manipulate or defraud in the conference call.

### G. Conaway Aided and Abetted Kmart's Fraud and Disclosure Violations.

█ Under Sixth Circuit case law, "a person may be held as an aider and abettor only if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *SEC v. Washington Co. Util. Dist.*, 676 F.2d 218, 224 (6th Cir.1982) (citing *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir.1974)).

(Plf. Exh. 289A and Plf. Exh. 20; Moreland 5/23/09, at TrDep00163–64.)

■ For reasons noted above, there is evidence to support the jury's finding that Kmart violated Section 10(b) of the Exchange Act and Rule 10b–5 b., and further that Kmart violated Item 303(b) of Regulation S–K, and thus Section 13(b) of the Exchange Act and Rules 12b–20 and 13a–13. There is also sufficient evidence for the jury to find that Conaway was aware that his role in concealing Kmart's liquidity crisis and slow pay from the investing public was "part of an overall activity that [was] improper." *Washington Co.*, 676 F.2d at 225. In making this determination, the Sixth Circuit has held that "the surrounding circumstances and expectations of the parties are critical." 676 F.2d at 226. Where a defendant "conducts a transaction of an extraordinary nature, less evidence of his complicity is necessary." *Id.* (citing *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95–96 (5th Cir.1975)). The jury could find the implementation and magnitude of Project SID and the Talking Points cover story were extraordinary events unprecedented in Kmart's history.

The record supports a conclusion that Conaway provided "substantial assistance" to Kmart in the commission of the fraud and in the MD & A inadequacies, and his assistance "was knowingly rendered." *Washington Co.*, 676 F.2d at 226–27. From beginning to end, Conaway was at the center of Kmart's response to the liquidity crisis. Conaway approved the vast program of delaying payments to Kmart's vendors in a manner that would appear to have invoices "hung up in processing." (Moreland 6/27/07, at TrDep00087.) He also approved the Project eLMO cover story and used it repeatedly to mislead Kmart's Board of Directors, employees and the investing public about the true source of vendor payment delays. Based on this evidence, the jury could conclude that Conaway was the driving force behind the fraud in its inception, and in the lies and nondisclosures that perpetuated it. Thus, there is sufficient evidence for the jury to find that Mr. Conaway knowingly and substantially assisted Kmart in its violations of Section 10(b) and 13(a) of the Exchange Act.

## IV. CONCLUSION.

Because Mr. Conaway's statements in the conference call, when viewed in the total context of that conference call and his involvement in Kmart's response to the liquidity crisis precipitated by the Schwartz overbuy, including the misrepresentations made by him and others with his knowledge, acquiescence or approval, there is sufficient evidence to uphold the jury's finding of his primary liability on Claim One based on these Conference Call misrepresentations alone. Thus, there is sufficient evidence to upholding the jury's ultimate verdict on Claim One even without the separate jury findings that Mr. Conaway caused the misstatement and omissions in the MD & A of the Form 10–Q(3). This is not a retreat from the analysis in subsections II.D. Land 2.b. above that there is sufficient evidence to uphold the jury findings that Mr. Conaway caused the misstatement and omissions in the MD & A of the Form 10–Q(3).

For reasons stated above, neither primary liability of Defendant Conaway under Section 10(b) of the Exchange Act nor aiding and abetting liability of Defendant Conaway under Section 10(b) or Section 13(a) of that Act can be imposed based on the Verdict Form findings on Claim One Question 2. and Claim Two Question 1.b. The jury's findings on Verdict Form Claim One Question 2. and Verdict Form Claim Two Question 1.b. are vacated as not supported by sufficient evidence. Even with these findings of fact vacated there remains sufficient evidence to uphold the jury's findings of primary liability of Mr.

Conaway on Claim One and of aiding and abetting liability of Mr. Conaway on Claims Two and Three. Thus, all other findings of the jury are upheld as is Defendant Conaway's liability under Claims One, Two and Three. Other than noted with respect Verdict Form findings on Claim One Question 2. and Claim Two Question 1.b., Defendant's motion under Rule 50(b) for judgment as a matter of law or, in the alternative, under Rule 59 for a new trial, is DENIED.

So Ordered.